Bradley J. Glass (022463)
Stuart S. Kimball (026681)
Kenneth N. Ralston (034022)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000
Facsimile: (602) 530-8500
Email: brad.glass@gknet.com
stuart.kimball@gknet.com
ken.ralston@gknet.com
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MORELAND PROPERTIES LLC, a Colorado Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio Corporation, and GOODYEAR FARMS, INC., an Arizona Corporation, <br><br> Defendants. | No. 20-02297-SRB <br><br> **AMENDED COMPLAINT** <br><br> **(Assigned to the Honorable Susan R. Bolton)** |

Plaintiff Moreland Properties LLC's ("Moreland") alleges the following as its Complaint against Defendants Goodyear Tire and Rubber Company ("Goodyear") and Goodyear Farms, Inc. ("Goodyear Farms") (together, "Defendants").

**PARTIES AND JURISDICTION**

1.  Plaintiff Moreland is a Colorado limited liability company doing business in Maricopa County, Arizona.

2.  Defendant Goodyear is an Ohio corporation doing business in Maricopa County, Arizona.

3.  Defendant Goodyear Farms is an Arizona corporation doing business in Maricopa County, Arizona.

4. All actions and conduct forming the basis of this litigation have occurred in Maricopa County, Arizona.

5. The property at issue is located within Maricopa County and is currently a vacant property at the northwest corner of McDowell Road and 159th Avenue, Maricopa County, Arizona (the "Site").

6. This action arises under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as well as A.R.S. § 49-285. Alternatively, this action arises under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367(a) (same case or controversy) and 42 U.S.C. § 9613(b) (Section 113(b) of CERCLA).

8. Venue lies in the Phoenix Division of the United States District Court for the District of Arizona pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. §§ 9607(a) and 9613(b). The claims asserted in this Complaint arose in Maricopa County, Arizona; the releases and threatened releases of hazardous substances have occurred in Maricopa County, Arizona; and the response costs were incurred in Maricopa County, Arizona.

9. Pursuant to Section 113(l) of CERCLA, 42 U.S.C. § 9613(l), Moreland is providing copies of this Complaint to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency contemporaneously with the filing of this Complaint.

**Factual Background**

10. Upon information and belief, Goodyear has owned thousands of acres of various properties in Arizona since 1916, including the currently vacant Site.

11. Upon information and belief, Goodyear owned and operated its properties, including the Site, through wholly-owned subsidiaries that have been entirely owned and controlled by Goodyear.

12. Upon information and belief, Goodyear owned and operated its properties, including the Site, through its subsidiary Southwest Cotton Company since the 1910s. Southwest Cotton Company's name was changed to Goodyear Farms in 1943.

13. On behalf of and at the direction of Goodyear, Goodyear Farms leased the Site from approximately 1974 until June 1988 for use as an aerial pesticide and herbicide application airstrip with various associated operations, including, but not limited to, a hangar for fueling and maintenance facilities, a pesticide/herbicide mixing and storage area, and two burn areas.

14. Aircraft from the Goodyear property applied insecticides and defoliants consisting of organochloride and arsenic compounds to local farmland. As a result of these activities, hazardous substances, including arsenic and toxaphene, were released and deposited at the Site during the time of Defendants' ownership and operation that resulted in soil contamination.

15. Starting in 1988, the Arizona Department of Environmental Quality ("ADEQ") conducted an inspection of the Site that triggered investigations to define the lateral and vertical extent of pesticide and arsenic soil contamination and to determine necessary remedial activities associated with the Site.

16. Goodyear conducted environmental investigations and related remedial activities at the Site. Upon information and belief, in 2000, Goodyear was aware that arsenic and toxaphene were present in soils at the Site with concentrations exceeding Arizona's soil remediation levels ("SRLs") established by A.R.S. § 49-152 and Ariz. Admin. Code R18-7-205. The maximum arsenic concentration at the Site was 801 milligrams per kilogram (mg/kg), which exceeds the residential and non-residential use SRL of 10 mg/kg. The maximum concentration of toxaphene was 1,600 mg/kg, which exceeds the then-applicable residential use SRL of 4 mg/kg and the non-residential use SRL of 17 mg/kg.

