Stuart S. Kimball (026681)
William F. King (023941)
Kenneth N. Ralston (034022)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
stuart.kimball@gknet.com
bill.king@gknet.com
kenneth.ralston@gknet.com

Attorneys for Plaintiff Moreland Properties LLC

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Moreland Properties LLC,<br><br>               Plaintiff,<br><br>v.<br><br>The Goodyear Tire & Rubber Company, *et al.*,<br><br>               Defendants. | No. 20-02297-SRB<br><br>**Plaintiff's Response in Opposition to The Goodyear Tire & Rubber Company and Goodyear Farms, Inc.'s Motion for Partial Summary Judgment (Dkt. 81)**<br><br>(Assigned to the Honorable Susan R. Bolton) |

## I. Summary of Argument

The Goodyear Tire & Rubber Company's and Goodyear Farms, Inc.'s Motion for Partial Summary Judgment (Dkt. 81) filed July 14, 2022 ("D. Memo" or "Motion") represents Defendants' latest procedural attempt[1] to escape a liability determination on the merits—and for good reason:  After nine depositions, the depths of Defendants' concerted fraud in connection with the 2004 Declaration of Environmental Use Restriction (the "2004 DEUR") finally came to light.  Specifically, Defendants' own environmental consultant, Haley & Aldrich, who Defendants commissioned to perform the clean-up, admitted for the first time during deposition in May 2022 ***that 12 of the 17 arsenic samples used to support the 2004 DEUR's residual arsenic concentration have absolutely no foundation in fact*** and, for all intents and purposes, do not and never did exist.  On top of the 12 fabricated "ghost" samples, according to both Haley & Aldrich and Plaintiff's expert, Stephen E. Speyer, Ph.D., R.G., the one statistical document Defendants used to calculate the arsenic level incorporated in the recorded 2004 DEUR has at least 20 "mistakes."

Goodyear knew the soils at the property were infested with arsenic.  Yet still, it made the conscious decision not to incur the costs necessary to remove the arsenic.  Goodyear then misled the Arizona Department of Environmental Quality ("ADEQ"), deviated from ADEQ-approved plans, and omitted, concealed, and fabricated other material facts,[2] all in reckless disregard of the substantial risks Goodyear was purporting to address.  Against this backdrop, Goodyear's only "disfavored" defense—that Plaintiff's common law claims are time-barred—should be seen for what it is:  A desperate, misguided plea to avoid a trial on the merits.

---

[1] The Court previously struck Defendants' Notice of Non-Parties at Fault.  *See* Dkt. 42.

[2] In similar fashion, Goodyear and its remedial consultant, Haley & Aldrich, appear to have ***intentionally destroyed*** relevant text communications.  That issue remains pending before the Court.  *See* Dkt. 87.

1

Defendants' bid for summary dismissal is not well-taken for at least the following three reasons:

***First***, while Defendants submit Plaintiff's common law claims accrued in January 2015 when it received Western Technologies, Inc.'s report (the "WTI report"), that "preliminary" report—which according to Defendants concerned an entirely different, smaller piece of property compared to the property described in the 2004 DEUR—merely concluded that "it is possible that estimates upon which the DEUR has been established may be underestimated given the current extent of the DEUR area and the concentrations reported in this assessment." [*See* Defendants' Statement of Facts ("DSOF"), Dkt. 82 at ¶ 28.] Although the January 2015 WTI report (using Mr. Moreland's words) at best indicated a possible "environmental issue" (DSOF at ¶ 30) and potential need for Plaintiff to remediate the property (which ADEQ subsequently debunked in June 2018), it nowhere included any facts remotely hinting at the possibility that fraud was afoot, or better yet, that Goodyear had fabricated the arsenic sampling results used to calculate the final 95% UCL soil concentrations of arsenic represented in the 2004 DEUR. *Cf.* A.R.S. § 12-543 (a cause of action for fraud "shall not be deemed to have accrued until the discovery by the aggrieved party ***of the facts constituting the fraud or mistake***") (emphasis added). Having notice that the property may require remediation is hardly synonymous with having knowledge of the "facts constituting the fraud." Defendants' attempt to conflate these two entirely distinct concepts in hopes of satisfying their "heavy" burden under Rule 56 is misguided.

