1
2
3
4
5
6
7
8
9
10
11
12
13
14

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Plaintiff Properties, LLC, a Colorado Limited Liability Company, | No. 2:20-CV-02297-SRB |
| Plaintiff, | **GOODYEAR'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| The Goodyear Tire & Rubber Company, an Ohio Corporation, and Goodyear Farms, Inc., an Arizona Corporation, | |
| Defendants. | |

15    **I.    FINDINGS OF FACT**

16        **A.    Parcel History**

17        1.    In approximately 1916, the company that became Goodyear Farms

18    purchased thousands of acres of land west of Phoenix, Arizona to grow cotton.  The cotton

19    was used in The Goodyear Tire & Rubber Company's tire manufacturing process.

20    Collectively, Goodyear Farms and The Goodyear Tire & Rubber Company are referred to

21    as "Goodyear."

22        2.    Relevant to this case, Goodyear's land included a property on the northwest

23    corner of what is now McDowell Road and 159th Avenue in western Maricopa County,

24    Arizona.

25        3.    Included in this property are areas referenced by Goodyear Farms as the

26    Goodyear Farms Labor Camp #54, Runway Area, and Operations Area.

27
28

4.     From 1974 through 1988, Goodyear Farms, Inc. leased the property to Marsh Aviation Co. ("Marsh"), for its crop-dusting operation, which used aircraft to spray chemical defoliants and pesticides on the surrounding cotton fields.

5.     Marsh used the Operations Area for, among other things, aircraft storage, mixing and storage of chemicals, loading chemicals onto planes for aerial spraying, and destroying chemical bags and other garbage in burn pits.

6.     Some of the chemicals used by Marsh Aviation contained toxaphene and arsenic, which were later deemed dangerous to human health by the Environmental Protection Agency.

7.     The Operations Area was contaminated with toxaphene and arsenic, particularly in the mixing, storage, and burn pit areas.

8.     Both toxaphene and arsenic are relatively immobile in soil, and are not known to migrate or seep significantly over time.

9.     In addition to its presence in chemicals that were sprayed on crops, arsenic is a naturally-occurring element that can be naturally elevated in Arizona soils.

10.     In December 1986, Goodyear Farms, Inc., sold the real estate all around the former Marsh property to SunCor Development Company, Inc. ("SunCor").

11.     Goodyear also sold SunCor an option to purchase the former Operations Area (the "Goodyear Property").

12.     Goodyear and SunCor knew the Goodyear Property required environmental remediation.

**B.     Goodyear remediated the Goodyear Property with ADEQ and Haley & Aldrich.**

13.     The Arizona Department of Environmental Quality ("ADEQ") issued a Compliance Order to Marsh on May 6, 1988, determining that Marsh was responsible for remediating the Goodyear Property to remove chemicals deemed dangerous to human health.

14.    On April 23, 1997, ADEQ and Marsh entered into a consent judgment to settle Marsh's civil liability related to the Goodyear Property.

15.    Before completing the consent judgment's requirements, Marsh became insolvent, filed bankruptcy, and ceased operating.

16.    Goodyear, as owner and lessor, took possession of the Goodyear Property.

17.    Goodyear worked with ADEQ to remediate the Goodyear Property.

18.    Goodyear, through its employee, Mr. Jeffrey Sussman, retained third-party environmental engineers to assess the extent of contamination and remediate the Goodyear Property, including Ogden Environmental, and Haley & Aldrich, Inc.

19.    Ogden drafted the initial Site Assessment Plan ("SAP").

20.    The SAP was signed by Donald S. Barrie, a licensed Senior Geologist, stamp # 34432.

21.    ADEQ and Ogden, having analyzed dozens of potential chemicals of concern, jointly determined that the primary contaminants of concern were toxaphene and arsenic.

22.    The SAP describes the process by which the Goodyear Property would be tested for toxaphene and arsenic.

23.    ADEQ approved the SAP.

24.    Mr. Scott Zachary, an environmental engineer at Ogden, worked on the remediation project for the Goodyear Property.

25.    Mr. Zachary moved to Haley & Aldrich, and Goodyear hired Haley & Aldrich to complete the remediation with ADEQ.

26.    On April 1, 2002, Haley & Aldrich submitted its Site Assessment Report and Corrective Action Plan to ADEQ (the "SAR/CAP").

27.    The SAR/CAP is signed by Richard M. Farson, a licensed Senior Engineer, stamp # 29870, and Anita Broughton, a licensed Risk Assessment Task Manager, stamp # 5682 CP.

28.    The SAR/CAP analyzed the results of the testing performed in the SAP.

29.     Haley & Aldrich conducted additional soil sampling, which revealed arsenic and toxaphene concentrations that exceeded ADEQ's established soil remediation levels ("SRLs") for residential ("rSRLs") and non-residential ("nrSRLs") uses of the Goodyear Property.

30.     The SAR/CAP proposed a Corrective Action Plan to remediate the Goodyear Property through excavation and disposal of thousands of tons of contaminated soil and replacement with clean soil.

31.     The SAR/CAP stated that SunCor's **intended future use** of the Goodyear Property was for non-residential (mixed-use commercial) development, as SunCor had represented to the City of Goodyear in public filings.

32.     Goodyear elected to remediate the Goodyear Property to a non-residential standard under A.R.S. § 49-152(B).

33.     Because the intended future use was commercial development, the methodology within the SAR/CAP report was designed to achieve a non-residential remediation, after which the land still had contaminants over the residential standard.

34.     Goodyear's remediation proceeded through ADEQ's Hazardous Waste Program.

35.     The SAR/CAP stated that after the non-residential remediation, Goodyear and ADEQ would place an institutional control on the Goodyear Property restricting future development to non-residential use.

36.     The two contaminants of concern on the Goodyear Property, arsenic and toxaphene, were not evenly spread out over the parcel.

37.     Goodyear's environmental consultants and ADEQ exchanged dozens of communications, including technical memoranda, to establish the protocols to test and remediate the Goodyear Property and approve the SAR/CAP.

38.     Goodyear was required to follow ADEQ's instructions and requirements in connection with conducting the non-residential remediation.

39.     Goodyear's remedial and statistical methodology was developed with and approved by ADEQ.

40.     After ADEQ's review and comment, Haley & Aldrich and ADEQ approved and finalized the SAR/CAP on or about September 30, 2002.

41.     Goodyear, through Haley & Aldrich, and contractors that Haley & Aldrich hired, performed the remediation on the Goodyear Property.

42.     Haley & Aldrich excavated and removed 4100 tons of contaminated soil and replaced it with a similar amount of imported clean soil.

43.     After the remediation, Haley & Aldrich submitted its Final Corrective Action Report (the "CAR").

44.     The CAR is signed by Richard M. Farson, a licensed Senior Engineer, stamp # 2970, and Anita Broughton, a licensed Risk Assessment Task Manager, stamp # 5682 CP.

45.     The CAR was approved by ADEQ.

46.     No witness will testify regarding any improper behavior by Goodyear, Haley & Aldrich, or ADEQ in connection with the remediation resulting in the 2004 DEUR.

47.     On September 30, 2004, Goodyear Farms, Inc. and ADEQ signed and recorded the *Declaration of Environmental Use Restriction* with a Remediation ID of 27423 (the "2004 DEUR") restricting approximately 6.9 acres of the Goodyear Property (the "Restricted Parcel") to non-residential use.

48.     The 2004 DEUR stated that the statistical mean concentrations (95% upper confidence limit ("UCL")) of arsenic and toxaphene remaining on the Restricted Parcel after remediation were 10 mg/kg and 13 mg/kg, respectively.

49.     The 2004 DEUR stated that ADEQ possessed "[m]ore detailed information on the remediation."

**C.    SunCor purchased and altered the Goodyear Property.**

50.     After Goodyear recorded the 2004 DEUR, SunCor exercised its option to purchase the Goodyear Property from Goodyear Farms, Inc.

51.    On May 23, 2006, SunCor subdivided the Restricted Parcel into eight residential-sized parcels (the "Residential Parcels") on the western portion and a large non-residential parcel on the eastern portion ("Tract D"), as set forth in the *Final Plat, Palm Valley Phase VIII South Parcel*.

52.    In January 2007, SunCor sold Tract D to commercial developers as set forth in the *Special Warranty Deed*, dated January 19, 2007.

53.    SunCor developed the Residential Parcels in violation of the 2004 DEUR.

54.    In 2009, SunCor belatedly amended the 2004 DEUR to remove the non-residential use restriction from the Residential Parcels, leaving only Tract D subject to the non-residential use restriction ("2009 DEUR").

55.    In the 2009 DEUR, SunCor stated in part:

> Amendment.  The basis for this Amendment is additional characterization and remedial activities were performed to address the presence of Arsenic and Toxaphene in excess of the residential Soil Remediation Levels ("SRL") on the Property for which the Declaration was executed and recorded.  The results of the remedial activities indicate that a portion of the Property has been remediated to an applicable residential cleanup standard and is suitable for unrestricted use pursuant to A.R.S. § 49-152 (B)…
>
> ***
>
> Effect of this Amendment.  All other provisions of the Declaration remain in full force and effect as if this Amendment hand not been entered into.

56.    Goodyear made no representation in the 2009 DEUR.

57.    Goodyear had no input into any representation made in the 2009 DEUR.

58.    The 2009 DEUR maintains non-residential development restrictions on an area of Tract D of approximately 5.7 acres.

