Stuart S. Kimball (026681)
William F. King (023941)
Kenneth N. Ralston (034022)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
stuart.kimball@gknet.com
bill.king@gknet.com
kenneth.ralston@gknet.com

Attorneys for Plaintiff Moreland
Properties LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Moreland Properties LLC,<br><br>              Plaintiff,<br><br>v.<br><br>The Goodyear Tire & Rubber Company, *et al.*,<br><br>              Defendants. | No. 20-02297-SRB<br><br>**Plaintiff's Proposed Findings of Fact and Conclusions of Law**<br><br>(Assigned to the Honorable Susan R. Bolton) |

Pursuant to the Court's Scheduling Order (Dkt. 14), Plaintiff Moreland Properties LLC respectfully submits its Proposed Findings of Fact and Conclusions of Law.

**Proposed Findings of Fact and Conclusions of Law**

A trial to the Court was held on March 27, 2023.  After considering the evidence, briefs, and arguments of counsel, the Court makes the following findings of fact and conclusions of law.[1]

---

[1] The Court has elected to issue its findings in narrative form.  Any finding of fact that also constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that also constitutes a finding of fact is hereby adopted as a finding of fact.

I.      **Procedural Background**

1.      Plaintiff Moreland Properties, LLC ("Plaintiff") filed its initial complaint on November 26, 2020; Plaintiff filed its Amended Complaint on September 16, 2021 (Dkt. 19.) Defendants Goodyear Tire & Rubber Company ("Goodyear") and Goodyear Farms, Inc. ("Goodyear Farms," together with Goodyear, the "Goodyear Defendants") filed their Answer to Amended Complaint on September 30, 2021. (Dkt. 20.)

2.      The Court granted the Goodyear Defendants' Motion for Partial Summary Judgment on Plaintiff's common law claims for fraud, negligent misrepresentation, and unjust enrichment on November 1, 2022. (Dkt. 117.)

3.      Plaintiff tried to the Court the following causes of action against the Goodyear Defendants: (1) cost recovery and declaratory relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*; and (2) breach of the implied covenant of good faith and fair dealing.

II.     **Factual Background**

4.      Plaintiff purchased the vacant property located at the northwest corner of McDowell Road and 159th Avenue in Goodyear, Arizona (the "Site") on December 13, 2010.  The Goodyear Defendants owned and/or operated certain real property, including the Site (the "Goodyear Property"), between the early 1900s to 2004.

5.      The Goodyear Defendants leased the Goodyear Property, including the Site, to Marsh Aviation Services, Inc. ("Marsh") from approximately 1974 until June 1988, which Marsh used as part of an aerial pesticide and herbicide operation.  The Goodyear Property included a former labor camp, runway, aircraft maintenance yard, burn pits, a pesticide storage and mixing area, and a miscellaneous open area near the center of the "Operations Area."  The Site included the following portions from the Goodyear Property: the pesticide storage and mixing area, the burn pit areas, the miscellaneous open area, and a small portion of the runway.

6.      Chemicals used for aerial application were purchased and managed by the purchasers of application services, including the Goodyear Defendants.  It is undisputed that

2

1    during the Goodyear Defendants' lease to Marsh, arsenic and toxaphene were released and

2    deposited at the Goodyear Property, including the Site, which resulted in soil contamination

3    that exceeded applicable Arizona soil remediation levels ("SRLs").

4          7.    In 1986, Goodyear entered into a Purchase Agreement with SunCor

5    Development Company ("SunCor") to purchase Goodyear Farm's Arizona properties,

6    including the Goodyear Property.  Some properties with environmental concerns, including

7    the Goodyear Property, were subsequently excluded from the Purchase Agreement.  The

8    Goodyear Property was then leased to SunCor, who held an exclusive option to purchase the

9    Goodyear Property.

10          8.    In June 1998, SunCor requested that Marsh vacate the Goodyear Property.

11          9.    Goodyear and SunCor thereafter entered into a "Working Group Agreement"

12    to address the environmental conditions at Goodyear Property, including the Site.

13          10.    In 1987, the Arizona Department of Environmental Quality ("ADEQ")

14    conducted an inspection of the Goodyear Property that resulted in numerous environmental

15    investigations to define the vertical and lateral extent of the pesticide and arsenic soil

16    contamination that exceeded Arizona's applicable SRLs.  Consistent with the Purchase

17    Agreement and the Working Group Agreement, SunCor performed an environmental

18    investigation, evaluated remedial alternatives, and proposed a remedial action to address the

19    soil contamination at the Goodyear Property, including the Site.  SunCor identified elevated

20    soil contamination levels over 90% of the Goodyear Property, with the highest levels located

21    at the Site.  Suncor proposed the removal of a foot of soil from nearly the entirety of the

22    Goodyear Property.  Goodyear rejected SunCor's proposal and decided to hire its own

23    environmental consultant under the Working Group Agreement to investigate and remediate

24    the Goodyear Property, including the Site.

25          11.    In 1988, ADEQ issued a Compliance Order to Marsh arising out of the soil

26    contamination present on the Goodyear Property, including the Site.  Consistent with the

27    Compliance Order, ADEQ worked with Marsh from 1988 to 1991 on a site characterization

28    plan, a sampling plan, draft feasibility study plans, and proposed remediation plans.  ADEQ

1    provided notice to the public of the ongoing remedial actions at the Goodyear Property,

2    including the Site, and responded to public comments.  Goodyear commented to ADEQ that

3    any remedial action by Marsh should ensure unrestricted use of the Goodyear Property;

4    SunCor raised issues about the investigations, including the presence of arsenic

5    contamination.  Negotiations between ADEQ, Goodyear and Marsh continued until 1999,

6    when Goodyear assumed control of the environmental investigation.

7         12.    During Goodyear's environmental investigation in 2000, Goodyear found that

8    arsenic and toxaphene were present at the Goodyear Property, including the Site, with

9    concentrations exceeding Arizona's SRLs.  The maximum arsenic concentration reported by

10    Goodyear measured at 801 milligrams per kilogram (mg/kg), which was located on the

11    Goodyear Property, including the Site, and exceeded Arizona's arsenic residential and non-

12    residential SRL of 10 mg/kg.  The maximum toxaphene concentration reported by Goodyear

13    measured 1,600 mg/kg, which was present at the Goodyear Property, including the Site, and

14    exceeded the residential SRL of 4 mg/kg and the non-residential SRL of 14 mg/kg.[2]

15         13.    Goodyear worked with ADEQ to prepare work plans to ensure that the

16    contaminated soils were removed from the Goodyear Property, including the Site, in order to

17    meet the non-residential standards of arsenic (10 mg/kg) and toxaphene (14 mg/kg).

18         14.    Consistent with the prior evaluations of remedial action alternatives, Goodyear

19    removed 4,100 tons of contaminated soils from the Goodyear Property in February and

20    March 2003.  Of the 4,1000 tons, Goodyear excavated more than 1,885 tons of contaminated

21    soil from Site.

22         15.    On October 9, 2003, Haley & Aldrich, Inc. ("Haley"), on Goodyear's behalf,

23    submitted a Final Corrective Action Report to ADEQ that summarized the remedial action

24    activities at the Goodyear Property, inclusive of the Site.  Haley & Aldrich certified that the

25    remedial action (a) was conducted in accordance with the Site Assessment Report and the

26    Corrective Action Plan, and (b) reduced the arsenic and toxaphene levels that were present in

27

28    [2]  At the time, the non-residential SRL for toxaphene was 14 mg/kg, but the SRL has been modified since Goodyear's remediation to 16 mg/kg today.

the soils in the former Operations Area[3] to the applicable non-residential SRLs based on a 95% upper confidence level ("UCL").  Specifically, the Final Corrective Action Report stated that "[a]ll excavation extensions due to observed staining or elevated confirmation samples were performed in accordance with the protocols outlined in the ADEQ-approved SAR/CAP."  Goodyear later provided ADEQ with the required "Owner Certification," wherein Goodyear attested "under penalty of law" that the information provided was "true, accurate, and complete."

16.    Goodyear elected to clean the Goodyear Property, including the Site, to the applicable non-residential SRLs.  Under Arizona law, Goodyear was accordingly required to record an institutional control, or a "declaration of environmental use restriction."  Arizona law requires that a declaration of environmental use restriction shall limit by legal description the area of the property to be restricted to nonresidential use because contamination remains on the property above the applicable residential SRLs.

17.    A declaration of environmental use restriction thus prohibits residential use of the restricted property and informs current and future property owners that the property may only be redeveloped, sold or otherwise put to productive *nonresidential* use.

18.    Goodyear recorded a declaration of environmental use restriction in September 2004 (the "DEUR") that restricted the Goodyear Property, despite SunCor's noted concerns to ADEQ that the proposed legal description of Goodyear's DEUR included areas that were not contaminated above the applicable residential SRLs, including the western portion of the Former Operations Area.  The DEUR represented that the toxaphene levels at the Goodyear Property measured 13 mg/kg (above the residential SRL but below the nonresidential SRL); the arsenic levels were noted at 10 mg/kg (at the residential and nonresidential SRL).

19.    Under Arizona law, a declaration of environmental use restriction can only be removed at the written request of the property owner who owns real property subject to a

---

[3] The Site includes the Former Operations Area of the Goodyear Property, including the burn pit areas and pesticide storage and mixing areas.

5

declaration of environmental use restriction and ADEQ's approval of any such request, which requires a determination by ADEQ that the property is suitable for residential use.

20.    In October 2004, SunCor exercised its option to purchase the Goodyear Property, including the Site.

21.    In 2007, SunCor sold the Site; SunCor however retained ownership of a portion of the Goodyear Property: the western portion of the Former Operations Area.