17.     Upon information and belief, Goodyear coordinated the remediation with the SunCor Development Company ("SunCor") due to its exclusive right to purchase the properties from Goodyear, including the Site.

18.     Upon information and belief, Goodyear and its consultant were aware that SunCor was interested in the potential residential use of the Goodyear properties, including the Site.

19.     In April 2002, Goodyear prepared a site assessment report and corrective action plan ("CAP") with its consultant Haley & Aldrich, Inc. to address the elevated levels of soils contaminated with toxaphene and arsenic and to clean-up Goodyear's properties, including the Site, to allow future use of the Goodyear properties, including the Site. .

20.     Based on anticipated future use of the Site, Goodyear's CAP was intended to clean-up the Site to meet the residential and non-residential SRLs for arsenic (10 mg/kg) and, at the time, toxaphene (14 mg/kg).

21.     In February and March 2003, Goodyear excavated 4,100 tons of contaminated soils at the Goodyear properties, stockpiled these soils on-site, profiled them for hazardous waste characterization, and transported them to a landfill for disposal.

22.     Upon information and belief, after this work was completed, Goodyear pursued a Declaration of Environmental Use Restriction ("DEUR") from ADEQ for its properties, including the Site, by submitting a formal request to ADEQ.

23.     A DEUR is an institutional control recorded by the property owner, which restricts future land use to non-residential activities because on-site soil contamination is above the applicable residential use SRLs and at or below the non-residential use SRLs. *See* A.R.S. § 49-152 and Ariz. Admin. Code R18-7-205.

24.     A DEUR ensures that current and future property owners are aware of the level of soil contamination at a property so that the owners can take appropriate actions to protect public health and the environment by limiting future use of the property to specific use activities.

4

25. A DEUR is perpetual unless formally released by ADEQ pursuant to A.R.S. § 49-152(D).

26. A DEUR is a covenant that runs with and burdens the land and binds successive owners pursuant to A.R.S. § 49-152(F).

27. ADEQ approved a DEUR for Goodyear's properties, including the Site, in September 23, 2004 ("Goodyear Farms DEUR") based on Goodyear's representations.

28. Thereafter, Goodyear Farms, on behalf of or at the direction of Goodyear, recorded the Goodyear Farms DEUR, which represented that the maximum residual soil concentrations on certain Goodyear properties, including the Site, based on the statistically determined, upper bound estimated value representative of the site-specific contaminant distribution were 13 milligram per kilogram (mg/kg) of toxaphene and 10 mg/kg of arsenic.

29. In 2009, SunCor sought an amendment to the Goodyear Farms DEUR to allow unrestricted use of the western portion of the Operations Area based on the sampling data in SunCor's 2008 Sampling Report.

30. SunCor's 2008 Sampling Report informed ADEQ that "[a]lthough only a limited portion of the Operations Area contained concentrations of COCs that exceeded the residential SRLs after remediation, in 2004 Goodyear recorded a Declaration of Environmental Use Restriction (DEUR) for the entire Operations Area, including the [western portion of the Operations Area], since it was simpler to place the DEUR on the whole site."

31. SunCor's 2008 Sampling Report concluded that the concentrations of arsenic and toxaphene within the soil at the western portion of the Operations Area was less than the respective residential SRLs with a maximum concentration of 5.5 mg/kg and 1.7 mg/kg of arsenic and toxaphene, respectively.

32. ADEQ has not released the Goodyear Farms DEUR and it is still in effect at the Site.

1    33. The Goodyear Farms DEUR publicly declared and represented that the residual soil concentrations at the Site were at or below the applicable non-residential use SRLs that would allow the Site to be developed for non-residential uses in the future by Goodyear Farms or any subsequent owner.