***Second***, Defendants ignore the undisputed chronology following Plaintiff's receipt of the 2015 WTI report and, in particular, Plaintiff's interactions with ADEQ about that report. For example, in April 2017, Plaintiff approached ADEQ to discuss WTI's preliminary findings. After several months of meetings and its review of the WTI report and Plaintiff's subsequent sampling data, ADEQ informed Plaintiff on June 22, 2018 in no uncertain terms that the property ***did not require remediation***. [Plaintiff's Separate Statement of Facts ("PSOF") at ¶ 14.] That fact cannot honestly be squared with

2

Defendants' positions that Plaintiff's fraud claims accrued in January 2015, or at the latest, by July 2017. To illustrate the absurdity, and using Defendants' January 2015 accrual date, Plaintiff's fraud claim against Goodyear would have expired by January 2018—all notwithstanding (a) ADEQ's June 2018 statement to Plaintiff that the property did not require remediation under the 2004 DEUR and (b) ADEQ's corroborating testimony that as of June 2018, there was "no evidence to suggest that the SRLs [soil remediation levels] as set forth in the 2004 DEUR were inaccurate" or otherwise a product of fraud. [PSOF at ¶¶ 14 & 15.][3]

It was not until November 27, 2018 that ADEQ, through its counsel at the Arizona Attorney General's office, finally sent Plaintiff a near-to-final draft administrative settlement agreement, which was ultimately executed in March 2019. [PSOF at ¶ 16.] In the executed agreement, ADEQ acknowledged Moreland's subsequent soil sampling had confirmed that residual soil concentrations of arsenic were substantially above the non-residential standard of 10 mg/kg as represented in the 2004 DEUR. [PSOF at ¶ 17.] As explained in the Declaration of Dennis Shirley, it was only in October 2020 after Plaintiff's cooperative investigation and remediation with ADEQ, which followed the execution of the Administrative Settlement Agreement, that first revealed the bases for Plaintiff's common law claims against these Defendants. [PSOF at ¶¶ 31-33.][4]

***Third***, in determining a claim's accrual for purposes of the discovery rule, a claim does not accrue until the injured party knows both the 'what,' *i.e.*, the fact of injury, and the 'who,' *i.e.*, the causative agent. Plaintiff knew neither by January 2015, or using Defendants' alternate accrual date, by July 2017. As regards the 'what,' Plaintiff certainly

---

[3] As made clear during the June 2021 Rule 16 scheduling conference, ADEQ itself was still having difficulty in assembling and locating its complete file. *See* Dkt. 86, Transcript of Proceedings from June 3, 2021 Scheduling Conference, at 5:8-13.

[4] ADEQ approved Plaintiff's work plan on September 30, 2019. [PSOF at ¶ 19.] ADEQ then approved Plaintiff's completion of work on October 22, 2020. [PSOF at ¶ 20.] This action was filed weeks later on November 30, 2020. Dkt. 1.

did not comprehend in 2017 "the facts constituting the fraud of mistake;" at most, Plaintiff knew that the property may require remediation—a proposition ADEQ later conclusively dispelled in June 2018.  Even setting that reality aside, Plaintiff had no knowledge to connect the WTI report's preliminary estimates to any fraudulent activity by the Goodyear Defendants.  In the words of the Arizona Supreme Court, "it is not enough that a plaintiff comprehends a 'what;' there must also be reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault."  *Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002).  That the property had changed hands ***four times over a period of six years*** before Plaintiff's purchase in 2010 [*see* DSOF at ¶¶ 12-17] highlights this reality and perhaps best explains Defendants' inability to marshal any Rule 56 facts to satisfy their burden on this essential element of their Motion.

At bottom, fact-intensive questions such as the time of discovery, notice, and whether a reasonable person was required to initiate an investigation are not properly resolved under Rule 56.[5]  For all of these reasons, more fully explained below, the Court should deny Defendants' Motion in its entirety.

**II.    Material Facts**

    **A.    The WTI Report**

On January 14, 2015, Plaintiff received the WTI report, which by its terms "was intended to evaluate whether extensive surficial areas might be impacted which would require remediation." [PSOF, ¶ 1.]  WTI's "sampling plan was designed to provide a ***cursory evaluation*** of the condition of soils that underlay and surround the previous remedial excavations." [PSOF, ¶ 2 (emphasis added).]

The results of WTI's sampling and testing "identified that toxaphene and arsenic-impacted soils are present at the Property exceeding the respective r-SRLs and nr-SRLs." [PSOF, ¶ 3.]  The WTI report further provides "that the level of impact observed indicates

---

[5] That Defendants in their Motion propose two different, competing accrual dates—January 2015 and July 2017—only further reinforces this reality.