59.    In May 2010, Pine & Palm Streets, LLC, purchased Tract D.

60.    No witness will testify regarding earth moving and vegetation control activities on Tract D between the years of 2004 and 2010, after Goodyear sold the Goodyear Property to SunCor, and before Plaintiff purchased Tract D.

61.    Aerial photographs demonstrate material soil disturbances occurred on Tract D between 2004 and 2010.

62.    These soil disturbances coincide with SunCor's development of the western portion of the Goodyear Property and surrounding fields into residential developments.

63.    No witness can testify regarding how many vehicles, what kind of vehicles, or what size of tires and tread drove over Tract D between 2004 and 2010 during SunCor's development activities on surrounding properties.

64.    No witness will testify regarding what kind or frequency of physical or chemical vegetation control measures were used on Tract D between 2004 and 2010, other than by acknowledging that one vegetation control method was "disking" whereby the soil was tilled, vegetation broken up, and pushed back into the soil.

65.    No witness will testify as to the extent to which the soil on Tract D was churned, mixed, or replaced between 2004 and 2010.

66.    No witness will testify regarding how much soil was moved onto and off of Tract D from SunCor's other development efforts from the Goodyear Property and surrounding properties between 2004 and 2010.

**D.    Plaintiff purchased Tract D in 2010.**

67.    On December 3, 2010, Empire West Title Agency issued to Plaintiff a Commitment for Title Insurance showing the environmental history of Tract D, including the 2004 DEUR and the 2009 DEUR.

68.    On December 24, 2010, Plaintiff purchased Tract D for $600,000.

69.    Plaintiff purchased Tract D as part of a § 1031 Exchange.

70.    Plaintiff did not conduct any environmental due diligence prior to closing.

71.    Plaintiff's agent, Mr. Moreland, read the 2004 DEUR before Plaintiff purchased Tract D.

72.    Plaintiff did not review or obtain publicly available records from ADEQ before purchasing Tract D.

73.    Plaintiff did not obtain a Phase I environmental site assessment report before purchasing Tract D.

74.    Unauthorized dumping incidents occurred on Tract D during Plaintiff's ownership between 2010 and 2022.

**E.    Plaintiff hires WT to conduct soil sampling for a potential sale.**

75.    On August 31, 2014, Plaintiff and Spectrum Acquisition Goodyear, LLC ("Spectrum") signed the *Purchase and Sale Contract 6.0 Acres +/-, Goodyear, Arizona* (the "Spectrum Sale Agreement").

76.    The Spectrum Sale Agreement provided, among other things, Plaintiff agreed to sell Tract D for $1,575,000 (Section 1), and Spectrum intended to develop, construct, and operate a residential development—a senior housing facility (Section 5.E).

77.    Plaintiff hired Western Technologies, Inc. ("WT") to "conduct **shallow** soil sampling and testing…to evaluate whether extensive **surficial areas** might be impacted which would require remediation in order to meet **residential** soil remediation levels (r-SRLs) across [Tract D]."

78.    The testing methodology that the WT report used was a residential methodology.

79.    As a result, the "grid" on Tract D from which the WT samples were taken ("Decision Units") were densely grouped, reflecting a residential methodology.

80.    The native soil on Tract D was a different color from the clean fill soil that Goodyear imported as part of its 2003 remediation.

81.    If the soil where the WT test was to be taken according to the grid occurred in a location with remediated clean-fill soil, WT moved the test to avoid the clean-fill.

82.    WT's results were intentionally biased to show higher contaminant concentrations than are actually present by avoiding clean areas that Goodyear had already remediated.

83.    WT's report did not purport to provide an accurate 95% UCL calculation for the levels of contaminants—arsenic and toxaphene—present on Tract D.

84.    On December 24, 2014, WT recommended that Plaintiff test the unrestricted, non-DEUR portion of Tract D to verify residual contaminant levels.

85.    Plaintiff chose not to investigate the non-DEUR portion of Tract D.

86.    The stated purpose of the Western Tech Report was to conduct testing to determine how difficult it would be to remove the DEUR so Tract D could be used for residential development.

87.    On January 14, 2015, WT issued its final report (the "WT Report").

88.    The WT Report was signed by Steven C. Kaminski, a licensed Geologist, stamp # 29826.

89.    The WT Report stated:

> The results of [WT]'s sampling and testing activities identified that **toxaphene and arsenic** impacted soils are present at the Property exceed the respective r-SRLSs.  [WT] has expressed to Plaintiff that the level of impact observed indicates that it is possible the UCL estimates upon which the DEUR has been established may be under-estimated **given the current extent of the DEUR area and the concentrations reported in this assessment**.  [WT] does not know what action, if any, ADEQ might pursue if the information from this assessment is submitted to it for review.

(Emphasis added).

90.    The WT Report does not claim that Goodyear and ADEQ's 2004 DEUR was inaccurate.

91.    WT did not, directly or indirectly, blame Goodyear for "the concentrations reported in this assessment."

92.    WT did not state that "the current extent of the DEUR," was Goodyear's responsibility.

93.    The WT Report did not state that the "concentrations reported in this assessment" were the result of improper behavior by Goodyear.

94. WT recommended only one remedial method to address the remaining contaminants and achieve removal of the DEUR – excavation of between 2.6 and 3.9 acres of soil to a depth of 9 to 12 inches and replacement of the removed soil with imported clean fill.

95. The WT Report noted that other remedial alternatives were available:

> Less expensive remediation/mitigation alternatives are potentially available, **but they often involve increased agency interaction** and frequently less certainty in the schedule for the project.

96. The WT Report does not purport to be a Remedial Investigation/Feasibility Study ("RI/FS") that complies with the National Contingency Plan ("NCP"), a requirement of CERCLA.

97. WT's engagement was limited to "conduct[ing] shallow soil sampling and testing at approximately 21 locations around the DEUR portion of the Tract D Property."

98. On January 6, 2015, Spectrum terminated the Spectrum Sale Agreement.

99. Plaintiff believed it could not sell Tract D because it claimed it had notice of environmental contaminants on Tract D exceeding the nrSRLs.

100. From January 2015–March 2017, Plaintiff took no action to test or remediate Tract D.

**F.    Plaintiff hires G&K and Synergy.**

101. In early 2017, Plaintiff hired Gallagher & Kennedy ("G&K") and Synergy Environmental, LLC ("Synergy"), as environmental counsel and environmental engineer, respectively, to evaluate and remediate Tract D.

102. On June 22, 2018, ADEQ told Plaintiff in writing that no remediation was necessary to put Tract D to nonresidential use.

103. Plaintiff's correspondence with G&K, Synergy, and its real estate broker show that Plaintiff wanted to pursue a residential remediation of Tract D and remove the DEUR .

104.    On March 15, 2019, Plaintiff and ADEQ entered into an Administrative Settlement Agreement.

105.    Moreland's Administrative Settlement Agreement provides in part:

- "F. On August 17, 2015, the Governor of the State of Arizona designated Misael Cabrera as Director of the ADEQ, and on August 31, 2015, designated Mr. Cabrera as the Natural Resource Trustee for the State of Arizona pursuant to CERCLA, 42 U.S.C. § 9607(f)(2)(B).    Pursuant to A.R.S. § 49-292, Director Cabrera is authorized to execute and enter into this Agreement to resolve and settle Settlor's liability."

- "G. Settlor relied on the ADEQ-approved DEUR, purchased the Site on December 13, 2010, currently owns the Site and is a potentially responsible party pursuant to CERCLA, 42 U.S.C. § 9607(a) and WQARF, A.R.S. § 49-283."

- "2. The purposes of this Agreement are as follows:

    A.  To protect the public health and welfare of the environment;

    B.  To resolve all of Settlor's WQARF and CERCLA liability to ADEQ for Covered Matters by providing a covenant not to sue to Settlor and to settle all claims as defined in paragraph 9 below;

    C.  To provide all accompanying rights and protections afforded by State or Federal law; …"

- "19. Settlor's obligation under this Agreement is to prepare and implement a remedial action plan that will address the soil contamination at the Site to meet applicable non-residential standards that are protective of public health and the environment, based on the 95% upper confidence limit (UCL) estimates of the mean concentrations of the soils left in place."

- "33. In the event that Settlor fails to perform the terms of this agreement as described in paragraph 19, at ADEQ's option, this agreement may be

1    declared null and void, and any protections, rights or privileges that may have

2    arisen under this contract shall likewise be designed null and void."

3    106.    ADEQ did not independently verify any of the factual allegations appearing

4    within the Administrative Settlement Agreement.

5    107.    ADEQ did not validate the accuracy or statistical validity of Plaintiff's UCL

6    calculations.

7    108.    Even though Plaintiff intended to perform a remediation to the residential

8    standard, in emails dated August 14, 2019, Plaintiff and its counsel discussed Plaintiff's

9    intention to deliberately mislead ADEQ regarding the true purpose of its remediation, as

10    well as its intention to remove the DEUR in the future.

11    109.    Plaintiff stated that its reason for misleading ADEQ was because the truth

12    would hurt a cost recovery action.

13    110.    Specifically, on August 14, 2019, G&K stated to Moreland in an email: "The

14    **removal of the DEUR** is **not discussed in our work plan** (only **achieving existing DEUR**

15    **standards**) … **but will be the result after completion of remedial action.**  We **won't**

16    **address that with ADEQ until later**.  That way, **it won't hurt a cost recovery action**

17    given those costs are only to complete the **soon-to-be-ADEQ approved plan (get back to**

18    **DEUR levels).**" MPPRIV209-213 (emphasis added).