22.    In 2009, SunCor sought to remove the DEUR from its property as part of its intent to develop its property for residential use.  To support its request, SunCor performed soil sampling in 2008, on its property alone, which only included the western portion of the former Operations Area.  SunCor's sampling showed the maximum concentrations of 5.5 mg/kg of arsenic and 1.7 mg/kg of toxaphene, both of which registered under the respective residential SRLs.  Accordingly, SunCor did not have to remove any soil or perform any additional cleanup as part of its request to remove the DEUR from its property.  Along with its request to release its property from the DEUR, SunCor informed ADEQ that "[a]lthough only a limited portion of the Operations Area contained concentrations of COCs that exceeded the residential SRLs after remediation, in 2004 Goodyear recorded [the DEUR] for the entire former Operations Area, including the [western portion of the former operations area], since it was simpler to place the DEUR on the whole site."

23.    ADEQ approved SunCor's request in 2009.  SunCor's amendment to the DEUR merely removed SunCor's property, the western portion of the former operations area, from the DEUR restriction.  SunCor's amendment did not otherwise impact the DEUR, which remained in place over the rest of Goodyear Property, including the Site.  SunCor's amendment specifically states that the DEUR remains "in full force and effect" as if no amendment had occurred.  To date, the DEUR has not been removed from the Goodyear Property, including the Site.

24.    Plaintiff bought the vacant Site in 2010 subject to the DEUR.  Before its purchase, Plaintiff reviewed the recorded DEUR.  The DEUR represented that Site could be

used for nonresidential uses.  Plaintiff intended to hold the Site and to sell it to a commercial developer.

25.     In 2013, a putative buyer approached Plaintiff about purchasing the Site for a nonresidential use.  During those negotiations, the prospective purchaser indicated that it was willing to increase its purchase offer if the property was suitable for residential use.

26.     Western Technologies Inc. ("WTI") was hired to provide a preliminary assessment of the current status of the soil contamination at the Site.  Since the Site had been vacant since Goodyear's remediation, it was possible that the toxaphene, the only contaminant represented in Defendants' DEUR above the residential SRL, had diminished below the residential SRL (considering that toxaphene has a half-life of four to eleven years).

27.     WTI implemented a sampling plan consisting of 58 soil samples within a grid and other source areas to obtain a representative snapshot of the existing soil contamination. WTI's sampling results from the grid-based sampling identified arsenic concentrations between 3.9 to 550 mg/kg, with an average of 55.7 mg/kg, and toxaphene concentrations between <.40 to 280 mg/kg. with an average of 13.6 mg/kg.  WTI's sampling results for the source area samples identified arsenic concentrations between 2.4 to 170 mg/kg, with an average of 45.2 mg/kg, and toxaphene concentrations between <.40 to 26 mg/kg. with an average of 2.9 mg/kg.  WTI concluded that toxaphene and arsenic impacted soils were present at the Site exceeding the respective residential and nonresidential SRLs.  Despite not performing any UCL estimates of its own, WTI noted that the level of contaminants indicated it is possible the UCL estimate upon which the DEUR had been established may be under-estimated.  However, recognizing ADEQ's role in determining compliance with laws and applicable SRLs, WTI clarified that it was unknown what action, if any, ADEQ might pursue if the information from WTI's assessment was submitted to ADEQ.  WTI proposed additional soil investigations and potential remediation to achieve applicable SRLs.

28.     In 2017, Plaintiff decided to interact with ADEQ to determine whether additional remediation was reasonable or necessary to achieve the non-residential SRLs represented in the DEUR.  Upon review of WTI's preliminary sampling data, ADEQ did not

immediately conclude that additional remediation was necessary. Instead, ADEQ concurred that additional sampling would be helpful to fill in gaps from the WTI sampling event to better understand the actual extent of soil contamination at the Site.

29.    Plaintiff's consultant, Synergy Environmental, LLC ("Synergy"), performed a focused field sampling plan at the Site to determine (a) the vertical and lateral extent of arsenic and toxaphene concentrations and (b) whether there was an exceedance of the applicable SRLs that required remediation under Arizona law. Synergy collected 64 soil samples associated with both the surface and subsurface field sampling and supplemental sampling event. Synergy's sampling results identified arsenic concentrations between 5.05 to 135 mg/kg, with an average of 20.5 mg/kg, and toxaphene concentrations between <.40 to 20.5 mg/kg. with an average of 1.7 mg/kg. Despite Synergy's additional sampling event, ADEQ determined as of June 2018 that no remediation was necessary and concluded that Site could be used for non-residential use, consistent with the DEUR's restriction.

30.    Plaintiff continued to discuss the issue with ADEQ and highlighted how the extent of contamination at the Site exceeded the non-residential SRL for arsenic and required remediation under Arizona law. Since the DEUR was based on a 95% UCL calculation, Synergy utilized the 2014 WTI and 2017 Synergy sampling data to calculate the (then) present 95% UCL for the Site, which resulted in 35.5 mg/kg for arsenic and 7.8 mg/kg for toxaphene.

31.    After being presented with the 95% UCL calculation, ADEQ concluded that the Site's residual arsenic soil concentrations required remediation. Thereafter, Plaintiff and ADEQ entered into an Administrative Settlement Agreement in March 2019. The Administrative Settlement Agreement recites that:

- "ADEQ has been provided sufficient information to reasonably identify the extent of the contamination at the Site[;]"

- "The Site has been the subject of prior investigations and remedial activities under the oversight of ADEQ relating to Marsh Aviation. Past remedial investigations and

actions identified releases or threatened releases of hazardous substances having occurred at or onto the Site within the meaning of A.R.S. § 49-281(12)[;]"

- "In September 2004, ADEQ approved an institutional declaration of Environmental Use Restriction ("DEUR"), which included the Site, based on a 95% upper confidence limit ("UCL") estimates of the mean concentrations of the soils left in-place, that assured the general public and any future buyer that the residual arsenic and toxaphene soil concentrations at the Site were at or below the non-residential standards of 10 and 16 mg/kg, respectively[;]" and

- " [S]ubsequent soil sampling recently confirmed residual soil concentrations of arsenic substantially above the non-residential standard of 10 mg/kg.  The calculated 95% UCL of average concentrations of arsenic at the Site is 34.7 mg/kg."

32.    Under the Administrative Settlement Agreement, ¶ 19, Plaintiff agreed to "prepare and implement a remedial action plan [to] address the soil contamination at the Site to meet applicable non-residential standards that are protective of public health and the environment, based on the 95% upper confidence limit (UCL) estimates of the mean concentrations of the soils left in place."

33.    Pursuant to the Administrative Settlement Agreement with ADEQ, Plaintiff engaged Synergy to prepare a Work Plan that would remove arsenic contamination at the Site to meet the applicable arsenic SRL represented in the DEUR.  Synergy's Work Plan noted that: "Although the soil removal action is targeted to address the residual arsenic contamination, it will similarly reduce toxaphene levels in soil due to the fact that the isolated areas of elevated toxaphene levels tend to coincide with areas of arsenic impact.  **As a result, the toxaphene levels in soil will be reduced from 7.8 mg/kg to below 5.0 mg/kg**." (Emphasis added.)

34.    ADEQ reviewed and commented on Synergy's Work Plan.  ADEQ approved Synergy's Work Plan in September 2019.

35.    Following ADEQ's approval of the Work Plan, Synergy performed site preparation and other pre-remediation activities before excavating arsenic-impacted soils.

9

Prior to implementing the ADEQ-approved arsenic removal action, Plaintiff also reached out to Defendants and requested Defendants to implement the ADEQ-approved removal action. Defendants refused Plaintiff's invitation. Additionally, and also prior to implementing the Work Plan, Synergy distributed flyers to homes within 500 feet of the Site and installed a large sign about the pending on-site remediation. Synergy also received and responded to public inquiries from the posted notices.

36.     Synergy then began to implement the Work Plan in April 2020. Based on the planned depths of excavation derived from AutoCad modeling, approximately 2,400 cubic yards (or an estimated 3,600 tons) of arsenic-impacted soil was targeted for removal. Over the course of eight working days, Synergy removed a combined total of 3,500 tons of contaminated soil, which was transported in 176 separate truckloads and disposed of at an off-site landfill. After Synergy excavated the elevated arsenic-impacted soils, it backfilled the soils to further reduce any risks to public health or the environment. Based on the 95% UCL, the average arsenic and toxaphene concentrations in soil remaining post-remediation was calculated to be 9.9 mg/kg for arsenic and 4.9 mg/kg for toxaphene.[4]

37.     Synergy submitted a "Removal Action to Address Residual Arsenic Contamination in Shallow Soils" to ADEQ in July 2020. On October 22, 2020, ADEQ confirmed that Synergy's documentation in support of the completion of the ADEQ-approved remedial action satisfied Plaintiff's obligations under the Administrative Settlement Agreement: "The Administrative Settlement Agreement called for Moreland Properties L.L.C. to prepare and implement a remedial action plan to address the soil contamination at the Moreland property site. ADEQ previously approved the remedial action plan and Synergy submitted documentation in support of completion of the work which has become part of the public record. ADEQ's Executive Director, Laura Malone, then concluded that "ADEQ confirms that Moreland Properties L.L.C. has complied with its obligations under

---

[4] These calculations do not factor in added benefit of the backfilling required by the ADEQ-approved remedial action.

the settlement agreement, with the understanding that there are ongoing obligations for access to the property and corporate records if necessary."