34. The Goodyear Farms DEUR identified the hazardous substance arsenic even though Goodyear's reported residual concentrations after its remediation allegedly were below the arsenic residential and non-residential use SRL of 10 mg/kg.

35. Since the Goodyear Farms DEUR was recorded, the Site has remained vacant and has not been developed.

36. Moreland purchased the Site in 2010 and relied on Defendants' public declarations and representations in the recorded Goodyear Farms DEUR that the Site had been fully investigated, characterized, and remediated to allow future non-residential development and use of the Site.

37. Moreland hired Synergy Environmental LLC ("Synergy") in 2017 to conduct limited site characterization work, which found the following ranges of residual soil concentrations: <0.40 to 20.5 mg/kg of toxaphene and 5.05 to 135 mg/kg of arsenic.

38. When Synergy completed its work, it determined that the residual soil concentrations at the Site may exceed the applicable non-residential use SRLs in direct contradiction to the representations included in the recorded Goodyear Farms DEUR, and, therefore, may prohibit any development of the Site as a matter of Arizona law pursuant to A.R.S. § 49-152.

39. Moreland then voluntarily reached out to ADEQ, which had approved the Goodyear Farms DEUR, to find out additional information regarding the Site and investigate how Moreland's investigatory sampling results contradicted the represented residual soil concentrations in the Goodyear Farms DEUR.

40. After discussions with ADEQ, Moreland elected to voluntarily characterize and remediate the soil contamination at the Site with ADEQ's approval.

41. On March 15, 2019, Moreland entered into a voluntary administrative agreement with ADEQ that required Moreland to prepare and implement a remedial action plan that would accurately characterize and remediate the soil contamination at the Site to meet the applicable non-residential use SRLs originally identified in the DEUR that allow use of the Site and are protective of public health and the environment.

42. Moreland complied with the applicable public notices for the voluntary administrative agreement and informed neighbors of the pending remedial action work in accordance with state law. Moreland responded to public comments and obtained ADEQ approval of the voluntary administrative agreement, proposed remedial action work plan ("Remedial Action Work Plan"), and the completed work.

43. Moreland submitted its Remedial Action Work Plan to ADEQ on July 10, 2019, which ADEQ approved on September 30, 2019.

44. Moreland's Remedial Action Work Plan included additional sampling to fully and adequately characterize the scope of contamination at the Site and identify necessary remediation work so the Site could meet the applicable non-residential SRLs identified in the Goodyear Farms DEUR.

45. After it completed characterization of the Site consistent with the Remedial Action Work Plan, Moreland learned for the first time that a large portion of the central part of the Site extending from the northern to southern Site boundaries was above applicable arsenic non-residential SRLs, which was contrary to the public declarations and representations in the recorded Goodyear Farms DEUR, and would require remediation too allow any development or use of the Site.

46. Moreland then decided to investigate and review all prior characterization and remedial action work associated with the Site to understand how the Goodyear Farms DEUR could be inaccurate and inconsistent with the actual soil concentrations at the Site.

47. After completing the site characterization, Moreland completed all of the remedial work required by the Remedial Action Work Plan, with the approval of ADEQ, on October 2, 2020.

7

48. Moreland has incurred remedial action response costs of approximately $638,000 to date to remediate the Site to the applicable non-residential use SRLs that were represented by Defendants to have been achieved in the Goodyear Farms DEUR.

49. During Moreland's investigation and review of prior characterization and remedial action work associated with the Site, Moreland learned of numerous concerns with the methodology, analysis, and prior remedial work that was the basis and justification for the Goodyear Farms DEUR. Specifically, Moreland learned that Goodyear did not collect sufficient data to adequately characterize the residual arsenic soil contamination at the Site. Additionally, Goodyear did not comply with the sampling procedures specified in the ADEQ-approved CAP despite the observed data suggesting arsenic exceeded the SRLs in direct contradiction to the declarations and representations that Defendants made to ADEQ and the general public and included in the Goodyear Farms DEUR.