4

1  that it is ***possible*** the UCL estimates upon which the DEUR has been established ***may be***
2  ***under-estimated*** given the current extent of the DEUR area and the concentrations
3  reported in this assessment." [PSOF, ¶ 4 (emphasis added).] Given the preliminary
4  nature of the results and the existence of the 2004 DEUR, WTI in its report cautioned it
5  "[did] not know what action, if any, ADEQ may pursue if the information from this
6  assessment is submitted to it for review." [PSOF, ¶ 5.]

       **B.**     **Plaintiff's Work with ADEQ**

8  As time would tell, WTI's last statement proved clairvoyant. By way of
9  background, on April 5, 2017, Plaintiff retained its current counsel, who then just two
10 days later on April 7 contacted ADEQ to discuss the WTI report's preliminary findings.
11 [PSOF, ¶ 6.] After several additional exchanges that followed between Plaintiff and
12 ADEQ, Plaintiff sent an e-mail to ADEQ in August 2017 explaining that Plaintiff wanted
13 "to perform additional soil sampling in order to achieve further refinement of the vertical
14 and horizontal extent of arsenic and toxaphene concentrations at the Site." [PSOF, ¶ 7.]
15 Plaintiff's e-mail concluded by asking ADEQ whether the proposed "additional sampling
16 would be beneficial" and offered to set a meeting with ADEQ "to discuss the results and
17 next steps." [PSOF, ¶ 8.] ADEQ responded the next day on August 8, 2017: "It would
18 be difficult to say yes or no based on what has been provided, however, I don't see an
19 issue with your sampling rationale. I agree—let's together after you have your results and
20 then we can discuss." [PSOF, ¶ 9.] Based on ADEQ's response, Plaintiff completed the
21 proposed additional soil sampling in December 2017. [PSOF, ¶ 10.]

22 After Plaintiff finished its soil sampling, it wrote to ADEQ on January 30, 2018 to
23 set up "a meeting to provide an update on the Moreland property." [PSOF, ¶ 11.] And on
24 February 23, 2018, Plaintiff's counsel and its consultant, Synergy Environmental, LLC
25 ("Synergy"), met with ADEQ to discuss the results of Plaintiff's preliminary sampling
26 plan. [PSOF, ¶ 12.] ADEQ remained non-committal.

27 Following the February 23, 2018 meeting, Plaintiff's counsel wrote to ADEQ on
28 June 21, 2018 and informed ADEQ that Plaintiff had prepared a "work plan to address the

5

residual soil contamination at the site." [PSOF, ¶ 13.] Despite several meetings, months of communications, and a review of the WTI report and Plaintiff's additional sampling data, ADEQ informed Plaintiff on June 22, 2018 that the property did not require remediation because of the 2004 DEUR: "*no remediation is necessary for nonresidential use.*" [PSOF, ¶ 14.] According to the same agency who approved the 2004 DEUR, the WTI report—at least as of June 22, 2018—had zero effect on the findings reflected in the 2004 DEUR and certainly did not forecast any indication of fraud:

> Q.   According to ADEQ, as of the date of Deposition Exhibit 57, there is no evidence to suggest that the SRLs as set forth in the 2004 DEUR were inaccurate, correct?
>
> A.   Correct.
>
> ***
>
> Q.   And as of the date of Deposition Exhibit 57, ADEQ was unaware of any facts to suggest that the numbers in the 2004 DEUR were in any way a product of fraud. Is that correct?
>
> A.   Yeah. Correct. We had no -- The numbers are the numbers.

[PSOF, ¶ 15.]

### C.   The Administrative Settlement Agreement

After several more months of discussion with Moreland and internal deliberations in what ADEQ Director, Laura Malone, described as an "iterative process," ADEQ reversed course and negotiated a draft administrative settlement agreement, which was ultimately executed in March 2019. [PSOF, ¶ 16.] In the executed agreement, ADEQ acknowledged recent soil sampling had confirmed that residual soil concentrations of arsenic were substantially above the non-residential standard of 10 mg/kg as represented in the 2004 DEUR. [PSOF, ¶ 17.]

The executed agreement also required Plaintiff to prepare and implement a remedial plan to clean the property to the levels represented in the 2004 DEUR. [PSOF, ¶ 18.] And that's precisely what Plaintiff did. ADEQ approved Plaintiff's work plan on

September 30, 2019. [PSOF, ¶ 19.] ADEQ then approved Plaintiff's completion of work on October 22, 2020. [PSOF at ¶ 20.] This action was filed *weeks* later on November 30, 2020. *See* Dkt. 1.