19    111.    ADEQ was not aware of Plaintiff's intentions to pursue a residential

20    remediation of Tract D when it entered into the Administrative Settlement Agreement.

21    **G.    Plaintiff remediated Tract D to the residential level and edited Synergy's**

22    **Final Report to deemphasize toxaphene.**

23    112.    One important consideration for any remediation is the intended future use

24    of the property.

25    113.    Synergy drafted the *Remedial Approach Work Plan* ("Moreland Work

26    Plan").

27    114.    Synergy adopted all of the WT tests, which were based on a residential

28    methodology, as the starting methodology for its own testing.

115.    Synergy's testing duplicated some of the "hotspots" identified in the WT Report, further driving up the average reported concentrations of arsenic and toxaphene.

116.    Synergy did not exchange technical memoranda with ADEQ for months or years in developing Plaintiff's methodology for testing and remediating Tract D.

117.    The Moreland Work Plan stated the arsenic and toxaphene levels on Tract D were higher than as stated on the DEUR.

118.    The Moreland Work Plan is not, and does not purport to be, an RI/FS consistent with the National Contingency Plan of CERCLA ("NCP").

119.    Synergy's sole proposed remedial method was to excavate all of the DEUR area and replace that soil with a combination of imported clean fill and re-used native soil.

120.    G&K edited the Moreland Work Plan.

121.    G&K's edits removed references to toxaphene, and specifically that the remediation would reduce toxaphene levels below the residential standard.

122.    G&K's edits emphasized arsenic, and the non-residential standard.

123.    All of the proposed G&K edits were adopted by Mr. Shirley in his final Moreland Work Plan, which was submitted to ADEQ.

124.    The G&K edits are consistent with Plaintiff's August 2019 emails that discuss keeping the true purpose of the remediation hidden from ADEQ.

125.    The Moreland Work Plan proposed "to reduce the residual arsenic soil contamination at the Site by a focused removal action designed to restore conditions at the Site to meet the environmental contamination concentrations specified in the DEUR."

126.    The Moreland Work Plan did not make any finding that arsenic or toxaphene posed a threat to human health or the environment.

127.    The Moreland Work Plan did not discuss whether to remove the 2009 DEUR.

128.    The Moreland Work Plan did not identify or analyze any alternatives to the remediation method Synergy used.

129.    The Moreland Work Plan did not analyze a "no action alternative."

130.    The Moreland Work Plan did not analyze whether its chosen remediation methodology was more protective of human health than alternative methodologies.

131.    The Moreland Work Plan did not analyze whether its remediation methodology was more effective than alternatives.

132.    The Moreland Work Plan did not analyze whether its remediation methodology was more cost-effective than alternatives.

133.    Synergy was aware of a "risk-based approach" that would involve less remediation.

134.    The Moreland Work Plan did not evaluate a "risk-based approach."

135.    Plaintiff did not want to evaluate a "risk-based approach" because Moreland believed it would be too burdensome because of the high level of ADEQ oversight and scrutiny the "risk-based approach" would require.

136.    Plaintiff gave the Moreland Work Plan to ADEQ for review.

137.    On September 17, 2019, Mr. Scott Green of ADEQ responded to the proposed Moreland Work Plan with the following:

> "ADEQ's technical staff have reviewed the Work Plan … that was prepared by Synergy Environmental LLC (Synergy) on behalf of Moreland Properties, LLC (Moreland) …. We would like to get some **clarification** on the following items **before finalizing** the Work Plan review:
>
> ***
>
> 2. Unclear Project End Goal: … **understanding your goals would help determine the type of closure ADEQ could provide**.
>
> 3. Unclear Land Use Goals: **Future land use is not detailed** in the Work Plan.  **ADEQ must understand the end use for the land (i.e., residential, commercial, parking, etc.) to drive critical decisions**, such as size of **Decision Units for sampling**…
>
> 4. **Unclear Intent for Declaration of Environmental Use Restriction (DEUR)**: The Work Plan does not indicate whether Moreland **intends to modify the current DEUR**,

keeping the non-residential use restriction in place, **or if Moreland intends to release the DEUR** and permit unrestricted use of the Site.

\*\*\*

6. Exposure Areas Cannot Be Determined: **Without knowing the intended end use of the property, ADEQ will not be able to determine the proper Decision Units** to represent future exposure areas. **This impacts the use of statistics to develop a remedial endpoint**."

(Emphasis added).

138.    On September 19, 2019, G&K on behalf of Plaintiff, responded to the September 17 email by stating:

"…ADEQ's email disregards … the stated goal of the Work Plan."

\*\*\*

"Although Mr. Green states that the project's end goal and land use goal are unclear, **the Work Plan is quite clear on page 2 that the 'planned soil removal actions are intended to achieve concentrations of residual arsenic in surface and underlying soils that meet the applicable residential/non-residential SLR of 10 mg/kg, as specified in the DEUR**.'  As explained multiple times to ADEQ, **the primary end goal always has been to actually achieve the specified soil-contaminant concentrations that ADEQ confirmed existed in the DEUR** prior to our client's purchase of the property."

\*\*\*

"This unnecessary delay is damaging our client who is in current discussions with potential buyers."

\*\*\*

"The Work Plan **proposes remediation that our client should never have needed to perform**."

\*\*\*

"ADEQ also approved the DEUR.  ADEQ certainly should not now demand that our client must go through all the steps outlined in Mr. Green's email again, **when our client is simply trying to achieve conditions ADEQ confirmed existed when our client purchased the property**."

\*\*\*

> "Given the history at this Site and ADEQ's prior approvals, it is unclear why **the victim** is being required to jump through additional and unnecessary regulatory hurdles to address the property. This continued delay simply **adds to the ongoing costs and damages that have resulted from our client's reliance on ADEQ's prior approvals**."

(emphasis added).

139.     ADEQ testified that Plaintiff had an obligation to disclose its intended future use for Tract D, including removal of the DEUR if Tract D was remediated to a residential standard.

140.     Plaintiff never told ADEQ its intended future use of Tract D.

141.     On September 30, 2019, ADEQ approved the Moreland Work Plan.

142.     The Moreland Work Plan is signed by Dennis H. Shirley, a licensed Geologist, stamp # 26393.

143.     Moreland, through Synergy, began remediating Tract D.

144.     Synergy excavated the Primary Area of Impact ("AOI") to a depth of two to four feet.

145.     Synergy calculated its pre-remediation 95% UCL calculation.

146.     Synergy used a different methodology than Haley & Aldrich and ADEQ when calculating the 95% UCL calculation for arsenic on Tract D.

147.     Prior to remediation, under the lognormal data distribution, given Synergy's sample data and methodology, Synergy stated that the 95% UCL was 154 mg/kg for arsenic and 28 mg/kg for toxaphene.

148.     Based on this, Synergy engaged in a large excavation project, excavating soil across the entire DEUR portion of Tract D, rather than targeted excavations as ADEQ required Goodyear to perform, and replaced it with clean-fill soil.

149.     In addition, Plaintiff chose to "scrape" or remove the top six inches of soil of all of the DEUR portion of Tract D and replace it with clean-fill soil.

150.    After scraping the DEUR portion of Tract D, Plaintiff deposited that soil into its deeper excavations in the middle of Tract D.

151.    Synergy excavated approximately 3,872 tons of imported clean fill.

152.    Synergy's remediation resulted in arsenic and toxaphene concentrations at residential SRLs.

153.    Plaintiff's investigation and remediation of Tract D were conducted over a different, smaller area than the Goodyear Property restricted by the 2004 DEUR.

154.    Following the completion of its remediation, Synergy provided ADEQ with its *Removal Action to Address Residual Arsenic Contamination in Shallow Soils* (the "Moreland Final Report").

155.    The Moreland Final Report was signed by Joel D. Peterson, a licensed Engineer, stamp # 31739, and Dennis H. Shirley, a licensed Geologist, stamp # 26393.

156.    The Moreland Final Report describes the information Synergy provided to the public in connection with the remediation project.

157.    The Moreland Settlement Agreement required Plaintiff to publish notice of the Moreland Settlement Agreement and its material terms "in a newspaper of general circulation in the county in which the Site is located."

158.    Plaintiff did not publish notice of the Moreland Settlement Agreement in a newspaper of general circulation in the county in which Tract D is located.

159.    The Moreland Work Plan did not demonstrate that Plaintiff prepared a community relations plan.

160.    The Moreland Work Plan did not establish a local information repository.

161.    Plaintiff did not interview local officials, community residents, or other interested parties before selecting its remediation approach.

162.    Plaintiff did not provide a public comment period or hold a public meeting prior to selecting its remediation plan.

163.    Plaintiff distributed flyers to the front doors of homes within 500 feet of Tract D two weeks before the remediation began, after Moreland selected its remediation plan.

164.    In its remediation, Plaintiff used excavated soil contaminated with arsenic and toxaphene concentrations over the rSRLs as fill for deeper excavation areas on Tract D.