38.    Plaintiff incurred $587,064.39 in response costs to remediate the Site.

## III.    The Goodyear Defendants' Liability Under CERCLA § 107[5]

39.    Congress enacted CERCLA in 1980 with two main objectives: (1) to protect the public health and environment "by facilitating the expeditious and efficient cleanup of hazardous waste sites[,]" and (2) to assure that "responsible persons pay for the cleanup." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (citations and quotations omitted).  *See also Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 602 (2009) (*"BNSF II"*) ("The Act was designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."); *CTS Corp. v. Waldburger*, 573 U.S. 1, 4 (2014) (same) (citing *BNSF II*, *supra*).  The Ninth Circuit "construe[s] CERCLA liberally to achieve these goals." *Carson Harbour*, 270 F.3d at 881; *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th Cir. 1992) (same); *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1363 (9th Cir. 1990) ("We agree that [CERCLA] is to be given a broad interpretation to accomplish its remedial goals.").

40.    CERCLA "authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation[,]" and "imposes strict liability on owners and operators of facilities at which

---

[5] The elements for a CERCLA § 107 claim are largely the same as § 113 and WQARF claims. In particular, for determining the nature of recoverable costs, the amounts recoverable, the accrual date, and liability provisions of § 107 are incorporated into § 113, those elements are the same. *See AmeriPride Servs. Inc. v. Texas E. Overseas Inc.*, 782 F.3d 474, 490 (9th Cir. 2015). Plaintiff will only pursue a claim under § 113 if the Court determines that Plaintiff cannot proceed under § 107. Claims under the Arizona Water Quality Assurance Revolving Fund ("WQARF") authorizes the recovery of all reasonable, necessary and cost-effective expenditures against responsible parties for remedial actions conducted in substantial compliance with Arizona's rules and procedures to address a release of a hazardous substance.  *See* Ariz. Rev. Stat. §§ 49-283, 49-285(A-B); *Pinal Creek Group v. Newmont Min. Corp.*, 926 F. Supp. 1400, 1414 (D. Ariz. 1996), *rev'd*, 118 F.3d 1298 (9th Cir. 1997).

11

hazardous substances were disposed.'" *Carson Harbor*, 270 F.3d at 870 (quoting *3550 Stevens Creek Assocs.*, 915 F.2d at 1357); *accord BNSF II*, 556 U.S. at 608.

41.     To establish liability for cost recovery under CERCLA a plaintiff must prove, by a preponderance of the evidence, that (1) the property is a "facility" as defined by 42 U.S.C. § 9601(9); (2) the defendant falls into one of the four categories of persons subject to liability under 42 U.S.C. § 9607(a); (3) that a release or threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur necessary response costs consistent with the National Contingency Plan. *Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) ("*Carson Harbor II*").

42.     CERCLA's provisions should "given a broad interpretation to accomplish its remedial goals." *Kaiser Aluminum & Chem. Corp.*, 976 F.2d at 1343 (quoting *3550 Stevens Creek Assoc.*, 915 F.2d at 1363); *Pakootas v. Tech Cominco Metals, Ltd.*, 905 F.3d 565, 580-81 (9th Cir. 2018) ("*Pakootas*") ("CERCLA's broad remedial purpose 'supports a liberal interpretation of recoverable costs.'").

43.     Once a *prima facie* case for Section 107 liability is established, the burden shifts to the defendant to rebut that *prima facie* showing. *BNSF II*, 556 U.S. at 614; *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053, 1056-57, 1065 (C.D. Cal. 2003); *Pakootas v. Teck Cominco Metals, Ltd.*, 868 F. Supp. 2d 1106, 1110-11 (E.D. Wash. 2012).

**A.    Facility**

44.     CERCLA defines "facility" as "any building, structure, installation . . . or any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).  "The term 'facility' has been broadly construed by the courts, such that in order to show that an area is a 'facility,' the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there." *3550 Stevens Creek Assocs.*, 915 F.2d at 1360 n. 10 (quoting *United States v. Metate Asbestos Corp.*, 584 F. Supp. 1143, 1148 (D. Ariz. 1984)).  Thus, to show that a site is a "facility," Plaintiff need only show that a hazardous substance has been placed on or has "come to be located" at the Site.

45.    Arsenic and toxaphene are defined as "hazardous substances" under CERCLA. *See* 42 U.S.C. §§ 9601(14), 9602(a); 40 C.F.R. §302.4.

46.    It is undisputed that arsenic and toxaphene have been placed at or have otherwise come to be located at the Site as identified by multiple sampling events that showed arsenic and toxaphene present in the soils at the Site.  *See e.g.* Answer to Amended Complaint, Dkt. 20 at ¶ 14 (admitting that arsenic and toxaphene were deposited at the Site); *see also* Goodyear Defendants' Responses to Plaintiff Moreland Properties, LLC's First Requests for Admission at No. 3 (admitting that the Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9)).

47.    Plaintiff has demonstrated that the Site qualifies as a "facility" under CERCLA.

**B.    Persons Liable Under CERCLA**

48.    CERCLA imposes strict liability on four categories of persons, typically referred to as "potentially responsible parties" or "PRPs," including former owners or operators of a facility, or "any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).

49.    For purposes of CERCLA, corporations like Goodyear qualify as "persons." 42 U.S.C. § 9601(21).[6]

50.    "Under the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution.  This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice." *BestFoods*, 524 U.S. at 65 (citations omitted).  *See also Riverside Market Dev. Corp. v.*

---

[6] A corporate parent that actively participated in, and exercised control over the operations of its subsidiary's facility, is directly liable in its own right as an operator of the facility.  *U.S. v. BestFoods*, 524 US 51, 64 (1998).  "The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace…CERLCA's 'operator' provision [which] is concerned primarily with direct liability for one's own actions." *BestFoods*, 524 U.S. at 65.

*International Bldg. Prods., Inc.,* 931 F.2d 327, 330 (5th Cir. 1991) ("CERCLA prevents individuals from hiding behind the corporate shield when, as 'operators,' they themselves actually participate in the wrongful conduct prohibited by the Act"); *United States v. Kayser–Roth Corp.,* 910 F.2d 24, 26 (1st Cir. 1990) ("[A] person who is an operator of a facility is not protected from liability by the legal structure of ownership").

51.    Even though the statute does not define "operate," the plain meaning is "simply someone who directs the workings of, manages, or conducts the affairs of a facility" and, "for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *BestFoods*, 524 U.S. at 66-67.

52.    "Disposal" is defined as the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment." 42 U.S.C. §§ 9601(29); 6903(3).

53.    The Ninth Circuit has determined that this "definition has been interpreted to include the dispersal of contaminated soil during the excavation and grading of a development site." *Kaiser Aluminum & Chem. Corp.*, 976 F.2d at 1342 (citing *Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568 (5th Cir.1988)). "CERCLA's definition of 'disposal' expressly encompasses the 'placing of any … hazardous waste ... on any land.' [since] Congress did not limit the term to the initial introduction of hazardous material onto property. Indeed, such a crabbed interpretation would subvert Congress's goal that parties who are responsible for contaminating property be held accountable for the cost of cleaning it up." *Id.* at 1342-43.

54.    Under the foregoing standards and definitions, the Goodyear Defendants are PRPs and are liable under CERCLA as former owners and operators if a "disposal" occurred on the Site during the Goodyear Defendants' ownership or operations.

14

55.    It is undisputed that "Goodyear Farms owned the Property, including the Site, when a former tenant used and deposited toxaphene and arsenic at the Property." *See e.g.* Goodyear Defendants' Answer to Amended Complaint, Dkt. 20 at ¶¶ 14 (admitting that "toxaphene and arsenic were deposited by tenants on the Property, which included the Site, during the lease period and that the airstrip was used by such tenant for aerial pesticide and herbicide application") & 66 (admitting that "Goodyear Farms owned the Property, including the Site, when a former tenant used and deposited toxaphene and arsenic at the Property").

56.    For its part, Goodyear admitted its status of "owner of the property" when it signed the "Owner Certification" in 2003, which ADEQ required as part of Goodyear's Final Corrective Action Report for the remediation Goodyear performed and managed at the Goodyear Property, including the Site:

## 5.    OWNER'S CERTIFICATION

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision according to a system designed to assure that qualified personnel properly gather and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are signification penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

David L. Chapman, Manager Global Environmental Engineering, The Goodyear Tire & Rubber Company, on behalf of Goodyear Farms, Inc. (Owner), a wholly owned subsidiary of The Goodyear Tire & Rubber Company

y: _____                    _____
Signature of owner, operator or volunteer requesting closure          Date

                                                      Manager, Global
David L. Chapman                                      Environmental Engineering
Name (printed)                                        Title

57.    As set forth in Goodyear's remedial reports, Goodyear managed, directed, and conducted operations at the Site during which time there was a "disposal" of hazardous substances. Specifically, Goodyear conducted operations at the Site during the environmental investigations from 1999 through 2003, which included disposal of hazardous substances, including "the dispersal of contaminated soil during the excavation and grading

15

of a development site." *Kaiser Aluminum & Chem. Corp.*, 976 F.2d at 1342 (citing *Tanglewood East Homeowners*, 849 F.2d 1568 (5ᵗʰ Cir.1988)).

58.     By way of one example, Goodyear's Final Corrective Action Report includes the following excerpts, all of which support the fact of Goodyear's disposal of hazardous substances at the Site:

This Corrective Action Report (CAR) has been prepared on behalf of The Goodyear Tire & Rubber Company (Goodyear) to summarize corrective action activities at the New Marsh Aviation Site (Site), in Goodyear, Arizona. This report has been prepared to facilitate Site closure through the Arizona Department of Environmental Quality (ADEQ) Waste Programs Division. The corrective action activities described in this report were conducted in accordance with a combined "Site Assessment and Corrective Action Plan," by Haley & Aldrich, dated 2002, and accepted by the ADEQ in a letter dated 24 September 2002.