50. Under Arizona law, a volunteer party shall complete characterization of a site and remediate a site to achieve soil remediation levels established by ADEQ. *See* A.R.S. § 49-177(B).

51. ADEQ rules consider a site adequately characterized "when the laboratory analytical results of the soil samples delineating the nature, degree, and extent of soil contamination have been received by the person conducting the remediation." *See* A.A.C. R18-7-202.E.1.

52. ADEQ guidance requires that the lateral and vertical extent of soil contamination should be investigated for each suspected or confirmed source area and if the laboratory data collected from the source area indicates that contaminant concentrations exceed the appropriate regulatory limit, such as SRLs, additional soil sampling should occur to define the lateral or vertical extent of source area contamination.

53. Goodyear's CAP noted that if any pre-excavation sampling or post-excavation sampling exceeded SRLs, then additional lateral or vertical excavation would be performed to define the lateral or vertical extent of the contamination that exceeds

SRLs. This process to define the limits of contamination applied to each of the remediation areas within the former Operations Area.

54.  In the CAP, Goodyear designated areas targeted for toxaphene or arsenic cleanup. Although two areas targeted for toxaphene clean-up also had the highest observed arsenic concentrations at the Site, Goodyear did not perform any arsenic sampling to delineate the lateral and vertical extent of the arsenic contamination in those areas.

55.  In the limited areas designated for arsenic remediation, four pre-excavation samples were analyzed for arsenic.  Two of those samples exceeded the SRL of 10 mg/kg (15 mg/kg in the Central Operations Area and 28 mg/kg in the Southeast Operations Area). No additional sampling was performed by Goodyear even though additional sampling was done when toxaphene pre-excavation samples exceeded the toxaphene SRL. Instead, Goodyear concluded the data indicated the lateral limit of the excavations had been defined in the Central and Southeast Operations Areas.

56.  Despite high arsenic concentrations in shallow soil samples in the Pesticide Storage and Mixing Area (PSMA) (an average of 330 mg/kg and a high of 801 mg/kg), no additional characterization work was performed to delineate the vertical extent of the arsenic contamination.  Although Goodyear installed several deep borings in the PSMA to enable vertical profiling of toxaphene contamination, arsenic was not analyzed in those samples.

57.  No post-excavation samples were analyzed for arsenic to ensure that SRLs were achieved at the Site.

58.  Moreland's investigation and review of available Goodyear and ADEQ documents in 2019 revealed that Defendants knew or reasonably should have known that the representations in the Goodyear Farms DEUR were false, misleading, and did not accurately and truly describe the existing levels of residual arsenic contamination in the soils at the Site. Upon information and belief, Goodyear manipulated the statistically determined, upper bound estimated value representative of the contaminant distribution of

arsenic by including the western portion of the Operations Area, which was unable to be included in the DEUR as a matter of law, and by failing to obtain pre- and post-excavation samples of arsenic as required by the CAP and ADEQ.

59. Defendants' statements in their reports to ADEQ and in the Goodyear Farms DEUR also negligently misrepresented the levels of residual arsenic soil contamination at the Site.

60. Consistent with the purpose of a recorded DEUR, A.R.S. 49-152 and Ariz. Admin. Code R18-7-208, Defendants knew or reasonably should have known future purchasers, developers, tenants, and users of the Site would rely on the representations Defendants made in their reports to ADEQ and in the Goodyear Farms DEUR to assess the actual residual soil contamination at the Site and the ability to use the Site for future non-residential development uses.

61. Defendants knew or reasonably should have known the misrepresentations in their reports to ADEQ and in the Goodyear Farm DEUR created a substantial risk for future owners of the Site, including the inability to develop or use the Site for any purpose under Arizona law, A.R.S. § 49-152, and that parties entering contracts for the purchase and use of the Site would value the Site based on the representations reported in the Goodyear Farms DEUR.