As confirmed by ADEQ's director, Laura Malone, from April 7, 2017 to October 22, 2020, Plaintiff worked continuously with ADEQ to put together a plan to remediate the property:

> Q.   We've already established that at least from ADEQ's perspective, ADEQ was first approached in or about April of 2017. Is that your understanding?
>
> A.   Yes.
>
> Q.   And we've looked at Exhibit 55 already. And that has a date of October 22nd, 2020, correct?
>
> A.   Yes.
>
> Q.   Can we agree that from April 7th, 2017, to October 22nd, 2020, Moreland was working with ADEQ to put together a plan to remediate the property?
>
> A.   Yes.

[PSOF, ¶ 21.] It took approximately two years from the date Plaintiff initially reached out to ADEQ in April 2017 to the date ADEQ approved and executed the Administrative Settlement Agreement in March 2019. [PSOF, ¶ 22.] And following the execution of the Administrative Settlement Agreement in March 2019, it took about another year-and-a-half for Plaintiff to prepare and implement the work plan required under the Administrative Settlement Agreement, which work ADEQ approved in October 2020. [PSOF, ¶ 23.]

### D.   Discovery of Goodyear's Fraud

Prior to commencing implementation of Moreland's remedial work plan, Synergy's investigation and assessment of the property was data-driven: Synergy was actively assessing the soil contamination levels at the Property and the remediation necessary to attain the non-residential levels of soil contamination represented to have existed at the Property. Synergy was not, however, at this time attempting to assess the root cause of

the discrepancy between the analytical data found at the site and the representations in the 2004 DEUR. [PSOF, ¶ 24.] Indeed, given the environmental issues dating back to 1988, including those several environmental reports from multiple environmental consultants (*i.e.*, Dames & Moore (1988), Pegler & Welch (1988-1989), Ameritec Environmental Services (1989), PC Toxic (1995), Ogden Environmental (2000), and Haley & Aldrich (2002-2004)), Synergy encountered significant discontinuities and gaps in what was perceived to be the full record of past environmental work specific to this Property. [PSOF, ¶ 25.] As a result, Synergy's efforts and resources prior to implementation of Moreland's remedial plan were primarily focused on clarifying the scope of prior work and its context in the successive remedial investigation activities conducted at the Property for the purpose of planning further work to best address the environmental conditions. [PSOF, ¶ 26.]

   In October 2020, after completion of the ADEQ-approved work plan, Synergy began to perform additional professional services,[6] and following its critical review of Haley & Aldrich's reports, discovered that the site was not adequately delineated because Haley & Aldrich did not take sufficient steps, as required by the ADEQ-approved work plans, to either delineate, confirm, or further excavate the areas of arsenic impacted soil, including its failure to take sufficient pre- and post-confirmation arsenic samples. [PSOF, ¶¶ 31 & 32.] Those factors, in combination with WTI's and Synergy's more recent soil sampling results, led Synergy to conclude that (a) Goodyear, through Haley & Aldrich, failed to perform the required sampling necessary to characterize the arsenic soil concentrations at the Property and, consequently, that (b) Goodyear, through Haley & Aldrich, lacked the necessary understanding of the extent and magnitude of the residual arsenic soil contamination at the Property to appropriately represent the residual arsenic impacted soil in the 2004 DEUR after its subsequent corrective action. [PSOF, ¶ 33.]

---

[6] Synergy's work in this respect—which differed from its prior tasks to prepare and implement a remedial plan of action—was invoiced by Synergy under a separate litigation task consulting matter starting in October 2020. [PSOF, ¶ 31.]

On those facts, Plaintiff filed its lawsuit against Defendants in November 2020. Dkt. 1. And only during discovery into those claims did Plaintiff learn *that 12 of the 17 arsenic samples used to support the 2004 DEUR's arsenic reading had absolutely no foundation in fact* and, for all intents and purposes, do not and never did exist. [PSOF, ¶ 34.] As Scott Zachary, Haley & Aldrich's Rule 30(b)(6) representative testified, the missing chain of custody documents and corresponding laboratory reports for the 12 missing samples is "problematic." [PSOF, ¶ 35.]