**H.    Plaintiff filed this cost recovery action.**

165.    On November 30, 2020, Plaintiff filed a complaint initiating this litigation.

166.    On September 16, 2021, Plaintiff filed the amended complaint.

167.    Plaintiff sold Tract D in 2022 for $3,000,000.

168.    Plaintiff sold Tract D in a § 1031 Exchange.

169.    Arsenic is a hazardous substance within the meaning of CERCLA.

170.    Toxaphene is a hazardous substance within the meaning of CERCLA.

171.    Arsenic and toxaphene were released on Goodyear's Property before Goodyear performed its remediation in 2003.

172.    Goodyear remediated the Goodyear Property to the non-residential standards for arsenic and toxaphene as set forth in the SAP, SAR/CAP, CAR, and 2004 DEUR.

173.    Goodyear and ADEQ's remediation, as described in the SAP, SAR/CAP, and CAR are all a matter of public record.

174.    SunCor "released" additional arsenic and toxaphene on Goodyear's property between 2004 and 2010.

## II.    CONCLUSIONS OF LAW

Plaintiff is bringing a CERCLA claim where (1) Goodyear conducted a prior, successful remediation for arsenic and toxaphene on the Goodyear Property with close, direct oversight by ADEQ, resulting in the 2004 DEUR; (2) SunCor altered the property by subdividing it into smaller parcels and engaging in residential development on the Goodyear Property (notwithstanding the 2004 DEUR); (3) Plaintiff set forth in writing its plan to intentionally deceive ADEQ and this Court regarding its remedial objectives and then followed that plan through completion to this trial; and (4) Plaintiff's remedial methodology, intended to bring the land to a residential level, is so faulty and biased that it cannot be trusted to provide the most basic premise of Plaintiff's claims—that the levels of

arsenic on Tract D were above the non-residential level and required remediation to make the land safe for human health and the environment.

### A.    Count I – CERCLA - Elements

To establish a case under CERCLA, Plaintiff must show that (1) there is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a release or threatened "release" of a hazardous substance has occurred at the facility; (3) such release or threatened release has caused the plaintiff to incur response costs that were "necessary" and "consistent with the National Contingency Plan"; and (4) the defendant is in one of four classes of persons subject to liability under § 9607(a), commonly described as Potentially Responsible Persons ("PRPs"). 42 U.S.C. § 9607 (emphasis added); *see Carson Harbor Vill. v. County of Los Angeles,* 433 F.3d 1260, 1265 (9th Cir. 2006); *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989).

### 1.    Tract D is a "facility" under CERCLA, but it is a different "facility" than the Goodyear Property.

The term "facility" under CERCLA includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B).  A plaintiff must show that a hazardous substance has come to be located on the property to qualify as a facility. *Stewman v. Mid-South Wood Products of Mena, Inc.*, 993 F.2d 646, 649 (8th Cir. 1993) (holding that the district court's finding that there had been no release or threatened release of hazardous substances from a Superfund site based on expert testimony that Plaintiff's methodology was flawed was not clearly erroneous and thus that owners were not entitled to damages under CERCLA).

Goodyear concedes that the Goodyear Property *was* a "facility" upon which hazardous substances were deposited and stored. Those hazardous substances were the subject of a successful remediation that resulted in the placement of the 2004 DEUR. Goodyear therefore does not concede that Plaintiff's property is a "facility" within the meaning of CERCLA..

**2. Plaintiff cannot prove there was a "release" of hazardous substances on Tract D that can be tied to Goodyear, other than that which was already remediated and restricted in the 2004 DEUR.**

A release under CERCLA is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing in the environment." 42 U.S.C. § 9601(22). A hazardous substance includes any "element, compound, mixture, solution, or substance designated pursuant to" CERCLA § 9602. *See* 42 U.S.C. § 9601(14).

Under CERCLA, there is substantial overlap in terms used to define "disposal" and "release" of a hazardous substance, so the analysis of the "release" element required for CERCLA liability inevitably overlaps with the "responsible party" analysis. *Sycamore Indus. Park Assoc. v. Ericsson, Inc.*, 546 F.3d 847, 853 (7th Cir. 2008) (citing *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 879 (9th Cir.2001)).

There was a release of toxaphene and arsenic on the Goodyear Property from approximately May 1974 to June 1988 by Marsh. Goodyear completed a remediation addressing the Marsh "release" in 2003, achieving 95% UCLs of: 6 mg/kg for arsenic and 3 mg/kg for toxaphene in the Runway Area (the residential standard); and 10 mg/kg for arsenic and 13 mg/kg for toxaphene in the Operations Area (the non-residential standard). *See* CAR; 2004 DEUR.

From 2004-2010 SunCor (and others) owned the Goodyear Property and conducted residential development on the Goodyear Property, moving a significant amount of earth, which likely introduced or spread chemicals onto the property that were not there when Goodyear was the owner.

In 2010, Plaintiff purchased the Moreland Property. In 2015 and 2018, Plaintiff tested the Moreland Property using a biased, residential testing methodology. In 2017, Synergy, incorporating the biased WT data obtained through the residential testing methodology, claimed the contaminant concentrations on Tract D were 38.5 mg/kg for arsenic and 7.8 mg/kg for toxaphene.

In the ordinary case, there would be no issue that the contaminants of concern—arsenic and toxaphene, came to be located on Tract D because of the "release" from Marsh's operations, and the common identity of the contaminants that Goodyear remediated and those that are allegedly at issue in Plaintiff's remediation.

However, this is not the ordinary case because, here, four significant factors cast doubt on Plaintiff's claim that it incurred "necessary" costs to address a "release": (1) Goodyear and ADEQ conducted a full remediation to bring the land to the non-residential standard, meaning that the land was made safe for human health although some contaminants were intentionally left behind, consistent with Arizona law; (2) Plaintiff stated in emails that its intent was to deceive ADEQ about the objective of its remediation to achieve a residential remediation, but not to remove the DEUR so as not to hurt the cost recovery action; (3) SunCor owned the Goodyear Property after Goodyear, altered the Goodyear Property by subdividing it and conducting significant residential development and earthmoving on and around the Goodyear Property; and (4) Plaintiff's testing and remediation methodology is faulty and cannot be relied upon at all, either to establish that the contaminant levels on Tract D were higher than permitted for a non-residential property, or to show that its remediation was "necessary" under that element of CERCLA. Plaintiff can present no evidence to show any "release." Plaintiff cannot show any "release" was attributable to Goodyear rather than SunCor, and Plaintiff's plan to deceive ADEQ is the basis of this CERCLA cost recovery lawsuit.

### 3. Goodyear is not one of the four classes of persons that is liable under CERCLA.

Goodyear is not a liable person—a PRP—for purposes of CERCLA liability. A PRP is a person who owned or operated the site *at the time of the disposal of any hazardous substances*, or a transporter of hazardous substances, or anyone that arranged for disposal of a hazardous substance. 42 U.S.C. § 9607(a). Proving that the defendant falls within one of the four classes subject to CERCLA's liability is an element of a *prima facie* CERCLA

case. *Id.* Plaintiff must also prove that it incurred response costs responding to the same release for which the defendant is liable. *Id.*

Under the 2004 DEUR, toxaphene and arsenic concentrations on the Goodyear Property's soils in 2004 met the applicable non-residential SRLs, as calculated under the 95% UCL as approved by ADEQ.

No witness can testify regarding changes that occurred to the Goodyear Property or Tract D between 2004 and 2010. Aerial photographs demonstrate that significant earthmoving work occurred on Tract D and the surrounding property as SunCor developed the area. Plaintiff tested a different property, Tract D, excluding the Residential Parcels that SunCor subdivided. On Tract D, Plaintiff conducted tests under a residential methodology, without meaningful ADEQ regulatory oversight, evidenced by multiple technical memoranda. Plaintiff cannot present evidence that Plaintiff's remediation was a result of a release attributable to Goodyear. For the same reason, Plaintiff's WQARF claim fails.

### 4. Plaintiff's remediation costs were not "necessary."

The primary question regarding whether costs are necessary under CERCLA is whether they are incurred to address a threat to the public or the environment. *See Carson Harbor Village LTD. v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006). Response costs are necessary when the property poses "an actual and real threat to human health or the environment," *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (citations omitted), and the response action is tailored to address that threat. *See Carson Harbor*, 433 F.3d at 1265. Response costs are not necessary, and thus not recoverable, when they are "duplicative of other costs, wasteful, or otherwise unnecessary to address hazardous substances at issue." *Waste Management of Alameda County, Inc. v. East Bay Regional Park Dist.*, 135 F.Supp.2d 1071, 1099 (N.D. Cal. 2001).

Goodyear remediated the Goodyear Property to the non-residential standard for toxaphene and arsenic by working with ADEQ and Haley & Aldrich in the SAP, SAR/CAP, and CAR. Then, Goodyear and ADEQ placed the 2004 DEUR on the property, restricting its use to non-residential development. Thus, through its remediation to a lawful level and

1   the placement of an institutional control, the land was made safe for the public and

2   environment for the purpose for which it had been restricted.  CERCLA and its associated

3   regulations contemplate that a property may be made safe for human health and the

4   environment by remediation and placement of an institutional control restricting future uses

5   of the property.  *See* 40 C.F.R. §§ 300.430(a)(iii)(D); 300.430(e)(iii)(2).