- ■ The Site is located at 2190 West McDowell Road, in the city of Goodyear, Maricopa County, Arizona. The Site is currently vacant. Goodyear's subsidiary, Goodyear Farms, Inc. is the owner of record of the property.
- ■ Goodyear Farms, Inc., previously leased the Site to Marsh Aviation Services, Inc., (Marsh) for the aerial application of organochloride pesticides and arsenic-based defoliants on nearby farms from approximately 1974 until June 1988. For Site investigation purposes, the Site has been divided into two areas: the Runway Area and the Operations Area.
- ■ Several environmental Site assessments and subsurface investigations, conducted between 1998 through 1994, were performed for Estrella Flying Service, Inc., f/k/a Marsh Aviation Services, Inc., under an ADEQ Consent Judgement No. CV92-2058. The purpose of each investigation was to define the areas of pesticide and arsenic impact.
- ■ Over 145 sampling points were advanced to a depth of up to 20 feet below ground surface (bgs) and sampled to delineate soil impacts at the Site. Toxaphene and arsenic were reported in soil samples at concentrations up to 1,890 and 801 mg/kg, respectively.
- ■ Site cleanup goals were selected to be protective of human health in accordance with future land use. The proposed zoning for the Runway Area is low to moderate density residential land use; the proposed zoning for the Operations Area is non-residential/commercial land use.
- ■ ADEQ-published residential and non-residential soil remediation levels (SRLs) for toxaphene and arsenic were used as the cleanup criteria.
- ■ The SRL for toxaphene in the Runway and Operations Areas is 4 and 17 mg/kg, respectively. The SRL for arsenic is 10 mg/kg in both areas.
- ■ Given the random nature of the data and historical releases, conservative average concentrations were identified as potential exposure point concentrations for future Site occupants. These upper end average concentrations, defined as the 95% upper confidence limits of the mean (95% UCLs), were compared to SRLs to confirm that after remediation the on-site residual concentrations are no greater than those that would pose a significant risk to human health from potential exposures across each on-site area. After remediation, the 95% UCLs were recalculated based on existing on-site concentrations. These 95% UCLs were compared to the SRLs to confirm that the appropriate residential and non-residential criteria were met.

- ■ Based on the pre-excavation 95% UCLs, ten areas were scheduled for excavation to depths from 1 to 7.5 feet bgs.
- ■ Prior to excavation activities, Haley & Aldrich Inc., (Haley & Aldrich) collected 38 pre-excavation confirmation soil samples to delineate the lateral extent of the excavations. This pre-excavation delineation was approved by the ADEQ.
- ■ Excavation of impacted soils began on 18 February 2003, and was completed on 29 March 2003. Soils were excavated from ten areas: three within the Runway Area, seven within the Operations Area. Excavations were extended to the pre-delineated lateral limits and ceased once the post-excavation 95% UCLs, incorporating the ADEQ-approved post-excavation confirmation samples, met the appropriate SRLs. A total of 4,100 tons of contaminated soil was excavated and stockpiled on-site.
- ■ The stockpiled soil was profiled and approved for disposal under proper waste manifest documentation by Waste Management, Northwest Regional Landfill, in Surprise, Arizona.
- ■ A total of 4,200 tons of backfill material was imported to the Site to fill the excavations. The import fill was pre-screened for previous land use, as well as for pesticides, metals, volatile organic compounds, semi-volatile organic compounds, polychlorinated biphenyls and arsenic. The fill was placed in the excavations and rolled with a loader.
- ■ Based on the extensive assessment and remediation performed at the Site, Haley & Aldrich recommends that the ADEQ issue a closure letter for the Site.
- ■ Upon the ADEQ concurrence of closure, Goodyear Farms Inc., will complete a Declaration of Environmental Use Restriction (DEUR) for the Operations Area, which was remediated to non-residential SRLs.

*See* Final Corrective Action Report, "Executive Summary" at i and ii.

59.     Plaintiff has shown that the Goodyear Defendants are PRPs as former owners and operators under 42 U.S.C. § 9607(a)(2) because a "disposal" occurred on the Site during the Goodyear Defendants' ownership or operations.

**C.     Release of Hazardous Substance**

60.     CERCLA defines "release" to include "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing" of a hazardous substance into the environment.  42 U.S.C. § 9601(22).

61.     As with "facility," the term "release" is broadly construed, such that a release can occur without any affirmative human action; it simply represents the entry of hazardous substances into the environment.  *Carson Harbor*, 270 F.3d at 881.  Even "the passive migration of hazardous substances into the environment from where hazardous substances have come to be located is a release under CERCLA."  *Pakootas v. Teck Cominco Metals, Ltd.*,

17

452 F.3d 1066, 1075 (9th Cir. 2006).  Moreover, "the plain statutory language fails to impose any quantitative requirement on the term 'release.'" *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir. 1989*), as clarified on denial of 'reh'g* (Jan. 23, 1990); *Louisiana-Pac. Corp. v. ASARCO, Inc.*, 735 F. Supp. 358, 361 (W.D. Wash. 1990).

62.    Courts have therefore recognized that the presence of hazardous substances in soils constitutes a "release" under CERCLA.  *See, e.g., Mid Valley Bank v. N. Valley Bank*, 764 F. Supp. 1377, 1387 (E.D. Cal. 1991) ("[T]here is evidence to support the presence of allegedly elevated levels of hazardous substances in the soil samples, thus satisfying the second element of CERCLA liability, a 'release of a hazardous  substance.'"); *U.S. v. Hardage*, 761 F. Supp. 1501, 1510 (W.D. Okla. 1990) ("The presence of hazardous substances in the soil, surface water, or groundwater of a site demonstrates a 'release.'"); *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 at *19 (E.D. Cal. Jan. 21, 1993) (same); *City of Wichita v. Trs. Of APCO Oil Corp. Liquidating Tr.*, 306 F. Supp. 2d 1040, 1069 (D. Kan. 2003) ("[T]he dispositive fact [to find a CERCLA release] is that [hazardous substances] were found in the soil and groundwater" at the facility).

63.    It is undisputed that arsenic and toxaphene, both hazardous substances under CERCLA, have been identified in sampling to be present in the soils at the Site.  Multiple investigations concerning the Goodyear Property and the Site have documented the presence of arsenic and toxaphene that exceeded the applicable SRLs, including but not limited to the following:

- "Draft Site Investigation Report, Existing Marsh Aviation (Site 1-2)" by Dames and Moore (1988);
- "Site Characterization and Sampling Plan" by Pegler-Welch (1988);
- "Cleanup Action Plan, Soil Remediation, Estrella Flying Service, Goodyear, Arizona" by PC Toxic (1995);
- "Site Assessment Plan for New Marsh Aviation Service, Inc." by Ogden Environmental (2000); and,

- "Site Assessment Report and Corrective Action Report" by Haley & Aldrich, Inc. (2002).

64.     In addition to the foregoing reports, Defendants have admitted there was a "release" of arsenic and toxaphene at the Site.  *See e.g.* Goodyear Defendants' Answer to Amended Complaint, Dkt. 20 at ¶ 14 ("Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14, except admit that toxaphene and arsenic were deposited by tenants on the Property, which included the Site, during that lease period and that the airstrip was used by such tenant for aerial pesticide and herbicide application."); *accord* Goodyear Defendants' Responses to Plaintiff Moreland Properties, LLC's First Requests for Admission at No. 4 (admitting "that Marsh Aviation operated an aerial herbicide and pesticide operation on the Site that left toxaphene and arsenic on the Site").

65.     Last, ADEQ has determined that there were releases of hazardous substances at the Site above applicable SRLs: "[S]ubsequent soil sampling recently confirmed residual soil concentrations of arsenic above the non-residential standard of 10 mg/kg [with] the calculated 95% UCL of average concentrations of arsenic at the Site is 34 mg/kg."  *See* Administrative Settlement Agreement, Recital E.

66.      Factual determinations by expert agencies are entitled to substantial deference. *See Arizona v. Motorola, Inc.*, 805 F. Supp. 742, 747 (D. Ariz. 1992) ("[B]oth EPA and ADEQ have determined that there have been both release and threats of releases of hazardous substances from the Landfill …. This Court is not required to, and should not, conduct a *de novo* review of all the facts and circumstances considered by the governmental agencies including that there has been both releases and threats of releases of hazardous substances from the Landfill, and what measures belong in the appropriate remedial action plan.  This Court must grant deference to agency decisions.").

67.     In summary, multiple investigative environmental reports document the release of arsenic and toxaphene at the Site.  The Goodyear Defendants admit there was a release of arsenic and toxaphene at the Site.  And ADEQ too has concluded likewise.

68.    Plaintiff has offered ample evidence in support of CERCLA's "release"

element.  The Court concludes that there was a "release" at the Site.

**D.    Incurrence of Costs**

69.    CERCLA does not define "incur."  *See Chubb Custom Ins. Co. v. Space Sys./Loral,*

*Inc.*, 710 F.3d 946, 961 (9th Cir. 2013); *In re Dant & Russell*, 951 F.2d 246, 250 (9th Cir. 1991).

Therefore, "[b]ecause the statute does not define 'incur,' and there is no controlling authority

on the term in the CERCLA context, [the Court will] apply the ordinary meaning which is

'[t]o acquire or come into,' '[t]o become liable or subject to as a result of one's action,' to

'bring upon oneself.'" *Chubb Custom*, 710 F.3d at 961 (quoting *Am. Heritage Dictionary* (4th ed.

2000)).  The Ninth Circuit has stated that CERCLA § 107 "envision[s] that, before suing,

CERCLA plaintiffs will spend some money responding to an environmental hazard."  *In re*

*Dant & Russell*, 951 F.2d at 249-250.