## COUNT I

**Cost Recovery pursuant to the Federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Arizona Water Quality Assurance Revolving Fund ("WQARF")**

62. Moreland incorporates the allegations contained in paragraphs 1 through 47 herein by reference.

63. As the former owner and operator of the Site, Defendants are potentially responsible parties under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), for the Site, which constitutes a "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), and under WQARF, A.R.S. § 49-281(6).

64. Arsenic and toxaphene are listed hazardous substances under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and A.R.S. § 49-281(11).

65. There was a release or threatened release, as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and A.R.S. § 49-281(8), of one or more hazardous substances, including arsenic and toxaphene, at the Site.

66. Defendants formerly owned and/or operated the Site when these hazardous substances were released and deposited at the Site and contaminated the Site's soils above applicable SRLs.

67. As set forth above, the documented presence of hazardous substances in the soil at the Site that was above applicable non-residential use SRLs demonstrates that a "release" occurred at the Site and that hazardous substances were deposited at the Site when Defendants owned and operated the Site.

68. To comply with the National Contingency Plan, Moreland engaged in community involvement activities, responded to public comments, and cooperated with ADEQ to obtain ADEQ's approval of the settlement and remedial action plan.

69. Moreland has voluntarily incurred necessary remedial action response costs that were consistent with the National Contingency Plan as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), and A.R.S. § 49-285 in order to address and remediate the releases or threatened releases of hazardous substances at the Site, and, therefore, is entitled to bring this action against Defendants who formerly owned and/or operated the Site when the hazardous substances were deposited at the Site.

70. As a result of its voluntary efforts, Moreland has incurred necessary remedial action response costs relating to the investigation, development, and implementation of the required remedial action response actions approved by ADEQ. These costs include, but are not limited to, the costs of: (1) investigating, monitoring, assessing, and evaluating the hazardous substances; the releases and threatened releases of those hazardous substances, including the timing when the releases were deposited at the Site; and the identification of the facilities and parties responsible for those releases and

threatened releases; (2) investigations and studies to evaluate the scope of the contamination and remedial action response options; (3) the ADEQ administrative process, including community involvement activities, and approval of the Moreland's Remedial Action Work Plan to address the releases and threatened releases of hazardous substances; and (4) the evaluation, design, and implementation of the removal of contaminated soil consistent with the ADEQ-approved Remedial Action Work Plan.

71.     Defendants are liable for the necessary remedial action response costs Moreland has incurred to address the releases and threatened releases of hazardous substances pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

72.     In the alternative and if the Court finds that these costs are not recoverable under Section 107 of CERCLA, 42 U.S.C. § 9607, Defendants are liable to Moreland, pursuant to CERCLA § 113(f)(1), 42 U.S.C. §§ 9613(f)(1), for contribution, in accordance with an allocation to be determined at trial, of necessary costs of response and damages incurred by Moreland to date with respect to contamination at the Site, as well as for additional response costs incurred by Moreland through the date of entry of judgment in this action.

73.     Defendants are liable to Moreland for interest on such costs of response incurred and to be incurred by Moreland in connection with contamination at the Site, at the rate specified for interest on investments of the Hazardous Substance Superfund pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

74.     In the alternative, pursuant to A.R.S. § 49-283(A) and (B) and A.R.S. § 49-285(A), Defendants are liable to Moreland under WQARF as the owners or operators of the Site when the hazardous substances were placed or came to be located in or on the facility, when the hazardous substances were located in or on the facility but before the release, and during the time of the releases or threatened releases of the hazardous substances.