### III.   Legal Argument

Summary judgment is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of identifying portions of the record, including pleadings, depositions, answers to interrogatories, admissions, and affidavits, that show there is no genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (internal citations omitted). The movant's burden of persuasion under Rule 56 is a "heavy" one. *Fallon's Door Works No. 2, Inc. v. Ex-Factory, Inc.*, No. 2:09-CV-00213 JWS, 2010 WL 11519166, at *4 (D. Ariz. Oct. 6, 2010).[7]

---

[7] Given the "heavy" burden under Rule 56, the Court during the June 2021 scheduling conference discouraged filing summary judgment motions given that this matter is set for a bench trial: "I always like to make the pitch to counsel for a bench trial, why file a Motion for Summary Judgment when if there is a single material issue of fact, the motion will be denied, and then you're going to ask me to decide that material issue of fact shortly thereafter in a trial?" *See* Dkt. 86, Transcript of Proceedings from June 3, 2021 Scheduling Conference, at 12:25-13:5.

9

"[B]ecause the statute of limitations is an affirmative defense, the defendant bears the burden of proving that the plaintiff filed beyond the limitations period." *MacDougal v. McCarty*, No. CV-14-00133-PHX-SRB, 2015 WL 13333691, at *2 (D. Ariz. June 29, 2015). Arizona courts disfavor statute of limitations defenses. *Henry v. City of Somerton*, No. CV-18-03058-PHX-DJH, 2021 WL 2514686, at *9 (D. Ariz. June 17, 2021) ("Arizona law disfavors statute of limitations defenses, preferring instead to resolve cases on their merits.") (denying summary judgment); *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 968 (Ariz. 1995) ("The defense of statute of limitations is never favored by the courts[.]"). This is especially so in the context of Rule 56, since "when a claim a begins to accrue is a question of fact that generally cannot be determined on summary judgment." *IceMOS Tech. Corp. v. Omron Corp.*, No. CV-17-02575-PHX-JAT, 2019 WL 5960069, at *3 (D. Ariz. Nov. 13, 2019) (denying motion for summary judgment) ("Arizona law makes clear that when a claim begins to accrue is a question of fact that generally cannot be determined on summary judgment."); *Doe v. Roe*, 955 P.2d 951, 962 (Ariz. 1998) ("The jury must determine at what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action."); *Walk*, 44 P.3d at 999 ("We therefore conclude that for the present case, the questions of discovery, diligent investigation, and resulting accrual were for the jury.").

Defendants in their Motion challenge each of the following counts of Plaintiff's Amended Complaint as untimely: Count II (unjust enrichment; four-year limitations period); Count III (negligent misrepresentation; three-year limitations period); Count IV (fraud; three-year limitations period); and Count IV (breach of the implied covenant of good faith and fair dealing; six-year limitations period) (collectively the "Common Law Claims").[8]

---

[8] Defendants suggest they are "unclear" whether Plaintiff's claim for breach of the implied covenant of good faith and fair dealing sounds in tort or contract. *See* D. Memo, 8:26-28. But as made clear in the First Amended Complaint (Dkt. 19 at ¶¶ 104-112), the

10

Because Plaintiff's claims for negligent misrepresentation (Count III) and fraud (Count IV) (collectively, the "Misrepresentation Claims") are subject to the shortest limitation periods (two and three years, respectively), we analyze those claims first.

### A.   The Misrepresentation Claims Are Timely

In Arizona, the statute of limitations for negligent misrepresentation under A.R.S. § 12-542 is two years.  Fraud claims are subject to a three-year limitation period under A.R.S. § 12-543(3), "which cause of action ***shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake***."  (Emphasis added).  The statute of limitations under A.R.S. § 12-543 "does not commence until plaintiff discovers the fraudulent conduct."  *Rosenberg v. Rosenberg*, 601 P.2d 589, 592 (Ariz. 1979).

According to the uncontroverted record, Plaintiff's Misrepresentation Claims accrued at the earliest in October 2020 when it finally discovered "the facts constituting the fraud or mistake."  [PSOF, ¶¶ 31-33.]  Specifically, in October 2020, only after Plaintiff completed the ADEQ-approved work plan did Plaintiff's remedial consultant, Synergy, begin to perform additional professional services to investigate the cause of the discrepancy between the analytical data found at the site compared to the representations in the 2004 DEUR.  [PSOF, ¶ 31.]  And that investigation revealed for the first time that Defendants, through Haley & Aldrich, failed to comply with ADEQ-approved requirements to delineate, confirm, and further excavate the areas of arsenic impacted soil.  [PSOF, ¶ 32.]  This is consistent with Goodyear's now confessed failures (a) to analyze 12 of the 17 samples used to calculate the arsenic soil level represented in the 2004 DEUR and (b) to collect sufficient pre- and post-confirmation arsenic samples—samples Defendants certified to ADEQ had been collected to justify the representations in the 2004 DEUR.  [PSOF, ¶¶ 34-36.]