6        Subsequently, SunCor subdivided the Operations Area and recorded the 2009

7   DEUR.  Plaintiff then purchased Tract D in 2010.  ADEQ told Plaintiff in writing that Tract

8   D was safe for non-residential use without additional remediation.  The WT Report was

9   explicitly created for the purpose of remediating Tract D to a residential level, and

10   incorporated a residential methodology that exaggerated the concentrations of toxaphene

11   and arsenic on the property.  Synergy incorporated the WT Report into its Work Plan, and

12   supplemented with additional tests, which were also biased to exaggerate the concentrations

13   of contaminants.  During this lawsuit, ADEQ testified that the land was safe for Plaintiff to

14   use for the purpose for which it had been restricted, and that no additional remediation was

15   necessary.  Plaintiff erroneously contends that the Administrative Settlement Agreement,

16   standing alone, establishes the necessity of Plaintiff's remediation as set forth in the

17   Moreland Work Plan and in the Moreland Final Report.

18        **5.  CERCLA requires National Contingency Plan compliance as a**

19            **condition of recovery.**

20        The EPA promulgated the NCP, mandating specific steps a private party must take

21   in selecting a remedial action plan and cleaning up hazardous waste if it wishes to

22   subsequently bring an action for cleanup costs. *See* 40 C.F.R. § 300 et seq. A private party

23   may not recover response costs under CERCLA unless the remedial actions generating

24   those costs are consistent with the NCP. 42 U.S.C. § 9607(a)(4)(B); *Carson Harbor*, 433

25   F.3d at 1265.

26        The NCP is "designed to make the party seeking response costs choose a **cost-**

27   **effective course of action** to protect public health and the environment." *Wash. State Dep't*

28   *of Transp. v. Wash. Nat. Gas. Co.*, 59 F.3d 793, 802 (9th Cir. 1995) (emphasis added).  A

CERCLA plaintiff does not have carte blanche to go to excessive lengths or use CERCLA as an excuse to **improve** its own property. A private response action is "consistent with the NCP" if the plaintiff demonstrates "substantial compliance" with certain procedural requirements, resulting in a "CERCLA-quality cleanup." *See* 40 C.F.R. §§ 300.700(c)(3)(i), 300.700(c)(4).

Here, Plaintiff failed to (i) properly analyze alternative remedial actions, including the "no-action" alternative in its RI/FS, (ii) identify and/or comply with applicable or relevant and appropriate requirements ("ARARs"); and (iii) comply with community relations requirements. Plaintiff's failure to comply with the NCP constitutes material non-compliance that bars any recovery under CERCLA. *See generally Carson Harbor,* 433 F.3d at 1269 (affirming summary judgment on CERCLA claim where plaintiff failed to analyze alternative remedial actions and comply with community relations requirements required by the NCP).

### i. The requirements of NCP compliance vary depending whether the remediation was a "remedial" measure or a "removal" measure.

A threshold issue for determining whether costs were consistent with the NCP is whether a plaintiff conducted a "remedial" action or a "removal" action. Whether an action is remedial or removal in nature is a question of law for the Court. *Carson Harbor*, 287 F. Supp. 1118, 1161 n. 230 (C.D. Cal. 2003). "Removal" actions are generally interim responses designed to address an imminent threat to the health of the public like a burst pipe leaking hazardous chemicals; accordingly, NCP requirements to recover response costs for a removal action are less stringent. *See* 42 U.S.C. § 9601(23); 40 C.F.R. §§ 300.400, 300.415, 300.700(c)(5)(vi); *Sherwin-Williams Co. v. City of Hamtramck*, 840 F. Supp. 470, 475 (E.D. Mich. 1993). In contrast, "remedial" actions are typically non-emergent, and consistent with a permanent remedy, like Goodyear or Plaintiff's remediation, which involved excavation of chemicals that had been present in the soil for decades. *Pub. Serv. Co. of Colorado v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir. 1999).

Whether an action is a "removal" or "remedial" action changes the NCP requirements that are applicable to the landowner's CERCLA cost recovery and contribution action. *Public Service Co. of Colorado v. Gates Rubber Co.*, 175 F.3d at 1182-83 ("Although the regulations are less complex and comprehensive for removal actions to reflect the EPA's interest in facilitating a private party's swift response to a threatened release, the NCP's regulatory framework remains EPA's main leverage in assuring the quality and consistency of private party response actions when surrounding communities and the environment are put at risk."); § 9601(24); 40 C.F.R. §§ 300.400, 300.420.

The appropriateness of a removal action is evaluated based on "actual or potential exposure" to nearby human and animal populations, contamination of drinking water, drums, barrels, or tanks, present on the property that pose a threat of release, contaminants which are likely to migrate, weather conditions that may cause migration, threat of fire or explosion, and the availability of other response measures. 40 C.F.R. § 300.415(b).

Plaintiff conducted a *remedial* action. Synergy entitled its Work Plan as "Work Plan—Removal Action to Address Residual Arsenic Contamination in Shallow Soils at the Former Marsh Aviation Site." Plaintiff presents no other evidence that it performed a "removal" action. There was no emergency—according to Plaintiff, the contaminants had been in the ground since Goodyear last owned the land in 2004. There was a years-long delay from Plaintiff's discovery of allegedly elevated contaminant levels in the 2015 WT report to the commencement of planning and excavation. Plaintiff's leisurely pace in addressing alleged contaminants is evidence that there was not an actual or perceived emergency. *See Long Beach Unified Sch. Dist. v. Santa Catalina Island Co.*, No. CV 19-1139-JFW(ASX), 2021 WL 4706552, at *11 (C.D. Cal. Aug. 17, 2021) (*slip op.*) (concluding that cleanup was a remedial action where years-long delays in submission and approval of cleanup plan showed that the cleanup was not a "prompt" reaction to a "time sensitive" situation). In Plaintiff's complaint, as well as in its emails, Plaintiff admits that it incurred "remedial action response costs."

Because Plaintiff conducted a remedial action on Tract D aimed at a permanent cleanup, for immobile chemicals believed to be there for years, where there was no emergency or immediate threat to human health, the stricter NCP requirements applied to Plaintiff's remedial action.

###### ii.    Plaintiff failed to comply with NCP requirement of an RI/FS.

The NCP requires a CERCLA plaintiff to prepare a remedial investigation and feasibility study ("RI/FS"), and provide an opportunity for public comment." *Id.* at §§ 300.700(c)(5)(vii), 300.700(c)(5)(viii), 300.700(c)(6). Plaintiff failed to comply or substantially comply with the NCP requirement of an RI/FS.

The RI/FS's purpose is to "assess site conditions and evaluate alternatives to the extent necessary to select a remedy." 40 C.F.R. § 300.430(a)(2). The NCP states, "[t]he primary objective of the feasibility study (FS) is to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker **and an appropriate remedy selected**…. The development and evaluation of alternatives shall reflect the scope and complexity of the remedial action under consideration and the site problems being addressed. Development of alternatives shall be fully integrated with the site characterization activities of the remedial investigation described in paragraph (d) of this section." 40 C.F.R. § 300.430(e)(1) (emphasis added); *see also Carson Harbor,* 433 F.3d at 1268.

In the RI/FS, the plaintiff must develop and analyze remedial alternatives reflecting the scope and complexity of the remedial alternatives and establish acceptable exposure levels that are protective under the ARARs established by federal or state law, and evaluated for effectiveness, implementability, and cost. 40 C.F.R §§ 300.430(e)(1), (e)(7)(i)–(iii).

The RI/FS *must* analyze a "no-action alternative, **which may be no further action if some removal or remedial action has already occurred at the site**," *id.* at § 300.430(e)(6) (emphasis added), as well as other alternatives that protect human health and the environment. *Id.* § 300.430(e)(2).

1     The NCP requires real consideration of remedial alternatives before the plaintiff

2    selects a final remediation plan.  CERCLA requires that a "detailed analysis shall be

3    conducted on the limited number of alternatives that represent viable approaches to

4    remedial action after evaluation in the screening stage." *Id.* § 300.430(e)(9).  During this

5    "detailed analysis" stage, the NCP instructs the remediating party to complete a written

6    analysis of *each* remedial alternative, including the no-action alternative, that specifically

7    considers the following factors in descending order of importance: (1) overall protection of

8    human health and the environment; (2) compliance with ARARs; (3) long-term

9    effectiveness and performance; (4) reduction of toxicity, mobility, or volume through

10    treatment; (5) short-term effectiveness; (6) implementability; (7) cost; (8) state acceptance;

11    and (9) community acceptance. *Id.* § 300.430(e)(9)(iii).

12     Plaintiff's first engineering firm, WT, was hired in 2014 to investigate Tract D and

13    evaluate the steps necessary to remediate Tract D to a residential standard in order to remove

14    the 2009 DEUR.  The WT Report does not purport to be an RI/FS that complies with the

15    NCP – WT's engagement was limited to "conduct[ing] shallow soil sampling and testing at

16    approximately 21 locations around the [2009] DEUR portion of [Tract D].  This shallow

17    soil sampling and testing work was intended to evaluate whether extensive surficial areas

18    might be impacted which would require remediation in order to meet residential soil

19    remedial levels (r-SRLs) across [Tract D]."

20     WT recommended just one remedial method for achieving residential standards

21    across the property – excavation of between 2.6 and 3.9 acres of soil to a depth of 9 to 12

22    inches and replacement.  Importantly, WT noted that other, potentially less expensive

23    alternatives were available, but did not list or analyze them: "Less expensive

24    remediation/mitigation alternatives are potentially available, but they often involve

25    increased agency interaction and frequently less certainty in the schedule for the project."