70.    As defined in the Merriam-Webster on-line dictionary, "cost" includes: (1) "the

amount or equivalent paid or charged for something," as well as (2) the "outlay or

expenditure (as of effort or sacrifice) made to achieve an object."

71.    Plaintiff submitted evidence that it paid $587,064.39 for the technical and legal

costs to investigate, develop, and implement the ADEQ-approved remedial action.  The legal

costs are recoverable since those costs were "closely tied to the actual cleanup" and not

purely litigation costs.  *See Key Tronic Corp. v. U.S.*, 511 U.S. 809 (1994).

72.    Plaintiff has demonstrated that it incurred costs for purposes of its CERCLA

claim.

**E.    Reasonable and Necessary Response Costs**

73.    Response costs are deemed "necessary" when there is an actual "threat to

human health or the environment[.]" *Carson Harbor*, 270 F.3d at 871 ("Remediation costs are

recoverable under CERCLA only if 'necessary.'  It is generally agreed that this standard

requires that an actual and real threat to human health or the environment exist before

initiating a response action.") (collecting cases).

74.    As set forth in the Administrative Settlement Agreement between Plaintiff and ADEQ, ADEQ concluded that "subsequent soil sampling [had] recently confirmed soil concentrations of arsenic substantially above the non-residential standard of 10 mg/kg."[7] Accordingly, under the same agreement, Plaintiff agreed to "prepare and implement a remedial action plan [to] address the soil contamination at the Site to meet applicable non-residential standards that are protective of public health and the environment."

75.    Plaintiff through its consultant, Synergy, prepared and submitted a Work Plan to ADEQ.  ADEQ then approved Plaintiff's Work Plan on September 30, 2019.  Upon completion of Plaintiff's work, Plaintiff, through Synergy, submitted a "Removal Action to Address Residual Arsenic Contamination in Shallow Soils" to ADEQ in July 2020.  And on October 22, 2020, ADEQ confirmed that Synergy's documentation in support of the completion of the ADEQ-approved remedial action satisfied Plaintiff's obligations under the Administrative Settlement Agreement.

76.    Under Arizona law, ADEQ approval of a remedial action is "deemed to be in substantial compliance with the rules and procedures" of Arizona's remedial action programs. *See* Ariz. Rev. Stat. § 49-285(B).  The Ninth Circuit has held similarly.  *See Carson Harbor*, 270 F.3d at 872 ("[A]n actual agency cleanup order is highly relevant and, in some cases, compelling on the necessity question.").

77.    Further, removal of soil contamination exceeding applicable Arizona SRLs is reasonable and necessary.  Goodyear in fact selected this same process in its own response action at the Goodyear Property.   Haley & Aldrich, Inc., "Site Assessment Report and Corrective Action Plan," 13 (2002).

---

[7] Pursuant to Arizona law, ADEQ is authorized to establish remediation levels that "shall accomplish the following for remediation of contaminated soil to protect public health and the environment."  Ariz. Rev. Stat. § 49-152(A).  ADEQ has adopted soil remediation levels for arsenic (10 mg/kg for residential or nonresidential use) and for toxaphene (4 mg/kg for residential use and 17 mg/kg for nonresidential use).

78.     In addition, Goodyear's 30(b)(6) representative testified during his deposition that the levels identified by Synergy in the Administrative Settlement Agreement warranted remediation:

> Q. (BY MR. KING) Okay. Recital E, quote: However, subsequent soil
>
> sampling recently confirmed residual soil concentrations of arsenic
>
> substantially above the non-residential standard of 10 milligrams per
>
> kilogram. The calculated 95% UCL average concentrations of arsenic at
>
> the Site is 34.7 milligrams per kilogram.
>
> Do you see that?
>
> A. I do.
>
> Q. Okay. And would you agree based upon that statistic that additional
>
> remediation was required at this site?
>
> MR. COVAULT: Form and foundation.
>
> THE WITNESS: Based on the number that is presented here, the
>
> answer would be yes, but I have not, nor have anyone I know, verified
>
> that those numbers are correct.

*See* Rule 30(b)(6) Deposition of Goodyear Defendants at 316:22-317:12.

79.     Leaving aside any doubt, the Goodyear Defendants' own expert, who did perform an "independent" analysis of the pre-excavation levels at the Site, determined that arsenic averaged 153 mg/kg and toxaphene averaged 44 mg/kg, showing that both hazardous substances exceeded the non-residential SRL and necessitated remediation:

| Dataset | Synergy 95% UCLs | | | Independent 95% UCLs | | | |
|---|---|---|---|---|---|---|---|
| | Toxaphene | Arsenic | | Toxaphene | | Arsenic | |
| | Lognormal | Log-normal | Normal | Log-normal | Non-parametric | Log-normal | Normal |
| Pre-Excavation Moreland's Parcel | 28.3 | 153.6 | NA | 28.25 | 44.83 | 153.5 | NA |
| Post-Excavation Moreland's Parcel | 4.93 | 9.94 | 9.53 | 5.013 | NA | 9.964 | 9.53 |
| Note: All 95% UCLs are in units of mg/kg. NA – not applicable | | | | | | | |

*See* Expert Report of Scott S. Shock, P.E. at 29.

22

80.     Plaintiff's work at the Site, which ADEQ approved, was both reasonable and necessary under CERCLA to meet applicable non-residential standards that are protective of public health and the environment.

**F.    Plaintiff's Compliance with the National Contingency Plan**

81.     The national contingency plan is promulgated by the Environmental Protection Agency and "provide[s] the organizational structure and procedures for preparing and responding to...releases of hazardous substances." 40 C.F.R. § 300.1. *California ex rel. California Dept. of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 673 (9th Cir. 2004) (referencing *Wash. St. Dep't of Transp. v. Wash. Natural Gas Co.*, 59 F.3d 793, 799 (9th Cir. 1995)).

82.     A "private response action is 'consistent with the NCP' if the action, evaluated as a whole, is in 'substantial compliance' with certain procedural requirements, and results in a 'CERCLA-quality cleanup.' *See* 40 C.F.R. § 300.700(c)(3)(i). Any "immaterial or insubstantial deviations" will not render a response action inconsistent with the NCP. *See* 40 C.F.R. § 300.700(c)(4).

83.     Likewise, "failure to comply with the NCP is not a defense to liability, but rather a factual issue affecting damages." *California ex rel. California Dep't of Toxic Servs. v. Neville Chem. Co.*, 213 F. Supp. 2d 1115, 1125 (C.D. Cal. 2002), *aff'd sub nom. California ex rel. California Dep't of Toxic Substances Control*, 358 F.3d 661 (9th Cir. 2004); *see also Wash. St. Dep't of Transp.*, 59 F.3d at 798 (same).

84.     Given that CERCLA authorizes two kinds of response actions (short-term removal actions to address releases requiring prompt response, and long-term remedial actions that permanently and significantly reduce the dangers associated with releases), the NCP provisions that might be applicable for each response action are different. The Ninth Circuit has noted that the distinction is vague and deference should be given to the agency. *U.S. v. W.R. Grace & Co.*, 429 F.3d 1224, 1241 (9th Cir. 2005) (finding that courts should construe "removal" liberally to effectuate CERCLA's remedial purposes).

85.     Here, the removal action was presented to and approved by ADEQ to quickly remove arsenic contamination to meet applicable SRLs protective of public health and the environment so to allow nonresidential use of the Site.

86.     Under that standard, Plaintiff demonstrated that (a) it invited ADEQ to review and comment on its proposed removal site evaluation, (b) it communicated with the Goodyear Defendants in order to determine whether they would perform the ADEQ-approved removal action to address the residual arsenic that exceeded standards protective of public health and safety, (c) it published notice explaining that ADEQ had entered into an administrative settlement to require a removal action to restore the property to the levels represented in the ADEQ-approved DEUR, (d) it posted visible signage at the property and provided direct notice to neighbors about the ADEQ-approved work plan and upcoming fieldwork (see below), (e) it referred inquiring parties to the appropriate ADEQ staff, and (f) promptly excavated the high levels of hazardous substances in soils largely at or near the surface.



**NOTICE**

Moreland Properties, LLC, through their consultant Synergy Environmental, will be conducting soil removal at this property as part of the ongoing environmental investigations of the former Marsh Aviation aerial crop-dusting facility, previously managed by Suncor Development and overseen by the Arizona Department of Environmental Quality (ADEQ). The impacted soils on a portion of this property will be excavated and transported to an off-site landfill for disposal. Excavations will be replaced with certified "clean fill" to restore the property to existing grade.

The soil cleanup is needed to address residual arsenic remaining in the ground following prior site remediation efforts conducted in 2003 to be consistent with the Declaration of Environmental Use Restriction (DEUR) on the property.

Site work will begin in late-April 2020 and will be conducted between 7am and 5pm, weekdays only. Work is anticipated to be completed in approximately 3 weeks (mid-May 2020). Measures to control dust will be in place and strictly adhered to in accordance with Maricopa County Dust Control Permit # E203993. This work is being conducted in collaboration with the ADEQ. For further information, please contact:

Mr. Joel Peterson, PE              Ms. Laura Malone
Synergy Environmental    - OR -    ADEQ
480-284-3518                        602-771-4567
joel.peterson@syn-env.com          llm@azdeq.gov

87.     These efforts demonstrate substantially compliance with CERCLA's NCP requirements for a removal action under 40 C.F.R. § 300.415.

88.     Even if the removal action is judged under the NCP requirements for a federal remedial action under 40 C.F.R. § 300.430, a CERCLA plaintiff demonstrates NCP compliance "[w]hen evaluated as a whole," the entirety of the work performed at the Site shows substantial compliance with the NCP.