## COUNT II

### Unjust Enrichment and Restitution

75. Moreland incorporates the allegations contained in paragraphs 1 through 60 herein by reference.

76. Defendants have and continue to have a duty under CERCLA, 42 U.S.C. §§ 9601, *et seq.*, and WQARF, A.R.S. § 49-281, *et seq.*, and under Federal and Arizona common law to respond to the releases or threat of releases of hazardous substances from the facilities owned or operated or formerly owned or operated by Defendants.

77. Defendants additionally had a duty under the recorded Goodyear Farms DEUR and under A.R.S. § 49-152 and Ariz. Admin. Code R18-7-208, to ensure the Site met the applicable non-residential use SRLs as required by the DEUR to allow for non-residential uses.

78. Moreland has performed the duty of Defendants by supplying services immediately necessary to protect public health and safety. Such services include, in addition to responding to the release or threatened release of hazardous substances from the Site formerly owned and/or operated by Defendants, the employment of attorneys and consultants for the purposes of negotiation and arranging with ADEQ for the necessary investigation, evaluation, development, design, and implementation of effective remedial action responses.

79. Moreland's performance of the services described in this Complaint has conferred benefits on and unjustly enriched Defendants by remediating the Site to meet the applicable non-residential use SRLs required by the Goodyear Farms DEUR.

80. Moreland's performance of services described in this Complaint was not expected or required based on Defendants' representations, and has caused and is causing the unjust impoverishment of Moreland due to its expenditure of resources to supply those services, which was and is the duty of Defendants.

81. Defendants are liable to Moreland for the value of the benefits conferred on it by Moreland pursuant to Federal and Arizona state law.

13

# COUNT III

## Negligent Misrepresentation

82. Moreland incorporates the allegations contained in paragraphs 1 through 67 herein by reference.

83. Defendants owed a duty of reasonable care to Moreland, a foreseeable and specific third party, to accurately report the contamination at the Site when they provided information and reports to ADEQ and obtained and recorded the Goodyear Farms DEUR, which is a covenant that runs with the Site and binds successive owners.

84. Defendants negligently and/or knowingly misrepresented the concentrations of residual arsenic soil contamination at the Site in their reports and when the Goodyear Farms DEUR was recorded.

85. Defendants' characterization of residual arsenic soil contamination at the Site was false, incomplete and failed to meet ADEQ's requirements for site characterization.

86. Defendants intended that subsequent purchasers and users of the Site would rely on the representations recorded in the Goodyear Farms DEUR when evaluating the Site for purchase or sale.

87. Moreland relied on Defendants' characterization of the residual soil contamination of arsenic at the Site as declared in the Goodyear Farms DEUR.

88. Moreland's reliance was justified given the purpose of the Goodyear Farms DEUR under Arizona law.

89. As a result of Defendants' misrepresentation, Moreland sustained and continues to sustain damages, including attorneys' fees and costs, in an amount to be proven at trial.

90. Because this action arises out of the Goodyear Farms DEUR, a covenant and contract that runs with the Site, Moreland is entitled to reasonable attorneys' fees pursuant to A.R.S. § 12-341.01 and any other applicable agreement, statute, or rule.

91. Moreland is entitled to an award of its costs under A.R.S. § 12-341 and any other applicable agreement, statute, or rule.

## COUNT IV

### Fraudulent Misrepresentation

92. Moreland incorporates the allegations contained in paragraphs 1 through 77 herein by reference.

93. Defendants knowingly misrepresented the residual soil contamination of arsenic at the Site when reporting contamination levels to ADEQ to establish the Goodyear Farms DEUR.

94. Defendants' characterization of the residual soil contamination of arsenic at the Site was false.

95. Defendants knew the characterization of the residual soil contamination of arsenic at the Site was false.

96. Defendants intended Moreland and other future purchasers or users of the Site to rely on the level of residual soil contamination reported in the Goodyear Farms DEUR.

97. Moreland did not know the levels of residual soil contamination of arsenic at the Site as reported in the Goodyear Farms DEUR were false.