---

claim sounds in contract by virtue of the 2004 DEUR's contractual covenants that run with the land.  As a result, it is subject to a six-year limitation period (D. Memo, 8:26-28), which under either of Defendants' proposed accrual dates, renders that claim timely.

1    This is the only evidence of record connecting both the 'what,' *i.e.*, "the facts constituting the fraud," with the 'who,' *i.e.* the Goodyear Defendants. Plaintiffs' Misrepresentation claims were timely filed.

### B.    Defendants' Proposed Accrual Dates Lack Record Support

Defendants in their Motion argue Plaintiff's Misrepresentation Claims accrued in January 2015, at the earliest, or by July 2017, at the latest.[9] Both suggested dates are misplaced and lack record support.

### 1.    Defendants impermissibly conflate Plaintiff's knowledge of the elevated residual soil concentrations reported in the WTI report with knowledge "of the facts constituting the fraud."

As a preliminary matter, Defendants in their Motion argue that Plaintiff had knowledge of the "Material Facts" in either January 2015 or July 2017 and thus its Misrepresentation Claims were forever foreclosed by January 2018 or July 2020. According to Defendants' Motion, the "Material Facts" are defined as follows (i) "Goodyear misrepresented the contaminant concentrations on the Goodyear Property when Goodyear recorded the 2004 DEUR," (ii) "Moreland relied on Goodyear's publicly recorded statements about the residual soil contamination when evaluating Tract D for purchase," and (iii) "Moreland was harmed when it learned of the contaminants that he [sic] had to remediate before he could sell." (D. Memo, 9:23-28). But with regards to the first and third categories, there is nothing in the record (or in Defendants' Statement of Facts) indicating that as of either date, Plaintiff knew the "facts constituting the fraud" (A.R.S. § 12-543), or in Defendants' words, that "Goodyear misrepresented the contaminant concentrations on the Goodyear Property when Goodyear recorded the 2004 DEUR." That Plaintiff may have appreciated the potential need to remediate the property

---

[9] That Defendants offer two accrual dates—January 2015 and July 2017—further reinforces the difficulty in definitively determining when Plaintiff's claims accrued as a matter of fact.

as of either January 2015 or July 2017 is one thing.[10]  Stretching that simple point to mean that Plaintiff understood the property may require remediation *as a result of Goodyear's intentionally false misrepresentations*—a fact Plaintiff did not discover until October 2020 (PSOF, ¶¶ 32-34)—is quite another.

Defendants' attempt to conflate these two disparate realities is misplaced, not to mention without the support required under Rule 56.  Indeed, the WTI report merely provided Plaintiff notice of *possible* "environmental issues" [DSOF, ¶ 31] and equivocally suggested that the values in the 2004 DEUR "*may be underestimated*[.]"  [DSOF, ¶ 28.]  The e-mail Defendants point to in arguing for a July 2017 accrual date—which similarly acknowledges elevated arsenic and toxaphene soil concentrations—fares no better and for the same reason:  Elevated soil readings standing alone do not in any way even remotely suggest knowledge "of the facts constituting the fraud."  This point rings especially true considering that, in June 2018, ADEQ told Plaintiff that the property did not require remediation.  [PSOF, ¶ 14.]

In sum, the statutory test under § 12-543(3) is not when Plaintiff should have discovered facts constituting the potential need to remediate the property, but rather when Plaintiff discovered "the facts constituting [Goodyear's] fraud."  See A.R.S. § 12-543(3); *accord Rosenberg*, 601 P.2d at 592; *Van Go LLC v. Potts*, No. CV-16-00054-PHX-JJT, 2016 WL 4974968, at *3 (D. Ariz. June 7, 2016) ("Because Plaintiff brought its claims within the limitations periods from the date it discovered the facts of the alleged fraud and negligent misrepresentation, Defendants' argument that Plaintiff's claims are barred by the statute of limitations fails."); *Schayes v. T.D. Serv. Co. of Arizona*, No. CV-10-02658-PHX-NVW, 2011 WL 1793161, at *7 (D. Ariz. May 11, 2011) ("[A] cause of action for

---

[10] Defendants' argument on this point—which is premised upon a "mere suspicion" standard—is not the standard under Arizona, or for that matter, CERCLA.  *See O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1148 (9th Cir. 2002) (construing 42 U.S.C. § 9658) ("In sum, we reject an interpretation of the federal discovery rule that would commence limitations periods upon mere suspicion of the elements of a claim.").