26     Morland's second engineering firm, Synergy, was hired in 2017 to perform

27    additional site characterization and remediation on Tract D.  Synergy had access to the WT

28    report and WT's testing data was utilized by Synergy.  Despite WT's acknowledgement

that a variety of potential remedial alternatives existed, Synergy proposed just one – excavate and scrape the *entire* DEUR property and replace with imported clean fill and scraped soil.[1] Synergy does not identify any of its work product as an RI/FS.

Moreover, Synergy never engaged in the multi-step process of identifying, analyzing, and narrowing available remedial options to choose the best method as required by the nine-factor test for the NCP. Plaintiff acted contrary to the NCP's instruction that "[t]he **no-action alternative, which may be no further action if some removal or remedial action has already occurred at the site, shall be developed**." 40 C.F.R. § 300.430(e)(6) (emphasis added).

The Moreland Work Plan (which is not an RI/FS), did not analyze any alternatives to its single proposed course of action. Because no alternatives were analyzed, it engaged in unnecessary remedial steps without supporting testing data, Plaintiff chose to scrape the top six inches off of the entire DEUR portion of Tract D in addition to the Plaintiff's massive central excavation. Because Plaintiff did not consider alternatives, Plaintiff's remediation failed to comply with the NCP.

### iii. Plaintiff failed to follow the NCP's public participation requirements.

The NCP requires **meaningful** engagement with public stakeholders in the development, selection, and execution of the remedial action. Prior to beginning field work, the party conducting the cleanup "shall ... to the extent practicable" interview local officials, community residents, or other interested parties. 40 C.F.R. § 300.430(c)(2)(i). A formal community relations plan must be prepared, and at least one local "information repository" must be established to make information available to the public about the site remediation. 40 C.F.R. § 300.430(c)(2)(ii).

Before the final selection of a remediation alternative, the plan must be published in a "major local newspaper of general circulation." 40 C.F.R. § 300.430(f)(3)(i)(A). There

---

[1] It is notable that Plaintiff's alleged non-residential remediation involved *more* excavation than WT's proposed *residential* remediation.

must be an opportunity for the public to submit comments, hold a public meeting with the transcript made available to the public, and a written summary of significant comments and responses to those comments. 40 C.F.R. § 300.430(f)(3)(i)(B) – (F).  Only after proper public engagement may a final remedy be selected.  40 C.F.R. § 300.430(f)(1)(iii).

Synergy failed to comply with public notice requirements. Two weeks before the commencement of construction activities, *after* Plaintiff selected its remediation alternative, Synergy (i) dropped flyers on the front doors of some homes within 500 feet of Tract D with some details of the planned soil removal action and provided contact information for inquiries and (ii) erected a 4-foot by 6-foot sign on Tract D.  Plaintiff did not substantially comply with NCP public participation requirements.

### iv.  Plaintiff failed to comply with ARARs.

Plaintiff's selected remediation alternative must consider "[a]pplicable or relevant and appropriate requirements [ARARs] under federal environmental or state environmental or facility siting laws." 40 C.F.R. § 300.430(e)(2)(i)(A).  ARARs include "any standard, requirement, criteria, or limitation under any Federal environmental law" or more stringent "state environmental or facility siting law." *Id.* The NCP defines "applicable requirements" as "those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site." 40 C.F.R. § 300.5.  Stated differently, in designing a CERCLA quality cleanup consistent with the NCP, a Plaintiff should not violate other applicable environmental statutes.

Arizona's solid waste disposal statutes are ARARs because they are among the "cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under … state environmental or facility siting laws."  40 C.F.R. § 300.5. Pursuant to A.R.S. § 49-701.01(a), impacted soils that exceed the applicable SRL are classified as solid waste, unless they fall within certain limited exceptions as set forth in A.R.S. § 49-701.02.  Contaminated soils that are left in place (i.e., not excavated) are not

solid waste.  *See* A.R.S. § 49-701.02(A)(4).  Excavated soils are not solid waste, if and only if they (i) meet the residential SRL, or (ii) meet the predetermined or site-specific non-residential SRL, and the property owner files "a written notice with the director, for placement in the repository established pursuant to section 49-152" that identifies the location of the property and the location of the excavated soils on the property.  A.R.S. § 49-701.02(A)(1)-(3).

Plaintiff failed to follow state-law ARARs regarding disposal of solid waste by burying solid waste on Tract D.  Synergy claims that there were seven tests in the peripheral areas of Tract D that exceeded the residential/non-residential SRL of 10 mg/kg of arsenic, and one test that exceeded the residential SRL of 5 mg/kg for toxaphene.  Synergy scraped these impacted soils (thereby creating solid waste under Arizona ARARs), and then disposed of the waste by burying it in the bottom of the deeper excavations on Tract D.

Because Synergy violated Arizona's solid waste disposal statutes, it failed to comply with ARARs, meaning that it did not comply with the NCP, precluding cost recovery under CERCLA.

### 6.  The Administrative Settlement Agreement is Not a Proxy for NCP Compliance

Plaintiff may argue that the ADEQ-approved Administrative Settlement Agreement establishes compliance with the NCP, but any such argument is meritless.  When the United States government, a state, or an Indian tribe is seeking recovery of response costs, consistency with the NCP is presumed. *Washington State Dep't of Transp. V. Washington Nat. Gas Co., Pacificorp*, 59 F.3d 793, 799-800 (9th Cir. 1995) (internal citations omitted).  In that case, the potentially responsible party has the burden of rebutting the presumption by proving inconsistency with the NCP. *Id.*  In contrast, any "other person" seeking response costs must prove that its actions are consistent with the NCP. *Id.*

Under controlling Ninth Circuit precedent, Moreland is not entitled to any presumption of compliance with the NCP simply by virtue of entering into the Administrative Settlement Agreement.  However, even if it were entitled to a presumption

1    of compliance, the evidence of material non-compliance noted in the sections above with

2    respect to lack of an RI/FS, failure to analyze remedial alternatives, failure to engage in

3    meaningful public participation, and failure to follow ARARs are more than sufficient to

4    rebut any presumption.

5             **7.  Plaintiff's CERCLA claim against Goodyear is a § 113 contribution**

6               **claim.**

7          CERCLA provides two distinct and mutually exclusive cost recovery actions, a §

8    107 action and a § 113 action. 42 U.S.C. §§ 9607, 9613; *United States v. Atlantic Research*

9    *Corp.*, 551 U.S. 128, 138 (2007).

10         Section 113(f)(3)(B) provides that "[a] person who has **resolved its liability** to the

11    United States **or a State** for some or all of the costs of such action in an administrative or

12    judicially approved settlement may seek contribution from any person who is not party to a

13    settlement." (Emphasis added.)

14         Sections 107 and 113 provide "causes of action 'to persons in different procedural

15    circumstances'" and a cost recovery under Section 107(a) and contribution under Section

16    113(f) are two "clearly distinct remedies." *Atlantic Research*, 551 U.S. at 138–39

17    (quoting *Cooper Industries, Inc. v. Aviall Servs. Inc.*, 543 U.S. 157, 161 (2004)).

18         In *Guam v. United States*, the question before the Supreme Court was whether a

19    party must resolve a **CERCLA specific liability** in order to trigger the right to contribution

20    under Section 113(f)(3)(B) or "whether a broader array of settlements involving

21    environmental liability will do." 141 S. Ct. 1608, 1611 (2021).  Specifically, the Court held

22    that a party *may* seek contribution under Section 113(f)(3)(B) only after settling a

23    CERCLA-specific liability.  *Id.* at 1615.  Because Guam's consent decree with the EPA

24    resolved Guam's liability under the **Clean Water Act**, rather than any provision of

25    CERCLA, the Supreme Court concluded that Guam could not pursue a contribution claim

26    under Section 113(f)(3)(B).  In order to "trigger a right to contribution under Section

27    113(f)(3)(B), a settlement must "expressly discharge a CERCLA liability." *Stratus Redtail*

28    *Ranch LLC v. Int'l Bus. Machines Corp.*, WL 2187334, at * 2 (D. Colo. June 16, 2022).

1    Here, Plaintiff's Administrative Settlement Agreement discharges CERCLA

2  liability, and orders Plaintiff to clean up its property to the non-residential level.  The Ninth

3  Circuit has recognized that although the Supreme Court has held that 107(a) and 113(f)

4  actions are distinct, there are certain procedural postures that do not fit clearly into the

5  107(a) or 113(f) procedural framework, such as instances where a private party is ordered

6  by the government to clean up a property.  *Whittaker Corp. v. United States*, 825 F.3d 1002,

7  1007 (9th Cir. 2016) ("Such a party is not reimbursing someone else, but neither are its own

8  costs 'voluntary.'").

9    However, to resolve the issue of which action the plaintiff could bring, the *Whittaker*

10  Court stated that "every federal court of appeals to have considered the question

11  since *Atlantic Research* ... has said that a party who *may* bring a contribution action for

12  certain expenses *must* use the contribution action, even if a cost recovery action would

13  otherwise be available." *Whittaker Corp.,* 825 F.3d at 1007.

14    Here, Plaintiff's Administrative Settlement Agreement explicitly resolves Plaintiff's

15  CERCLA liability, and expressly states that Plaintiff is a PRP.  This is a resolution of a

16  107(a) action between ADEQ and Plaintiff.

17    Plaintiff's Administrative Settlement agreement also states that Plaintiff is a PRP,

18  which lends more weight to the notion that Plaintiff's action against Goodyear is a

19  contribution action.  Once an entity is identified as a PRP, it may be compelled to clean up

20  a contaminated area or reimburse the Government for its past and future response costs. *See*

21  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 609 (2009) (citing *Cooper*

22  *Industries, Inc. v. Aviall Services, Inc.,* 543 U.S. 157, 161, 125 S.Ct. 577, 160 L.Ed.2d 548

23  (2004)).