89.     "From 1988–2004, Goodyear worked with [ADEQ] and third-party remediation consultants to assess the extent of contamination and remediate the Goodyear Property." *See* Defendants' Statement of Facts, Dkt. 82 at 2:18-19, ¶ 6.  During that approximate 16-year time frame, the aforementioned "third-party remediation consultants" performed multiple site assessments, evaluated proposed numerous alternatives to address the contamination at the property, including a "no remediation" option, and elected to implement an excavation and removal action.  The following reports are illustrative:

- "Draft Site Investigation Report, Existing Marsh Aviation (Site 1-2)" by Dames and Moore (1988), at 5-2:

5.2.2  No Action

The site history and laboratory analyses conducted during this study indicate the Existing Marsh Aviation site contains contaminated materials.  Based on the health risk assessment presented in Section 3.0, remediation at the site is required.  Therefore, the no action alternative was eliminated from further consideration.

- "Remedial Action Plan" by PC Toxic (1993), at 5:

4.0    REMEDIATION ALTERNATIVES

4.1  No Action

This alternative provides for no action.  Institutional controls could be implemented to protect on-site and off-site personnel from contact with hazardous materials.  This alternative is not usually acceptable to regulatory agencies.

4.2  Off-site Land Disposal

Disposal in an authorized land disposal site is a acceptable option, if a suitable location can be found, but it is expensive and will result in long term storage liability.  Current available information indicates that land disposal sites many no longer be available.

90.     These efforts were not only performed with ADEQ's oversight, ADEQ provided opportunities for public comment throughout the 16-year remediation process and responded to those comments with the goal of removing soils contaminated with arsenic and toxaphene to meet the applicable SRLs in order to protect public health and the environment.

91.     The NCP suggests that "private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below or based on substantially equivalent state and local requirements." *See* 40 C.F.R. § 300.700(c)(6).  Plaintiff complied with the public participation requirements for a removal action under 40 C.F.R. § 300.700(c)(6) and the public participation requirements under Arizona's laws.

92.     Last, ADEQ's approval of Plaintiff's removal action "shall be deemed to be in substantial compliance with the rules and procedures" of Arizona's remedial action programs, which include community involvement activities.  *See* Ariz. Rev. Stat. § 49-285(B).

93.     Consistent with Arizona's statute, many federal District and Circuit Courts have held that State approval of a remedial action, like ADEQ's here, is sufficient to meet the NCP public participation requirements.  *See e.g. Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1167 (C.D. Cal. 2003)*, aff'd sub nom. Carson Harbor II*, 433 F.3d 1260 (9th Cir. 2006) ("[E]xtensive government involvement in a private cleanup effort can, under appropriate circumstances, fulfill the public participation requirement of the NCP."); *NutraSweet Co. v. X-L 'ng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) ("[T]he district court did not clearly err in concluding that NutraSweet had satisfied the NCP.  The Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation. NutraSweet remediated its property until the Illinois EPA advised it that it could stop because NutraSweet's efforts had succeeded to the maximum extent possible.  In light of this evidence, we are satisfied that NutraSweet met this requirement for a CERCLA recovery."); *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 91 (1st Cir. 2008) (Further, showing consistency with the NCP is often met if "the remediation work is carried out under the

approval and monitoring of the appropriate state environmental agency."); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 137 (2d Cir. 2010) ("One way of establishing compliance with the national plan is to conduct a response under the monitoring, and with the ultimate approval, of the state's environmental agency.").

94.     Plaintiff has demonstrated substantial compliance with the NCP.

## IV.     Defenses to CERCLA Liability

95.     CERCLA § 107(a) and (b), codified at 42 U.S.C. § 9607(a) and (b), allow for only three defenses to CERCLA liability.  A covered person is liable under the statute "subject only to the defenses set forth in subsection (b) of this section."  42 U.S.C. § 9607(a). Subsection (b) lists three defenses: "(1) an act of God; (2) an act of war; [and] (3) an act or omission of a third party...." 42 U.S.C. § 9607(b)(1)-(3).  The Ninth Circuit has "conclude[ed] that the three statutory defenses are the only ones available, and that traditional equitable defenses are not.  *California ex rel. California Dept. of Toxic Substances Control*, 358 F.3d at 672.

96.     The Goodyear Defendants in their Supplemental Responses to Plaintiff Moreland Properties, LLC's First Set of Non-Uniform Interrogatories admit that they are "unaware of any facts or evidence regarding the release at issue in the action that were caused solely by acts or omissions of third parties over whom Goodyear Farms had no control."

## V.     The Goodyear Defendants' Additional Defenses to CERCLA Liability Fail

### A.     Alleged Ulterior-Motive Defense

97.     The Goodyear Defendants argued that liability should not attach since Plaintiff's motive for its arsenic-specific remediation was allegedly to achieve a residential use for both arsenic and toxaphene, contrary to what Plaintiff purportedly told to ADEQ.

98.     This defense fails on several levels.  First, Plaintiff's July 2019 Work Plan informed ADEQ of the very fact that sits at the heart of the Goodyear Defendants' misplaced defense:  "Although the soil removal action is targeted to address the residual arsenic contamination, it will similarly reduce toxaphene levels in soil due to the fact that the isolated areas of elevated toxaphene levels tend to coincide with areas of arsenic impact.  ***As***

27

1     **a result, the toxaphene levels in soil will be reduced from 7.8 mg/kg to below 5.0**

2     **mg/kg**."[8]

3         99.    Second, Plaintiff bought and sold the Site with the DEUR still intact, which

4     restricted the Site's use to **nonresidential**.

5         100.    Third, this is not a valid defense to CERCLA liability.  The Ninth Circuit has

6     held that when "determining whether response costs are 'necessary,' we focus not on whether

7     a party has a business or other motive in cleaning up the property, but on whether there is a

8     threat to human health or the environment and whether the response action is addressed to

9     that threat." *See Carson Harbor,* 270 F.3d at 872 (citing *Cadillac Fairview/Cal., Inc.*, 840 F.2d 691,

10    695 (9th Cir.1988)).  "It is unrealistic to believe that clean up is necessarily motivated by

11    eleemosynary factors." *Id.* at 872.  "Although a private plaintiff will almost always have a

12    business or financial motive for cleaning up a site, such subjective intent is simply not part of

13    the calculus." *Id.*  "Rather, we focus on the objective circumstances of each case." *Id.*  "**The**

14    **issue is not why the landowner decided to undertake the cleanup, but whether it was**

15    **necessary**." *Id.* (emphasis added).  "To hold otherwise would result in a disincentive for

16    cleanup." *Id.*  Indeed, the cleanup may be motivated by many factors, such as fear of a

17    government enforcement action, landowner liability, and even self-serving economic

18    reasons." *Id.*

19        101.    Further, nothing in CERCLA states that "profit" is a relevant consideration;

20    reading profit into the statute as a disqualifier would undermine the policy of prompt

21    cleanups by innocent parties.  *See Pakootas*, 905 F.3d at 582 (stating that the "motives" of the

22    "party attempting to recoup response costs … are irrelevant.") (internal quotations and

23    citations omitted).

24

25

26

---

27 [8] Consistent with Plaintiff's statement to ADEQ in Plaintiff's Work Plan, Plaintiff had several
prior exchanges with ADEQ going back to 2017, all of which explained Plaintiff's intent to

28 remediate the soils at the Site to the levels in the DEUR, all as set forth in the Administrative
Settlement Agreement.

102.    Last, as Plaintiff demonstrated, its remediation was specific to arsenic, only. And arsenic, under Arizona law, has the same standards for residential and non-residential use.

103.    The Goodyear Defendants' ulterior motive defense is factually and legally misplaced.

**B.    Prior Remediation Defense**

104.    The Goodyear Defendants seek to avoid liability by arguing that Goodyear's prior remediation was approved by ADEQ. This is not a valid CERCLA defense.

105.    The reality remains that ADEQ concluded in March 2019 that the Site required additional remediation upon receipt of additional sampling data. The Court should not second guess ADEQ's determination in this respect. *Motorola, Inc.*, 805 F. Supp. at 747 ("[B]oth EPA and ADEQ have determined that there have been both release and threats of releases of hazardous substances from the Landfill …. ***This Court is not required to, and should not, conduct a de novo review of all the facts and circumstances considered by the governmental agencies including that there has been both releases and threats of releases of hazardous substances from the Landfill, and what measures belong in the appropriate remedial action plan. This Court must grant deference to agency decisions***.") (emphasis added).

106.    Defendants' prior remediation defense is also inconsistent with Arizona law. Specifically, the Goodyear Defendants claim to have performed the remediation under ADEQ's Voluntary Remediation Program ("VRP"). Even if true, the VRP only allows a party to request a "No Further Action" letter from ADEQ, which in turn "means that no further action shall be taken by the department under this title to remediate or require remediation of the site or portion of the site covered by the no further action determination, unless the no further action determination is rescinded or amended pursuant to subsection E of this section." Ariz. Rev. Stat. § 49-181(F). As noted above, Arizona law allows ADEQ to "rescind or amend the determination of a no further action … and require remedial action

pursuant to applicable law … [o]n discovery of new information."  Ariz. Rev. Stat. § 49-181(E).