98. Moreland relied on the levels of residual soil contamination of arsenic at the Site as reported in the Goodyear Farms DEUR when it purchased the Site.

99. Moreland had a right to rely on Defendants' representation in the Goodyear Farms DEUR.

100. As a result of Defendants' misrepresentation, Moreland sustained damages, and continues to sustain damages, including attorneys' fees and costs in an amount to be proven at trial.

101. Because this action arises out of the Goodyear Farms DEUR, a covenant and contract that runs with the Site, Moreland is entitled to reasonable attorneys' fees pursuant to A.R.S. § 12-341.01 and any other applicable agreement, statute, or rule.

102. Moreland is entitled to an award of its costs under A.R.S. § 12-341 and any other applicable agreement, statute, or rule.

103. Because of Defendants' knowing misrepresentation, Moreland is entitled to punitive damages.

## COUNT V

### Breach of the Implied Covenant of Good Faith and Fair Dealing

104. Moreland incorporates by reference the allegations of Paragraphs 1 through 89 above.

105. The Goodyear Farms DEUR is a covenant that runs with the Site, binding Moreland and all future owners of the Site, and is a contract originally entered into between Defendants and ADEQ.

106. The contractual relationship between Defendants, ADEQ, and all future owners of the Site included an implied promise by Defendants not to impair or deny Moreland's and all future owners of the Site's right to receive the benefits of the Goodyear Farms DEUR.

107. In the Goodyear Farms DEUR, Defendants affirmatively represented residual arsenic contamination at the Site was at or below the non-residential SRLs.

108. The purpose of the Goodyear Farms DEUR was to provide notice to future owners and users of the property of the levels of contamination existing at the Site and to restrict certain uses of the Site.

109. Defendants have failed to fairly or in good faith represent the levels of contamination of arsenic at the Site, and therefore, Moreland did not receive its expected benefit from the Goodyear Farms DEUR.

110. Defendants' actions and inaction constitute a breach of the implied covenant of good faith and fair dealing that caused Moreland to incur damages in an amount to be proven at trial, attorneys' fees, and costs.

111. Because this action arises out of the Goodyear Farms DEUR, a covenant and contract that runs with the Site, Moreland is entitled to reasonable attorneys' fees pursuant to A.R.S. § 12-341.01 and any other applicable agreement, statute, or rule.

112. Moreland is entitled to an award of its costs under A.R.S. § 12-341 and any other applicable agreement, statute, or rule.

**WHEREFORE**, Moreland requests that this Court enter judgment against Defendants as follows:

    a. For actual, incidental, and compensatory damages, including, but not limited to Moreland's remedial action response costs, in an amount to be proven at trial;

    b. Awarding Moreland its response costs incurred in responding to the releases and/or threatened releases of hazardous substances from the Site, with interest from the date of expenditure, pursuant to CERCLA Section 107 and/or Section 113, 42 U.S.C. 9607 and/or 9613, and pursuant to WQARF, A.R.S. § 49-285;

    c. For the amounts expended by Moreland that have unjustly enriched Defendants;

    d. For costs incurred herein, pursuant to A.R.S. § 12-341, 12-1840, and any other applicable agreement, statute, or rule;

    e. For attorneys' fees incurred herein, pursuant to A.R.S. § 12-341.01, and any other applicable agreement, statute, or rule;

    f. For punitive damages against Defendants to punish Defendants and deter Defendants and others similarly situated from engaging in like conduct in the future; and

    g. For such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 16th day of September, 2021.

GALLAGHER & KENNEDY, P.A.

By: */s/ Bradley J. Glass*
   Bradley J. Glass
   Stuart S. Kimball
   Kenneth N. Ralston
   2575 East Camelback Road
   Phoenix, Arizona  85016-9225
   *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day September, 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the Notice of Electronic Filing to the CM/ECF registrants of record in this matter.

*/s/ Bradley J. Glass*
Bradley J. Glass