13

common law fraud does not accrue 'until the discovery by the aggrieved party of the facts constituting the fraud or mistake[]'").[11]

Because Plaintiff did not discover "the facts constituting the fraud" until October 2020, its Misrepresentation Claims—which were filed in November 2020—are timely.

### 2. Defendants ignore Plaintiff's diligent interactions with and reliance on ADEQ's guidance.

Defendants' proposed accrual dates additionally ignore the import of Plaintiff's continuous interactions with ADEQ, which are notable on their own accord for several, independent reasons. ***First***, without any legal obligation to do so, Goodyear sought ADEQ's approval of its remediation and, subsequently, Goodyear's representations in the 2004 DEUR. ***Second***, after multiple meetings with ADEQ to discuss the WTI report and Plaintiff's own initial sampling results commissioned thereafter (and consistent with ADEQ's prior approval of the 2004 DEUR and WTI's doubt as to what ADEQ would do, if anything, with WTI's "cursory" findings), ADEQ informed Plaintiff on June 22, 2018 that the property did not require remediation. [PSOF, ¶ 14.] There is no conceivable argument Plaintiff's fraud claims could have accrued either in January 2015 or July 2017 when, in June 2018, ADEQ—the same state agency that approved the 2004 DEUR in the first instance—informed Plaintiff after the agency's review of the WTI report and Plaintiff's own follow-on sampling report that the property did not require remediation and could be used for nonresidential use consistent with the 2004 DEUR: "***no remediation is necessary for nonresidential use***." [PSOF, ¶ 15.] As ADEQ in fact confirmed in deposition, as of June 22, 2018, there was no reason to question the validity of the residual arsenic soil concentrations, let alone to suggest that the readings in the 2004 DEUR were in any way the product of fraud. [*Id*.]

---

[11] The plain language of A.R.S. § 12-543(3), stating that a cause of action for fraud does not accrue "until discovery of the facts constituting the fraud or mistake," comports logically with Rule 9(b)'s heightened pleading standards.

14

Accordingly, Plaintiff could not have filed its Misrepresentation Claims before either of Defendants' proposed accrual dates under Rule 11, let alone with the heightened particularity required under Rule 9(b), not only for lack of knowledge of the essential "facts constituting the fraud or mistake" but because, ***according to ADEQ, there was no injury and nothing wrong or that needed to be done to clean up or remediate the property as of June 22, 2018***. [PSOF, ¶¶ 14 & 15.] *Doe*, 955 P.2d at 960 ("One does not sleep on his or her rights with respect to an unknown cause of action.").

***Third***, there is no dispute that as soon as Plaintiff retained counsel in April 2017, it consistently undertook efforts to both address and remediate the "environmental issues" and, once its remedial efforts were complete, to investigate the cause of the heightened residual soil concentrations. As ADEQ's Executive Director, Laura Malone testified, Plaintiff initially contacted ADEQ in April 2017. [PSOF, ¶ 21.] From that date through October 20, 2020—when ADEQ approved the completion of Plaintiff's remedial work required under the Administrative Settlement Agreement—ADEQ and Plaintiff discussed the findings of the WTI report and Plaintiff's initial sampling results. [*Id.*] They prepared and negotiated the Administrative Settlement Agreement, which was finalized in March 2019. [PSOF, ¶ 16.] And they collaborated in the preparation and implementation of a remedial plan to restore the property's residual soil concentrations to the levels originally set forth in the 2004 DEUR. [PSOF, ¶¶ 18-21.]

These facts certainly do not demonstrate a plaintiff who "slept on its rights." (*See* D. Memo, 9:4.) On the contrary, the evidence of record conclusively shows that, from April 2017 through the date ADEQ approved Plaintiff's completion of the remedial work required under the Administrative Settlement Agreement on October 20, 2020, Plaintiff was actively working to assess and clean up the property before investigating in October 2020 the origin of data Goodyear used to justify the residual arsenic concentrations represented to close the site and obtain the 2004 DEUR. [PSOF, ¶¶ 21; 24-31.] That Plaintiff filed this lawsuit on November 30, 2020 (Dkt. 1)—***weeks after ADEQ approved***

***the completion of Plaintiff's remedial work*** and its claim for CERCLA accrued—further underscores Plaintiff's diligence and the timeliness of its claims.[12]

### 3. Defendants have failed to show Plaintiff's knowledge of the 'what' and the 'who.'

Under long-standing Arizona law, the Misrepresentation Claims did not accrue until Plaintiff knew both the 'what' *i.e.*, the fact of injury, and the 'who,' *i.e.*, the causative agent. Plaintiff knew neither as of January 2015, or using Defendants' alternate accrual date, by July 2017. As regards the 'what,' Plaintiff certainly did not comprehend "the facts constituting the fraud of mistake;" at most, Plaintiff knew that the property may require remediation—a proposition ADEQ later conclusively rebuked in June 2018. [PSOF, ¶ 14.]