24    And, regardless of whether Plaintiff articulates some basis for asserting another

25  107(a) direct cost recovery action, under *Whittaker Corp.*, because Plaintiff *may* bring a

26  113(f) contribution action, Plaintiff is obligated to bring a § 113(f) contribution claim.  *See*

27  *also Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 767 (6th Cir. 2014)

28  ("CERCLA's text and structure lead us to conclude that PRPs must proceed under § 113(f)

1    if they meet one of that section's statutory triggers."); 42 U.S.C. § 9613(f)(3)(B); *ASARCO*

2    *LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1117 (9th Cir. 2017).

3    Here, Plaintiff's Administrative Settlement Agreement specifically absolves

4    Plaintiff of liability under CERCLA and WQARF. *See Administrative Settlement*

5    *Agreement* Section II ¶ 2(B), VII ¶¶ 24–25. The Administrative Settlement Agreement

6    resolved Plaintiff's obligations "with certainty and finality" by requiring it to "prepare and

7    implement a remedial action plan that will address soil contamination at the Site . . . ."

8    Section IV ¶ 9, V ¶¶ 19–20, 25. Because the Administrative Settlement Agreement meets

9    the applicable standards to "resolve[] its liability to the United States or a State for some or

10   all of a response action," regardless of whether Plaintiff can articulate a separate 107(a)

11   claim against Goodyear, Plaintiff is required to bring its claim against Goodyear under §

12   113(f)(3)(B).

13   **8.  Damages and Allocation**

14   Response costs are allocated among liable parties "using such equitable factors as

15   the court determines are appropriate." 42 U.S.C. § 9613(f)(1). To determine a contribution

16   allocation under § 113, courts may consider the Gore factors, as well as other equitable

17   factors. *ASARCO, LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859, 869–69 (9th Cir. 2020);

18   *TDY Holdings, LLC v. United States*, 885 F.3d 1142, 1147 (9th Cir. 2018) (approving the

19   use of the Gore factors for allocation under CERCLA).

20   The Gore factors are: (1) the ability of a party to demonstrate that their contribution

21   to a discharge, release, or disposal can be distinguished; (2) the amount of waste involved;

22   (3) the toxicity of the waste involved; (4) the degree of involvement by the parties in the

23   generation, transportation, treatment, storage, or disposal of hazardous waste; (5) the degree

24   of care exercised by the parties with respect to the hazardous waste; and (6) the degree to

25   which a party cooperates with federal, state, or local officials to prevent harm to the public

26   health or the environment. *ASARCO*, 975 F.3d at 869–70.

27   Courts may also consider the following equitable factors: (1) "the extent to which

28   the clean-up costs are attributable to wastes for which a party is responsible; (2) the party's

level of culpability; (3) the degree to which the party benefitted from disposal of the waste; and (4) the party's ability to pay its share of the costs." *El Paso Nat. Gas Co., LLC v. United States*, 390 F. Supp. 3d 1025, 1053 (D. Ariz. 2019). A court may also consider principles of equity and fairness, including traditional defenses to contribution, even if they do not preclude CERCLA liability. *Town of Munster, Ind. v. Sherwin–Williams Co.*, 27 F.3d 1268, 1270 (7th Cir. 1994).

The first Gore factor looks at a party's ability to distinguish their waste from another party's. Goodyear took on Marsh's pollution when Marsh went out of business. Goodyear cleaned up Marsh's pollution with its remediation and institutional control. Later, after several others owned and altered the parcel, Plaintiff conducted environmental tests with a different methodology on a different parcel of land, Tract D, claiming unsafe contaminant levels. Plaintiff does not present any evidence to allocate waste to parties, does not account for anything that happened on the property between 2004 (when Goodyear sold the property) and 2010, and does not provide any testimony linking its remediation to the same hotspots or remedial actions done by Goodyear.

The second Gore Factor examines the amount of waste at issue. Here, there was very little waste because the Goodyear Property already met the applicable Arizona standards for a non-residential remediation. The chemicals had been sitting in the earth for decades. There was no threat to human health because of the DEUR.

The third Gore Factor examines the toxicity of the waste. Here, the waste is not toxic. While the chemicals are hazardous for human health, there was no emergency situation, such as the derailment of a train that released chemicals that were so toxic that they had to be immediately removed.

The fourth Gore Factor essentially evaluates a party's culpability, looking to see what role it had in transporting, generating, storing, and disposing of the waste. Goodyear is not culpable; it worked with ADEQ to remediate Marsh's pollution.

The fifth factor looks to the degree of care exercised by the parties concerning the waste. Goodyear worked with ADEQ for years to develop a methodologically sound

1    remediation to clean up the property.  It exercised all due care.  There is no professional

2    negligence claim in Plaintiff's lawsuit.  Goodyear's remediation is a matter of public record

3    and resulted in the 2004 DEUR.

4        Courts also evaluate which party benefitted from cleaning up the waste and which

5    party has the ability to pay for the cleanup.  Plaintiff greatly benefitted from its residential

6    remediation; it sold the property it has purchased for $600,000 for $3,000,000.  Both parties

7    are sophisticated and are easily capable of incurring such expenses.

8        Goodyear completed a full remediation on the property, worked closely with ADEQ,

9    and took all necessary steps in its previous remediation to protect human health and the

10   environment. In contrast, Plaintiff deliberately deceived ADEQ about its true intentions,

11   threatened ADEQ into entering into a settlement agreement, and manufactured this action

12   in bad faith. The Court concludes that Goodyear shall have no allocation under the Gore

13   factors and other case law.

14        **9.  If  Plaintiff  argues  its  2020  remediation  was  a  continuation  of**

15             **Goodyear's 2003 remediation, Plaintiffs' CERCLA and WQARF**

16             **claims are barred by the statute of limitations.**

17        Generally, there can only be one remedial action at a site. *MPM Silicones, LLC v.*

18   *Union Carbide Corp.*, 561 F. Supp.3d 293, 312 (N.D.N.Y. 2021).  A remedial action is the

19   same where it consists primarily of taking additional steps to address the same problem or

20   remediating different aspects of the original problem. *Id.*

21        A CERCLA claim may be barred if a subsequent remediation is part of the original

22   cleanup effort, instead of a new action. *Id.* If a plaintiff claims it is finishing a prior

23   remediation, the statute of limitations for its cleanup relates back to the date of the original

24   remediation.  A claim for cost recovery must be brought within six years of beginning of

25   the physical onsite construction of the remedial action. 42 U.S.C. § 9613(g)(2)(B).

26        Here, Plaintiff claims its remedial action "was a continuation and culmination of the

27   16-year long process . . ." of Goodyear's remediation. [Dkt. 118, p. 5.] Plaintiff adopts this

28   position—hoping  to  borrow  elements  of  Haley  &  Aldrich's  remediation  (that  it

{00220546-5 }                                35

1    simultaneously claimed to be fraudulent)—in a vain attempt to show compliance with the

2    NCP. *Id.* Goodyear never attempted to comply with the NCP because it never intended to

3    force the costs of its remediation onto others. WT never attempted to comply with the NCP,

4    and its stated purpose was to determine what work would be necessary to remove the 2009

5    DEUR. If the Court finds that Plaintiff's remediation is a continuation of Goodyear's, the

6    applicable statute of limitations relates back to the start of Goodyear's remediation, and is

7    time-barred.

8           **B.     Plaintiff's Count 1 – WQARF - Elements**

9           Plaintiff has apparently conceded the WQARF claim, failing to describe it in the

10   joint pretrial statement.

11          Arizona's Water Quality Assurances Revolving Fund ("WQARF") statute governs

12   liability of a prior landowner at the state level.   It is based on CERCLA, and shares

13   essentially the same elements.

14          WQARF allows a private party to recover response costs for the remediation of a

15   site from another responsible party if those costs were "reasonable, necessary and cost-

16   effective" and are consistent with A.R.S. § 49-282.06. *See* A.R.S. § 49-285(A).   This is

17   essentially the same as the NCP compliance required by CERCLA, including a reasonable

18   analysis of remedial alternatives, balancing cost and efficacy.

19          Like CERCLA, a party will be considered responsible for a release of a hazardous

20   substance under WQARF if it "owned or operated the facility: (a) when the hazardous

21   substance was placed or came to be located in or on the facility; (b) when the hazardous

22   substance was located in or on the facility but before the release; or (c) During the time of

23   the release or threatened release." A.R.S. § 49-283(A)(1).   This is very similar to

24   CERCLA's PRP analysis.

25          However, WQARF imposes an additional requirement, that the real property owner

26   must have also: (1) been "engaged in the business of generating, transporting, storing,

27   treating, or disposing" hazardous waste at the facility, or "knowingly permitted others to

28   engage in such business at the facility," (2) allowed another to use the facility for hazardous

{00220546-5 }                                    36

waste disposal, (3) "knew or reasonably should have known that a hazardous substance was located in or on the facility at the time right, title or interest in the property was first acquired by the person and engaged in conduct by which he associated himself with the release, . . . or (4) took action which significantly contributed to the release after he knew or reasonably should have known that a hazardous substance was located in or on the facility." A.R.S. § 49-283(B).