107.    Even though the Goodyear Defendants have not disclosed a "No Further Action" determination by ADEQ specific to Goodyear's prior remedial work, the Administrative Settlement Agreement provides in plain terms that ADEQ did obtain new information that showed the Site required additional remediation: "[S]ubsequent soil sampling recently confirmed soil concentrations of arsenic substantially above the non-residential standard of 10 mg/kg."  The Court should again defer to ADEQ, who determined in 2019—after review of additional sampling—that the Site required additional remediation. *See Waste Mgt. of Alameda County, Inc. v. E. Bay Regl. Park Dist.*, 135 F. Supp. 2d 1071, 1096-97 (N.D. Cal. 2001) (denying defendants' claim that prior closure determination was defense to liability when the agency received additional sampling calling into question the agency's initial closure determination) ("WMAC relies on the Water Board's 1984 determination that 'closure requirements had been achieved' to argue that a faulty cap and levee cannot be to blame. The Water Board was not privy, however, to the subsequent intensive geological analysis of site characteristics undertaken by Hydro Search in 1989 and RUST in 1996, or the confirming anecdotal evidence presented at trial.  Nor of course, was the Water Board privy to RUST's conclusion that there is massive  infiltration of precipitation through the cover and escape of leachate through the levee.  Under these circumstances, the Court declines to treat the Water Board determination as conclusive evidence of the actual conditions of the cap and levee.").

108.    Goodyear's prior remediation defense is factually and legally unsupported.

109.    Even assuming otherwise, Goodyear did not implement the terms of the ADEQ-approved plans.

110.    By way of one example, Goodyear's "Site Assessment Report and Corrective Action Plan," as approved and amended ("SAR/CAP"), required Goodyear to define the lateral and vertical extent of arsenic soil concentrations at the Goodyear Property through pre-excavation sampling.

111.    Specifically, under the ADEQ-approved SAR/CAP, ¶ 6.1, Goodyear was required to obtain pre-excavation samples and, if the pre-excavation samples showed readings in excess of the soil remediation levels ("SRL"), Goodyear was then required to obtain additional "step-out" samples "to define the excavation limits prior to digging":

> **If the pre-excavation confirmation sample results are below the SRL, the excavation will be extended laterally from the concentration exceeding the SRL to the pre-excavation confirmation boring location. If the sample exceeds the SRL, step-out borings will be advanced to define the excavation limits prior to digging. This process will be continued for each of the remediation areas within the former Runway Area and former Operations Area as shown by the flow diagram in Figure 8.**

*See* SAR/CAP, ¶ 6.1 at 14.

112.    Figure 8, as referenced in the SAR/CAP, ¶ 6.1, illustrates the prescribed methodology:



*See* SAR/CAP, Figure 8 at GOODYEAR00004618.

31

113.    Goodyear obtained four pre-excavation samples for arsenic: CONF-1, CONF-12, CONF-15, and CONF-17 pursuant to the SAR/CAP, ¶ 6.1.  Two of those samples, CONF-12 and CONF-15, detected arsenic at 15 mg/kg and 28 mg/kg, respectively, both of which exceeded the non-residential SRL of 10 mg/kg.

114.    According to the SAR/CAP and its Figure 8, Goodyear was then required to perform additional step out sampling.  Goodyear, however, did not perform any additional step out sampling.

115.    As a result, the lateral limits of excavation in the "Southeast Operations Area" "were defined by one pre-excavation sample (CONF-15) (arsenic=28 mg/kg)."

**Excavation No. 4 – Southeast Operations Area**

Excavation No. 4 was located in the southeast portion of the Operations Area (Figure 7).  The maximum arsenic concentration in this area was 24.5 mg/kg at a depth of 1.5 feet bgs at soil boring OB-32.  The lateral limits of the excavation were defined by one pre-excavation confirmation sample (CONF-15) (arsenic = 28 mg/kg), shown on Figure 7.  Excavation No. 4, approximately 100 ft$^2$, was excavated to 2 feet bgs.  A total of approximately 12.5 tons of soil was removed and placed in Stockpile No. 2.  No further excavation in this area was necessary to meet the ADEQ-approved cleanup criterion.

116.    Similarly, the lateral limits of excavation in the "Central Operations Area" "were defined by one pre-excavation sample (CONF-12) (arsenic=15 mg/kg)."

**Excavation No. 5 – Central Operations Area**

Excavation No. 5 was located in the central portion of the Operations Area (Figure 7).  The maximum arsenic concentration in this area was 42.9 mg/kg at a depth of 0.5 feet bgs at soil boring OB-48.  The lateral limits of the excavation were defined by one pre-excavation confirmation sample (CONF-12) (arsenic = 15 mg/kg), shown on Figure 7.  Excavation No. 5, approximately 100 ft$^2$, was excavated to 1-foot bgs.  A total of approximately 6 tons of soil was removed and placed in Stockpile No. 2.  No further excavation in this area was necessary to meet the ADEQ-approved cleanup criterion.

117.    Goodyear's 30(b)(6) representative, Jeff Sussman, testified at his deposition that the absence of step out samplings for CONF-12 and CONF-15 "suggested" a deviation from the ADEQ-required plans.  *See* Deposition of J. Sussman at 193:3-201:9.  He admitted

32

that this "deviation" did not appear in Goodyear's "Final Corrective Action Report," ¶ 1.4.4, which is captioned "Variances from the Approved SAR/CAP." *See id.* at 208:20-213:5. And likewise, he admitted that the variance provision in the Final Corrective Action Report, ¶ 1.4.4, represented to ADEQ that "[a]ll excavation extensions due to observed staining or elevated confirmation samples were performed in accordance with the protocols outlined in the ADEQ-approved SAR/CAP (Haley & Aldrich, 2002)."

118.    By way of a second example, Goodyear failed to comply with the sampling protocols established by ADEQ in the approved "Site Assessment Plan" or the "SAP." Pursuant to the SAP, Goodyear was required to obtain 4 surface soil samples and 4 soil boring samples for arsenic at the Pesticide Mix/Storage Area and Large Burn Pit Area (located on the eastern portion of the former Operations Area and the Site). The SAP explicitly defines surface soils as 0-6" below ground surface and specifies that each soil boring include 6 samples per boring, including a surface sample, at depths of 1, 2, 3, 5 and 10 feet below ground surface. *See* Table 1 to SAP, **Exhibit A**.

119.    Although the SAP required Goodyear to obtain a total of 28 arsenic samples (with 16 of those samples at a depth of greater than 2 feet), Goodyear's SAR/CAP only identifies 27 arsenic samples. And not one of those 27 samples was taken at a depth greater than 1.5 feet:

## Initial 95%UCL Calculations for Arsenic Former Operations Area

Red Rows = Detection Limit Samples

| ID | Arsenic (mg/kg) | ln |
|---|---|---|
| OB-30 | 13.6 | 2.61 |
| OB-36 | 33.5 | 3.51 |
| OB-39 | 429 | 6.06 |
| OB-40 | 13.2 | 2.58 |
| OB-41 | 79.4 | 4.37 |
| OB-44 | 801 | 6.69 |
| OB-49 | 56.2 | 4.03 |
| OB-50 | 81.3 | 4.40 |
| OB-51 | 19.5 | 2.97 |
| OB-31-6 | 6.22 | 1.83 |
| OB-32-18 | 6.22 | 1.83 |
| OB-32-6 | 9.8 | 2.28 |
| OB-48-18 | 13.2 | 2.58 |
| OB-48-6 | 42.9 | 3.76 |
| OB-49-0.5 | 56.2 | 4.03 |
| OB-58-6 | 5.22 | 1.65 |
| OB-60-6 | 12 | 2.48 |
| OB-61-6 | 31.3 | 3.44 |
| OB-63-18 | 2.44 | 0.89 |
| OB-63-6 | 8.21 | 2.11 |
| OB-64-18 | 2.48 | 0.91 |
| OB-64-C | 2.47 | 0.90 |
| OB-66-6 | 5 | 1.61 |
| OB-67-6 | 5.25 | 1.66 |
| OB-68-18 | 2.41 | 0.88 |
| OB-68-6 | 2.49 | 0.91 |
| OB-70-6 | 5.34 | 1.68 |

*See* SAR/CAP, Appendix B at GOODYEAR00004628.

120.    Further, although the SAP required all 28 samples to be taken in the eastern portion of the Former Operations Area, 5 of the sample locations in Goodyear's SAR/CAP were taken from the western portion of the Former Operations Area, even though the SAP did not require any arsenic samples to be taken from that area.

34

121.    Assuming for discussion only that Goodyear's prior remediation is an applicable defense to CERCLA liability, which the Court concludes it is not, the Court finds that Goodyear did not comply with the protocols established by the ADEQ-approved plans.

122.    The Court finds that Plaintiff has demonstrated a prima facie case under CERCLA § 107.  The Court further finds that the Goodyear Defendants do not have any affirmative defenses to Plaintiff's CERCLA § 107 claims.

**VI.    Joint and Several Liability**

123.    Having determined that Plaintiff has proved its claims against the Goodyear Defendants under CERCLA § 107, the Court next discusses their liability.

124.    Liability under CERCLA § 107 is joint and several.  *Anderson Bros., Inc. v. St. Paul Fire and Marine Ins. Co.*, 729 F.3d 923, 926, 930 (9th Cir. 2013); *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 875 (9th Cir. 2014).  A defendant seeking to avoid joint and several liability "bear[s] the burden of proving that a reasonable basis for apportionment exists." *BNSF II*, 556 U.S. at 614.

125.    In *BNSF II*, the Supreme Court confirmed that " '[t]he universal starting point for divisibility of harm analyses in CERCLA cases' is § 433A of the RESTATEMENT (SECOND) OF TORTS."  *BNSF II*, 556 U.S. 599, 614 (2009) (quoting *United States v. Hercules, Inc.*, 247 F.3d 706, 717 (8th Cir. 2001)).  Under the RESTATEMENT, "when two or more persons acting independently cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused."  *BNSF II*, 556 U.S. at 614 (quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 810 (S.D. Ohio 1983)).