Even setting that reality aside, Plaintiff had no knowledge to connect the WTI report's noted "environmental issues" to the fraudulent conduct underlying its Misrepresentation Claims against the Goodyear Defendants. In the words of the Arizona Supreme Court, "it is not enough that a plaintiff comprehends a 'what;' there must also be reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault." *Ring*, 44 P.3d at 996. Defendants' Motion and corresponding Statement of Facts are completely bereft of any Rule 56 facts on this point. Defendants have thus failed to carry their burden on this essential element of their Motion. *See Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1063 (D. Ariz. 2015) (denying summary judgment) (concluding that a report identifying the "what" did not begin the accrual of the claim when "nothing in the []

---

[12] Under 42 U.S.C. § 9613(g)(2)(A), Plaintiff's § 113 recovery action under CERCLA, pled as Count I in Plaintiff's First Amended Complaint, did not accrue until Plaintiff's completion of the removal action in October 2020. That Plaintiff's Misrepresentation Claims would have expired under either of the Defendants' proposed accrual dates before Plaintiff's CERCLA claim accrued is non-sensical and contrary to stated CERCLA policy. *See e.g. Kowalski v. Goodyear Tire and Rubber Co.*, 841 F.Supp. 104, 107-08 (W.D. N.Y. 1994) (discussing the policy of § 9658, which was enacted as an amendment to CERCLA in 1986, to protect prospective CERCLA plaintiffs whose common law claims were time-barred even before they knew of the cause of their injury).

1. report suggested that [the defendant] was responsible for these improprieties."); *Velasquez v. Cochise Cnty. Superior Ct.*, No. CV-15-00110-TUC-CRP, 2015 WL 12838801, at *3 (D. Ariz. Dec. 17, 2015) ("Defendant has not asserted undisputed facts showing when Plaintiff discovered Defendant's alleged misrepresentations.").

Nor could Defendants make such a showing. Not only did the property change hands ***four times over a period of six years*** before Plaintiff's purchase in 2010 [DSOF at ¶¶ 12-17], but on April 20, 2020, Plaintiff sent letters to the former property owners requesting that each of them to pay for the remediation costs, further evidencing Plaintiff's lack of knowledge as to which of the former property owners bore responsibility for the elevated residual arsenic soil concentrations reflected in the WTI report. [PSOF, ¶ 30.]

### C. Plaintiff's Remaining Common Law Claims Are Timely

Because Plaintiff's Misrepresentation Claims were timely filed, its remaining claims for unjust enrichment, which is subject to a four-year limitations period, and breach of the implied covenant of good faith and fair dealing, which is subject to a six-year limitations period, were both filed within four and six years, respectively, of the date those claims accrued. *Stewart v. Sterling Mobile Servs., Inc.*, No. 1 CA-CV 13-0221, 2014 WL 890370, at *3 (Ariz. Ct. App. Mar. 6, 2014) (applying discovery rule to claim for unjust enrichment); *Nationstar Mortg. LLC v. Magnum Fin. LLC,* No. 1 CA-CV 18-0518, 2019 WL 6606081, at *4 (Ariz. Ct. App. Dec. 5, 2019) (applying discovery rule to breach of implied covenant of good faith and fair dealing claim).

## RELIEF REQUESTED

Fact issues abound concerning the accrual of Plaintiff's Common Law Claims that cannot be resolved under Rule 56. This is especially so given the highly technical, environmental aspects underlying those claims and the need to interact with ADEQ based upon its approval of Goodyear's prior work, which compounded the already difficult proposition inherent in discovering Defendants' fraud. Defendants' Motion should be denied in its entirety.

RESPECTFULLY SUBMITTED this 29th day of August, 2022.

GALLAGHER & KENNEDY, P.A.

By: */s/ William F. King*
Stuart S. Kimball
William F. King
Kenneth N. Ralston
2575 East Camelback Road
Phoenix, Arizona 85016-9225

Attorneys for Plaintiff Moreland Properties, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day August, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the Notice of Electronic Filing to the CM/ECF registrants of record in this matter.

*/s/ Bernadine Zeigler*

18