Arizona's equivalent to CERCLA's NCP requirement is A.R.S. § 49-282.06. WQARF allows a party to recover its necessary response costs for a remedial action if it: "(1) assure[s] the protection of public health and welfare and the environment, (2) To the extent [is] practicable, provide[s] for the control, management, or cleanup of the hazardous substances in order to allow the maximum beneficial use of the waters of the state, [and] (3) [is] reasonable, necessary, cost-effective and technically feasible." A.R.S. § 49-282.06. To select the most appropriate remedial action, the remediating party must compare alternative remedial actions, including no action. *Id.* §§ 49-282.06(4), 49-287.03.

WQARF includes a safe harbor provision, which states that any person who receives the director's approval before, during, or after the remedial action may recover response costs, and the action will be considered to be in substantial compliance with § 49-282.06. A.R.S. § 49-285(B).

Regarding allocation of damages, however, liability under WQARF is several only among potentially responsible parties. A.R.S. § 49-285(E). Stated differently, a potentially responsible landowner can only be liable for its proportionate share of remediation costs. In determining allocations, a court shall consider: (1) "the amount and concentration of each hazardous substance involved; (2) the degree of toxicity of each hazardous substance involved; (3) the degree of involvement by the responsible parties" in the generating, transporting, or disposal of hazardous waste; (4) "the magnitude of the risk to human health or the environment . . ."; (5) the degree of cooperation with government officials by each PRP; and (6) any other equitable or relevant factors. *Id.* §§ 49-285(E)–(F).

Before a settlement can be approved by ADEQ, the public must receive notice and opportunity to comment. A.R.S. § 49-289.03(A). The settling party may then pursue contribution from any non-settling party. A.R.S. § 49-292(E).

A settlement agreement with ADEQ does not require an express finding as to "an imminent and substantial endangerment to the public health or welfare, the waters of this state, or the environment." A.R.S. § 49-292(A). For all of the reasons explained above in the analysis of the CERCLA § 113 action, Goodyear is not liable for any share of fault under WQARF because, among other things, Plaintiff cannot prove that the cleanup it performed was the result of a "release" occurring on Goodyear's Property prior to 2004.

## C.    Plaintiff's Count V – Breach of the Implied Covenant of Good Faith and Fair Dealing – Elements

A valid contract requires offer, acceptance, and consideration, and both parties must have intended to be bound. *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 212 Ariz. 381, 384, ¶ 10, 132 P.3d 825, 828 (2006). The party seeking enforcement of the contract has the burden of proving the contract exists. *U.S.W. Commc'n, Inc. v. Ariz. Corp. Comm'n*, 197 Ariz. 16, 22, ¶ 20, 3 P.3d 936, 942 (App. 1999). An offer is a proposal to enter into a contract on the terms contained in the offer. Rev. Ariz. Jury Instructions (Civil) 7th, *Contract 4* (July 2013) ("RAJI"); *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 139 Ariz. 209, 212 (App. 1983). A valid acceptance is an expression of agreement to the terms of the offer by the person to whom the offer was made. RAJI, *Contract 6*; *Contempo Const. v. Mt. States T & T Co.*, 153 Ariz. 279, 281 (App. 1987); *K-Line Builders*, 139 Ariz. at 212. Consideration is a benefit received, or something given up or exchanged, as agreed upon between the parties. *K-Line Builders*, 139 Ariz. at 212. "[L]egal consideration, like every other part of a contract, must be the result of agreement. The parties must understand and be influenced to the particular action by something of value recognized by all parties as the moving cause." *Demasse v. ITT Corp.*, 194 Ariz. 500, 506-07, ¶ 20, 984 P.2d 1138, 1144-45 (1999). Here, there is no contract between Plaintiff and Defendants.

In addition to the express terms, Arizona law "implies a covenant of good faith and fair dealing in every contract." *Bike Fashion Corp. v. Kramer,* 202 Ariz. 420, 46 P.3d 431 (App. 2002); *Rawlings v. Apodaca,* 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986).  Without a contractual relationship, no duty of good faith arises, and a party cannot bring an implied covenant breach claim.  *Beaudry v. Insurance Co. of the West,* 203 Ariz. 86, 50 P.3d 836, (App. 2002) (citing *Rawlings*, 151 Ariz. at 153-54, 726 P.2d at 569-70).  Here, there is no contractual relationship between Moreland and Goodyear, therefore, Plaintiff cannot bring an implied covenant claim against Goodyear.

A contract is breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach.  *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 201 Ariz. 474, 492, 38 P.3d 12, 30 (2002); *see e.g., Garza v. Gama*, 240 Ariz. 373, 377, 379 P.3d 1004, 1008 (App. 2016) ("As alleged here, that principle means that although Swift's contracts may not have required it to pay drivers for any more miles than HHG specified, Swift may have breached its duty of good faith and fair dealing if it deliberately manipulated HHG to have it short the mileage the software calculated for purposes of payment.")

Here, assuming the 2004 DEUR is a contract (it is not), Plaintiff has not alleged (and cannot prove) any exercise of discretion by Goodyear and ADEQ that deprived Plaintiff of the benefit of its bargain.  Rather, Plaintiff alleges a breach of an express term—the concentrations of contaminants set forth in the 2004 DEUR (rather than the operative 2009 DEUR).  Accordingly, Plaintiff's implied covenant claim fails.

Generally, a covenant or restriction runs with the land in equity if four elements are met: (1) there is an enforceable promise between the original parties; (2) the promise touches and concerns the land; (3) the parties intended to bind their successors; and (4) the successors have notice of the restriction.  *Federoff v. Pioneer Title & Tr. Co. of Arizona*, 166 Ariz. 383, 387, 803 P.2d 104, 108 (1990).

A restrictive covenant that runs with the land transfers when ownership of the attached land transfers, binding the subsequent owner instead of creating a contract between the prior owner and the subsequent owner.  *Salkhi v. BP West Coast Products, LLC*, 826 Fed. Appx. 671, 672 (9th Cir. 2020) (finding deed restrictions on land use did not implicate a statute which governed validity of contracts).  A subsequent owner of property subject to an environmental use restriction covenant that runs with the land is bound by that covenant and is required to assume all the obligations contained within the covenant. A.R.S. § 49-151(4).  However, there is no privity between owners subject to the same covenant that runs with the land, and subsequent landowners cannot sue prior landowners regarding the covenant.  The successor takes the property bound by the covenant and must comply with it.  *Federoff v. Pioneer Title & Tr. Co. of Arizona*, 166 Ariz. 383, 387, 803 P.2d 104, 108 (1990).  The 2004 DEUR restricts the land to non-residential purposes.  The 2004 DEUR is not a contract between Goodyear and Moreland; it is an institutional control that functions as a deed restriction that ADEQ can enforce against the current landowner.  Neither ADEQ nor Moreland can use the 2004 DEUR to reach back in time and sue Goodyear in contract.

Plaintiff is not a third-party beneficiary of the 2004 DEUR.  "For a person to recover as a third-party beneficiary in Arizona, the contracting parties must intend to directly benefit that person and must indicate that intention in the contract itself."  *Sherman v. First Am. Title Ins. Co.*, 201 Ariz. 564, 567, 38 P.3d 1229, 1232 (App. 2002), *citing Norton v. First Fed. Sav.,* 128 Ariz. 176, 624 P.2d 854 (1981), *Irwin v. Murphey,* 81 Ariz. 148, 302 P.2d 534 (1956).  The contemplated benefit must be both "intentional and direct." *Norton*, 128 Ariz. At 178, 624 P.2d at 856. It is not enough that a contract may operate to a person's benefit, but it "must appear that the parties intended to recognize him as the *primary* party in interest and as privy to the promise."  *Sherman,* 201 Ariz. at 567, 38 P.3d at 1232 (emphasis in original).  Whether a person is a third-party beneficiary is a question of law for the Court.  *Id.*

Defendants are entitled to recover attorneys' fees as the prevailing party under A.R.S. §§ 12-341 and -341.01 if they show there was never a valid contract. "Even when a

1    contract is alleged by a plaintiff and the defendant successfully proves that there was no

2    contract, the action is considered to have arisen out of contract for purposes of A.R.S. §12-

3    341.01." *Rudinsky v. Harris*, 231 Ariz. 95, 101, 290 P.3d 1218, 1224 (App. 2012). If

4    Goodyear prevails on Count V, the Court should award Goodyear its reasonable attorneys'

5    fees incurred in defending the claim pursuant to A.R.S. §12-341.01.

6         **D.     CONCLUSION**

7         The evidence at trial proves and the Court finds that Plaintiff failed to prove its

8    CERCLA and WQARF claims and that no contractual relationship existed between Plaintiff

9    and Defendants to support a breach of the implied covenant of good faith and fair dealing.

10        **IT IS ORDERED** granting judgment in favor of Goodyear on Count I.

11        **IT IS FURTHER ORDERED** granting judgment in favor of Goodyear on Count

12   V.

13        **IT IS FURTHER ORDERED** that Defendants, as the prevailing party of a contract

14   action under A.R.S §§ 12-341, -341.01, may submit an application for fees and costs

15   incurred in defending this matter.

16        DATED this 21st day of February, 2023.

17

18                                        **MAY POTENZA BARAN & GILLESPIE P.C.**

19                                        By *s/Andrew Harnisch*

20                                             Carla Consoli
                                              Jason Covault
21                                            Andrew Harnisch
                                              Eric Moats
22                                            *Attorneys for Defendants*

23

24

25

26

27

28