126.    The divisibility analysis involves two steps.  First, the court considers whether the environmental harm is theoretically capable of apportionment.  *See* RESTATEMENT (SECOND) OF TORTS § 434 cmt. d.  This is primarily a question of law.  *See United States v. Burlington N. & Santa Fe Ry. Co.*, 520 F.3d 918, 942 (9th Cir. 2008), *rev'd on other grounds*, 556 U.S. 599 (2009).  Second, if the harm is theoretically capable of apportionment, the fact-finder determines whether the record provides a "reasonable basis" on which to apportion

1  liability, which is purely a question of fact.  RESTATEMENT (SECOND) OF TORTS §§

2  433A(1)(b), 434 cmt. *d; see also BNSF II*, 556 U.S. at 615; *Hercules*, 247 F.3d at 718.

3      127.    At both steps, the defendant asserting the divisibility defense bears the burden

4  of proof.  *See* RESTATEMENT (SECOND) OF TORTS § 433B(2); *see also BNSF II*, 556 U.S. at

5  614.  This burden is "substantial" because the divisibility analysis is "intensely factual."  *United*

6  *States v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir. 1992).  Although causation is not

7  required to show liability under CERCLA, the burden the Goodyear Defendants must meet

8  in order to reduce their liability under the doctrine of divisibility is essentially a burden to

9  prove that it caused only some part of the contamination, and how much.  *See U.S. v. Alcan*

10 *Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993) ("[C]ausation is brought back into the

11 case—through the backdoor, after being denied entry at the front door—at the

12 apportionment stage.").

13     128.    The Ninth Circuit has provided additional guidance on the obligations of

14 defendants seeking divisibility.  As to the first step, the Ninth Circuit has determined that "it

15 is not the court's job to envision hypothetical scenarios in which a mix of pollution from

16 multiple sources could potentially be divisible," but that a defendant is "required to 'make a

17 showing sufficient to establish the existence of an element essential to' its divisibility defense:

18 that the harm is theoretically capable of division."  *Pakootas*, 905 F.3d at 590.  Additionally,

19 the defendant is "required to produce evidence showing divisibility of the entire harm," not

20 just the hazardous substances included in a complaint to establish liability, noting that such a

21 limitation was inconsistent with CERCLA since "'Congress has … allocated the burden of

22 disproving causation to the defendant who profited from the generation and inexpensive

23 disposal of hazardous waste."  *Id.* (quoting *United States v. Monsanto Co.*, 858 F.2d 160, 170

24 (4th Cir. 1988)).  Therefore, failure to account for all of the harm at a site, a defendant cannot

25 "make a sufficient showing to establish that liability for environmental harm to the site is

26 theoretically capable of apportionment."  *Id.* at 594.

27

28

129.    The Goodyear Defendants have neither produced nor disclosed any evidence to apportion fault.  Accordingly, there is no reasonable basis to apportion any harm, even if the harm had theoretically been capable of apportionment.

130.    For the foregoing reasons, the Court finds that Plaintiff has proved its claim under CERCLA § 107.  The Court further finds that the Goodyear Defendants are jointly and severally liable under CERCLA § 107 to Plaintiff in the amount of $587,064.39.

**VII.    Plaintiff's Claim for Breach of the Implied Covenant of Good Faith**

131.     By design, the DEUR was intended to benefit future landowners, including Plaintiff.

132.    According to the Arizona Department of Environmental Quality's ("ADEQ") webpage (https://www.azdeq.gov/DEUR):  "A DEUR is a restrictive covenant designed to:…Ensure appropriate future use of the contaminated site," and "to ensure that current and future property owners are aware of contamination on a site…."  "Use of [a DEUR] often allows properties to be safely closed in a shorter time frame and at less expense than a full scale cleanup, allowing the property to be redeveloped, sold or otherwise put to productive use earlier."

133.    The parties to the DEUR here thus intended that future landowners, like Plaintiff, could rely upon DEUR and its pronouncement that the property could be used for non-residential purposes.

134.     ADEQ, for its part, acknowledged that the DEUR was intended to benefit future property owners, and that future property owners, like Plaintiff, could reasonably rely upon the accuracy of the DEUR's contents.

135.    ADEQ's Executive Director, Laura Malone, for instance, testified that a declaration of environmental use restriction is intended to notify future property owners of restrictions for development.  *See* L. Malone Deposition, 13:17-22; 61:17 through 62:22.

136.    Goodyear too understood the importance "that the terms to be stipulated in the DEUR" would be relied upon by "both the present and future property owners, as well as those parties involved in processes of financial and real estate transactions[.]"  *See* ADEQ's

March 12, 2002 letter to S. Zachary; *see also* S. Zachary letter to ADEQ dated April 2, 2002 ("Goodyear understands the requirements of the DEUR….").

137.   In reliance upon the DEUR's representation that the Site could be used for non-residential purposes without additional remediation, Plaintiff in 2010 purchased the Site that remained subject to the DEUR's non-residential use restriction.

138.   Several years later, however, Plaintiff learned that the Site required additional remediation.

139.   In March 2019, Plaintiff entered into an Administrative Settlement Agreement with ADEQ, which required Plaintiff to prepare and implement a remedial action plan to address the soil contamination.

140.   According to the Administrative Settlement Agreement, Recital C:  "The Site has been the subject of prior investigations and remedial activities under the oversight of ADEQ relating to Marsh Aviation.  Past remedial investigations and actions identified releases or threatened releases of hazardous substances having occurred at or onto the Site within the meaning of A.R.S. § 49-281(12)."

141.   Recital D to the same Agreement provides:  "In September 2004, ADEQ approved an institutional Declaration of Environmental Use Restriction ("DEUR"), which included the Site, based on the 95% upper confidence limit ("UCL") estimates of the mean concentrations of the soils left in-place, that assured the general public and any future buyer that the residual arsenic and toxaphene soil concentrations at the Site were at or below the non-residential standards of 10 and 16 mg/kg, respectively."

142.   And finally, Recital E sets forth as follows:  "However, subsequent soil sampling recently confirmed residual soil concentrations of arsenic substantially above the non-residential standard of 10 mg/kg.  The calculated 95% UCL of average concentrations of arsenic at the Site is 34.7 mg/kg."

143.   In fulfillment of its obligation under the Administrative Settlement Agreement, Plaintiff prepared a comprehensive Work Plan and submitted that Work Plan to ADEQ for its review and approval.

144.   ADEQ approved Plaintiff's Work Plan in September 2019.

145.   Plaintiff, through its environmental consultant, Synergy, then commenced implementing the work plan in April 2020.

146.   Upon completion of its work, Synergy submitted its final report to ADEQ dated July 20, 2020.

147.   ADEQ in October 2020 confirmed that Synergy had complied with its obligations under the Administrative Settlement Agreement and had implemented the work plan as approved.

148.   Plaintiff incurred approximately $587,064.39 in preparing and implementing the remedial work ADEQ approved.

149.   The DEUR is a covenant that runs with the land.  *See* DEUR at ¶ 10 ("This Declaration constitutes a covenant that runs with and burdens the Property, binds Owner and its heirs, successors, tenants, and assigns, and inures to the benefit of the Department and the State of Arizona.").

150.   A deed containing a restrictive covenant that runs with the land is a contract.  *See Powell v. Washburn*, 125 P.3d 373, 375 (Ariz. 2006) (citing *Ahwatukee Custom Estates Mgmt. Ass'n v. Turner*, 2 P.3d 1276, 1279 (Ariz. App. 2000); *Ariz. Biltmore Estates Ass'n v. Tezak*, 868 P.2d 1030, 1031 (Ariz. App. 1993)).

151.   A covenant of good faith and fair dealing is implied in every contract under Arizona law.  *Wells Fargo Bank v. Arizona Laborers, Local No. 395 Pension Trust Fund*, 38 P.3d 12, 28 (Ariz. 2002).  A party that proves a breach of the implied covenant is entitled to contract damages. *Id.* at 29.

152.   The duty of good faith and fair dealing "emphasizes faithfulness to an agreed common purpose" and consistency with "justified expectations[.]" *Id.* at 28 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981)).

153.   Given the intent of the parties to the DEUR, and its stated purpose, Plaintiff was an intended beneficiary under the DEUR.  RESTATEMENT (SECOND) OF CONTRACTS § 302(1) (1979) (explaining that "a beneficiary of a promise is an intended beneficiary if

recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance).

154.    Plaintiff falls with a defined class of persons intended by the parties to the DEUR to benefit from the DEUR; Plaintiff was reasonable in relying upon the DEUR's contents prior to its purchase of the Site.  RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981), cmt. d ("If the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him, he is an intended beneficiary.").

155.    The policy purposes underlying declarations of environmental use restrictions, as set forth in A.R.S. § 49-152 *et seq.* and as explained by ADEQ, are also instructive.   *See id.* ("Where there is doubt whether such reliance would be reasonable, considerations of procedural convenience and other factors not strictly dependent on the manifested intention of the parties may affect the question whether under Subsection (1) recognition of a right in the beneficiary is appropriate.  In some cases an overriding policy, which may be embodied in a statute, requires recognition of such a right without regard to the intention of the parties.").

156.    Because the Court has concluded that Plaintiff's remediation of the Site was reasonably necessary to achieve a non-residential use of the Site, the Court finds that the Goodyear Defendants breached the covenant of good faith and fair dealing.  Plaintiff purchased the Site on the assurance that the Site would not require additional remediation, as represented in the DEUR.

157.    The Court finds in favor of Plaintiff and against the Goodyear Defendants on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing in the principal amount of $587,064.39.

RESPECTFULLY SUBMITTED this 21st day of February, 2023.

GALLAGHER & KENNEDY, P.A.

/s/ William F. King
Stuart S. Kimball
William F. King
Kenneth N. Ralston
2575 East Camelback Road
Phoenix, Arizona 85016-9225

Attorneys for Plaintiff Moreland Properties, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the Notice of Electronic Filing to the CM/ECF registrants of record in this matter.

/s/ Cyn Carlo