**NOT FOR PUBLICATION**


**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Moreland Properties LLC,

      Plaintiff,

v.

Goodyear Tire & Rubber Company, et al.,

      Defendants.

No. CV-20-02297-PHX-SRB

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      This case arises out of a Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") claim by Plaintiff Moreland Properties, LLC ("Moreland") for costs Moreland incurred by excavating arsenic-contaminated soil at property formerly owned by Defendants Goodyear Tire & Rubber Company and Goodyear Farms, Inc. (collectively, "Goodyear"). The Court conducted a ten-day bench trial on Moreland's CERCLA and breach of implied covenant of good faith and fair dealing claims, which concluded on May 10, 2023. (*See* Docs. 142, 143, 145, 149, 162, 167, 169, 174, 181, 182, Min. Entries.) Having considered the evidence received at trial as well as the arguments of counsel, the Court makes the followings findings of fact and conclusions of law.

I.    **FINDINGS OF FACT**[1]

    A.    **Goodyear's Ownership and Remediation of the Goodyear Property**

---

[1] Portions of the Court's findings of fact have been adopted from the Joint Proposed Pretrial Order, as well as Moreland's and Goodyear's respective Proposed Findings of Fact and Conclusions of Law, without separate citation. (*See* Docs. 130, 131, 141.)

From 1974 through 1988, Goodyear leased a large parcel of land on the northwest corner of McDowell Road and 159th Avenue in Maricopa County, Arizona ("Goodyear Property") to Marsh Aviation Co. ("Marsh"). Marsh used the Goodyear Property to mix, store, and load chemicals for its crop-dusting operation. The Goodyear Property included an area known as the Operations Area, which contained a pesticide mixing and storage zone, waste burn areas, and an aircraft hangar and fueling facility. (*See* Ex. 5, ("Summary Report Vol. 1") at MOR00011.) In 1986, Goodyear sold almost all of its real estate surrounding the Goodyear Property to SunCor Development Company, Inc. ("SunCor"), and sold SunCor an option to purchase the Goodyear Property.

Marsh's crop-dusting operation caused the release of environmental contaminants onto the Goodyear Property, including toxaphene and arsenic. Toxaphene was widely used as a pesticide until the Environmental Protection Agency ("EPA") banned its use in the 1980s, and arsenic is a heavy metal commonly used as a plant defoliant. Both are hazardous substances under CERCLA. 42 U.S.C. § 9601(14), 40 C.F.R. § 302.4. According to Dr. Stephen Speyer, human receptors for arsenic include contact with the skin, ingestion, and inhalation. (Stephen Speyer Trial Tr. ("Speyer Tr.") 159:13–17.) In May 1988, the Arizona Department of Environmental Quality ("ADEQ") issued a Compliance Order that required Marsh to remediate the Goodyear Property to remove chemicals deemed dangerous to human health and the environment. Goodyear retook possession of the Goodyear Property after Marsh became insolvent and worked with ADEQ from 1999 to 2004 to complete the remediation.[2]

**1.    Goodyear's Remediation of the Goodyear Property**

Ogden Environmental ("Ogden") drafted a Site Assessment Plan ("SAP") on behalf of Goodyear, which proposed to analyze the extent of toxaphene contamination in

---

[2] By the time Goodyear retook possession of the Goodyear Property, environmental investigations had been performed by several environmental consultant groups. These investigations were primarily focused on remediating toxaphene contamination and did not consider arsenic to be a contaminant of concern. (Ex. 166, ("SAR/CAP") at GOODYEAR00005018–20; *see, e.g.*, Ex. 50, at GOODYEAR00003734 (indicating no need for additional arsenic analysis); Ex. 58; Ex. 59, at GOODYEAR00004057–60 (no discussion of arsenic in its remedial alternatives).)

the soil at the Goodyear Property. (Ex. 129, at GOODYEAR00008274, 8281–86.) Ogden updated the SAP to also evaluate arsenic contamination after ADEQ requested Ogden include arsenic as a contaminant of concern at the Goodyear Property. (Ex. 14, at GOODYEAR00004248; Ex. 186, at GOODYEAR00004272.) ADEQ approved the SAP. Ogden's soil sampling, limited to the top 18 inches of soil in the Operations Area, revealed arsenic concentrations as high as 801 milligrams per kilogram ("mg/kg") and toxaphene concentrations as high as 1,600 mg/kg. (Ex. 18, GOODYEAR00004628, 4631.)

Goodyear then retained Haley & Aldrich ("H&A"), to draft a Site Assessment Report and Corrective Action Plan ("SAR/CAP"), which, *inter alia*, proposed remediating the Operations Area to meet the non-residential soil remediation levels ("SRLs") for arsenic and toxaphene.[3] (Ex. 18.) ADEQ approved H&A's SAR/CAP in September 2002. (*See* SAR/CAP; Ex. 17; Ex. 187.) The SAR/CAP identified seven distinct areas requiring remediation within the Operations Area to reduce toxaphene and arsenic contamination to non-residential SRLs. (SAR/CAP at GOODYEAR00005027, 5031 (identifying "excavation area[s] 4 through 10").) H&A did not propose to excavate the western third of the Operations Area because pre-excavation soil samples tested below the non-residential SRLs for arsenic and toxaphene. (*Id.* at GOODYEAR00005022–23 (explaining that no remediation was required near the aircraft hangar, fuel storage tank, and parts storage); *see* Ex. 17 at GOODYEAR00000085.)

The SAR/CAP required H&A to take "step-out" samples to "delineate" the lateral extent of contamination where a given sample exceeded the non-residential SRL for toxaphene or arsenic. (SAR/CAP at GOODYEAR00005028–29; 5051 (illustrating pre-excavation sampling procedure).) Before its excavation, H&A tested four "confirmation" soil samples for arsenic, two of which revealed arsenic concentrations above the non-

---

[3] Arizona requires property owners to meet acceptable SRLs that are protective of human health and the environment. At the time of Goodyear's remediation, Arizona's statutory SRLs for non-residential land uses were 10 mg/kg for arsenic and 17 mg/kg for toxaphene. The SRLs for residential purposes were 10 mg/kg for arsenic and 4 mg/kg for toxaphene. (SAR/CAP at GOODYEAR00005023.)

1  residential SRL. (Ex. 20, Corrective Action Report ("CAR") at GOODYEAR00006125.)

2  But H&A did not take any step-out samples to define the lateral extent of arsenic

3  contamination as required by the SAR/CAP. (*Id.* at GOODYEAR00005753 (explaining

4  that the lateral extent of arsenic contamination at these two locations were each "defined

5  by one pre-excavation confirmation sample"), 6125.) H&A excavated and disposed of

6  4,100 tons of contaminated soil from the Goodyear Property. The SAR/CAP also

7  required H&A to take post-excavation confirmation samples, including two arsenic

8  samples from the base of the excavations, to verify adequate removal of contaminated

9  soils. (SAR/CAP at GOODYEAR00004979.) But H&A did not take these post-

10  excavation confirmation samples for arsenic. (CAR at GOODYEAR00005753–55,

11  5768.) Because H&A failed to take step-out samples and post-excavation confirmation

12  samples, it failed to comply with the SAR/CAP's requirements for delineating arsenic

13  contamination across the Operations Area.

14       Goodyear submitted its Final Corrective Action Report ("CAR") to ADEQ on

15  October 9, 2003, which described Goodyear's remediation of the Goodyear Property.

16  (*See generally id.*) Using its pre-excavation soil sample data that represented soil

17  remaining at the property after the excavation, H&A calculated the 95 percent upper

18  confidence limit ("95% UCL") mean arsenic concentration for the entire Operations Area

19  to be 10 mg/kg.[4] (*Id.* at GOODYEAR00006125.) ADEQ approved the CAR.

### 3.     The 2004 DEUR

21       On September 30, 2004, Goodyear executed a Declaration of Environmental Use

22  Restriction, which limited the Operations Area to non-residential uses ("2004 DEUR").

---

[4] The parties spent multiple days of trial discussing the nuances of 95% UCL calculations and the appropriate methodologies for the parties' respective investigations of the arsenic and toxaphene contamination, but a brief explanation will suffice. The 95% UCL is a statistical measure that estimates the maximum contaminant concentration distributed throughout the represented property, with approximately five percent of randomized samples expected to exceed this value. (*See* Scott Shock Trial Tr. ("Shock Tr.") at 115:4–17.) The 95% UCL should be calculated using sampling data that is "representative" of the site's conditions. This is because data that under- or overrepresents contamination levels across the property will correlate directly to higher or lower 95% UCL calculations. The 95% UCL can be used to assess exposure risks to the contaminant based on exposure pathways. (*See id.* at 54:25–55:2 (explaining that an exposure pathway is the route of exposure between a contaminant and receptor).)

(Ex. 1, ("2004 DEUR") at GOODYEAR00000004, 9.) A DEUR restricts property from being put to residential use because contaminant levels exceed residential SRLs. Goodyear placed the 2004 DEUR over the entire 6.9 acres of Operations Area, even though the arsenic and toxaphene concentrations on the western portion of the property were below the residential SRLs. (*Id.* at GOODYEAR00000009–10; CAR at GOODYEAR00005022–23; Ex. 17 at GOODYEAR00000083, 85.) The 2004 DEUR represented that the 95% UCL concentrations of arsenic and toxaphene remaining across the Operations Area were 10 mg/kg and 13 mg/kg, respectively. (2004 DEUR at GOODYEAR00000012.)

In 2004, SunCor exercised its option to purchase the Goodyear Property and divided the Operations Area into a residential parcel on roughly the western third of the property and a non-residential parcel on the remaining portion. SunCor sold the non-residential parcel and performed soil sampling on the residential parcel, which indicated that maximum concentrations of arsenic and toxaphene were below the residential SRLs. (Ex. 103, at MOR19430.) SunCor later amended the 2004 DEUR to remove the residential parcel from the DEUR ("2009 DEUR"). (*See* Ex. 183, at SHOCK_000060 (illustrating 2004 DEUR and 2009 DEUR boundaries); *see generally* Ex. 2.)

### B. Moreland's Ownership and Remediation of Tract D

#### 1. Moreland Discovers Elevated Arsenic Concentrations

In December 2010, Moreland purchased a parcel of land that was still subject to the DEUR ("Tract D"), intending to resell it to a commercial developer. Tract D encompassed approximately 4.50 acres of the DEUR-restricted property and included all seven of Goodyear's remedial excavations in the former Operations Area.[5] (Ex. 183, at SHOCK_000011, 60 (illustrating Tract D boundary, parcel 50814898), 71.)

---

[5] The remaining property subject to the DEUR includes the right-of-way bordering McDowell Road and 159th Avenue, as well as an isolated segment of land in the northwest corner of the Operations Area. (Ex. 183, at SHOCK_000060; Ex. 100, ("WTI Report") at GOODYEAR00006287.)

Ex. 183, at SHOCK_000060

Moreland reviewed the 2004 DEUR but did not consult ADEQ's additional records detailing Goodyear's remediation. In August 2014, Moreland and Spectrum Acquisition Goodyear, LLC ("Spectrum") signed a purchase and sale contract for Tract D. Spectrum offered Moreland a higher purchase price if Tract D was suitable for residential use, so Moreland hired Western Technologies, Inc. ("WTI") to "conduct shallow soil sampling and testing . . . to evaluate whether extensive surficial areas might be impacted which would require remediation in order to meet residential soil remediation levels" across Tract D. (WTI Report at GOODYEAR00006289.)

WTI took 32 "grid samples" from 21 evenly distributed locations across the property, with samples ranging from 1 to 12 inches in depth. (*Id.* at GOODYEAR00006289–91.) WTI avoided sampling grid locations that contained clean soil imported during Goodyear's remediation so WTI could more accurately delineate the extent of remediation necessary to meet residential SRLs. (*Id.* at GOODYEAR00006290.) Of the 26 samples tested for arsenic, 18 exceeded the non-residential SRL.[6] (*Id.* at GOODYEAR00006309.) WTI also tested 16 "source area" samples of the soil peripheral to Goodyear's excavations for arsenic, nine of which exceeded the non-residential SRL. (*Id.* at GOODYEAR00006291, 6310.)

WTI notified Moreland in January 2015 that it was possible that the 2004 DEUR had underestimated the 95% UCL concentrations. WTI informed Moreland that it could excavate a portion of Tract D to achieve residential SRLs. (*Id.* at GOODYEAR00006295.) It indicated that less expensive remediation alternatives were also possible, but these would likely require "increased agency interaction and frequently less certainty in the schedule for the project." (*Id.*) WTI did not identify these potential alternatives in its report. (*See generally id.*) Spectrum did not purchase Tract D.

## 2. Moreland's Administrative Settlement Agreement

Moreland hired Gallagher & Kennedy ("G&K") and Synergy Environmental, LLC ("Synergy") in 2017 to address the elevated arsenic and toxaphene levels found at Tract

---

[6] Arsenic concentrations ranged from 3.9 mg/kg to 550 mg/kg. (WTI Report at GOODYEAR00006309.)

D. In August 2017, G&K communicated to ADEQ Moreland's intent to conduct additional soil sampling to define "the vertical and horizontal extent of arsenic and toxaphene concentrations" at Tract D. (Ex. 38.) Synergy issued a Remedial Refinement Sampling Report ("Sampling Report") in December 2017 that discussed Synergy's sampling of Tract D. (Ex. 6, ("Summary Report Vol. 2") at MOR00324–464.) Synergy collected 64 soil samples, which identified arsenic concentrations ranging from 5.05 to 135 mg/kg and toxaphene concentrations from less than 0.40 to 20.5 mg/kg. (*Id.* at MOR00333–34.) The Sampling Report indicated that Synergy sampled Tract D assuming a site-specific SRL of 25 mg/kg for arsenic.[7] (*Id.* at MOR00326.)

Following the Sampling Report, G&K scheduled a meeting with ADEQ in February 2018 to discuss initiating a cleanup of Tract D, "[s]ite-specific standards consistent with other DEURs issued by ADEQ," and issuing a new DEUR or modifying the 2004 DEUR. (*See* Ex. 39.) ADEQ subsequently informed Moreland in June 2018 that no further remediation was necessary to use Tract D for non-residential purposes. (*See* Ex. 41.) However, on December 20, 2018, Moreland published a "Notice of 30-day Public Comment Period Administrative Settlement Agreement" ("Notice of Settlement") in the Arizona Business Gazette. (Ex. 63, ("Notice of Settlement") at MOR01342.) The Notice of Settlement explained that Moreland and ADEQ would enter into a proposed administrative settlement agreement that would "resolve[] ADEQ's claims against Moreland," through a covenant not to sue. (*Id.*)

In March 2019, ADEQ and Moreland entered into the Administrative Settlement Agreement ("Settlement Agreement"), which required Moreland to "prepare and implement a remedial action plan [to] address the soil contamination at [Tract D] to meet applicable non-residential standards that are protective of public health and the environment, based on the 95% [UCL] estimates of the mean concentrations of the soils left in place." (Ex. 3, ("Settlement Agreement") at GOODYEAR00002960.) The

---

[7]  ADEQ may approve site-specific, risk-based SRLs when contaminants exceed Arizona's statutory SRLs. A.R.S. § 49-152(B); (LePage Tr. 35:18–38:14.) A site-specific SRL would have required Moreland to conduct a "site-specific human health risk assessment." As explained below, Moreland did not do this.

Settlement Agreement indicated that the 95% UCL concentration at Tract D was 34.7 mg/kg for arsenic. (*Id.* at GOODYEAR00002956.) The Settlement Agreement would also release Moreland from liability upon its successful implementation of a remedial action plan. (*Id.* at GOODYEAR00002961.)

Witness Dennis Shirley, the owner of Synergy, testified that Moreland entered into the Settlement Agreement to avoid the additional costs and procedures associated with the Voluntary Remediation Program ("VRP"). (Dennis Shirley Trial Tr. ("Shirley Tr.") 281:20–282:3.) Witness Tina LePage[8] explained that ADEQ prefers for property owners to proceed through the VRP because it enables ADEQ to have greater oversight of the remediation process. (Tina LePage Trial Tr. ("LePage Tr.") 9:16–19, 10:21–11:2.) While the VRP requires the property owner to pay an application fee plus an hourly rate for ADEQ's time, ADEQ's guidance often helps minimize a party's response costs. (*Id.* at 9:20–10:2, 10:18–11:2; Laura Malone Trial Tr. ("Malone Tr.") 57:23–25.) By contrast, ADEQ reviews and comments on reports submitted by parties under an administrative settlement agreement but does not directly supervise the response. (Malone Tr. 56:25–57:16, 58:8–11; LePage Tr. 11:3–6.) A landowner proceeding through the VRP receives a "No Further Action" letter from ADEQ, which, unlike an administrative settlement agreement, does not release the landowner of liability. (Malone Tr. 10:1–11:3.)

### 3.    Synergy's Work Plan to Excavate Tract D

In July 2019, Synergy submitted to ADEQ a draft work plan to satisfy Moreland's obligations under the Settlement Agreement ("Work Plan"). The Work Plan stated that WTI and Synergy's cumulative soil sampling results indicated a 95% UCL arsenic concentration of 35.5 mg/kg and toxaphene concentration of 7.8 mg/kg on Tract D. (Ex. 4, ("Work Plan") at MOR02205.) Based on this sampling data, the Work Plan purported "to optimally plan for the appropriate excavation of contaminated soils to reduce the resulting arsenic concentration in residual soils to achieve the cleanup criteria of 10 mg/kg specified in the [2004] DEUR." (*Id.* at MOR02206.) The Work Plan "propose[d]

---

[8] Ms. LePage is the Manager of Remedial Projects at ADEQ and helped oversee Moreland's cleanup of Tract D. (LePage Tr. 6:6–22.)

1    to excavate and transport the most highly impacted soil to an offsite disposal facility" and

2    scrape the "upper six inches of the surface soils" with lower arsenic concentrations to

3    place in the primary excavation sites. (*Id.* at MOR02196.) ADEQ did not request or

4    require Moreland to excavate the six inches of surface soils. (LePage Tr. 30:16–31:5.)

5         The Work Plan did not assess the possibility of a site-specific SRL. (*Id.* at

6    MOR02203 (indicating that Synergy was asked to analyze the potential for a site-specific

7    SRL); Shirley Tr. 16:18–17:4 (stating that Moreland "went quite a ways" to consider a

8    site-specific SRL but chose excavation).) Mr. Shirley testified that this was because a

9    site-specific SRL would have "still require[d] a significant amount of soil excavation," in

10   addition to more ADEQ oversight. (Shirley Tr. 224:9–23.) The Work Plan did not

11   address any remediation alternatives to soil excavation, analyze the cost-effectiveness of

12   the excavation, or discuss whether the proposed excavation was necessary to protect

13   human health and the environment. (*Id.* at 224:24–226:2; *see generally* Work Plan.)

14   Though Synergy had drafted the Work Plan before the Settlement Agreement, the Work

15   Plan was not included for public review and comment in the Notice of Settlement. (*See*

16   *generally* Settlement Agreement; Notice of Settlement; Ex. 123.)

17        ADEQ reviewed the Work Plan and requested additional information on, *inter*

18   *alia*, Moreland's intended future use for Tract D because "ADEQ [needed to] understand

19   the end use for the land (i.e. residential, commercial, parking, etc.) to drive critical

20   decisions, such as size of Decision Units for sampling." (Ex. 122, at MOR01165.) These

21   Decision Units would "represent future exposure areas" and help "to develop a remedial

22   endpoint." (*Id.*) ADEQ also informed Moreland that it could evaluate risk-based, site-

23   specific SRLs for Tract D instead of achieving the statutory SRLs. (*Id.*) ADEQ also

24   stated that it was unclear whether Moreland planned to remove or modify the 2004

25   DEUR. (*Id.*) G&K responded that Moreland "always" intended "to actually achieve the

26   specified soil-contaminant concentrations that ADEQ confirmed existed in the DEUR

27   prior to [its] purchase of the property." (Ex. 123, at MOR18532.) Ms. LePage testified

28   that she did not know whether Moreland ever proposed a risk assessment to pursue site-

specific SRLs for Tract D.[9] (LePage Tr. 37:10–16.)

Because Moreland elected to pursue the Settlement Agreement, ADEQ did not evaluate the Work Plan as vigorously as it would have under the VRP program. (*Id.* at 23:11–24:5, 27:11–28:19.) ADEQ approved the Work Plan on September 30, 3019. (Ex. 10, at GOODYEAR00007636.)

### 4.    Synergy's Excavation of Tract D

Approximately two weeks before beginning its excavation, Synergy distributed flyers to nearby homes and installed a sign at Tract D describing the excavation and stating that the Work Plan was available for review. (Summary Report Vol. 1 at MOR00028; Summary Report Vol. 2 at MOR0716–720.) The flyer provided contact information for interested parties to submit "questions regarding the planned soil cleanup or concerns or complaints during the course of the work" but did not otherwise solicit public feedback on the Work Plan. (Summary Report Vol. 2 at MOR0717.)

Synergy identified a 1.5 acre "Area of Impact" that "contain[ed] the highest concentrations of arsenic (and toxaphene)" at Tract D. (Summary Report Vol. 1 at MOR00021–22.) Synergy excavated and disposed of nearly 3,500 tons of soil from the Area of Impact. (*Id.* at MOR00031.) Though Synergy originally planned to reuse the clean soil H&A imported into the Area of Impact as fill, Synergy "abandoned" this "relatively small" cost-saving approach and instead disposed of the soil because of the effort required to isolate it from contaminated soil. (*Id.* at MOR00030; *see* Shirley Tr. 105:21–107:1.) Synergy instead "scraped" the upper six inches of the entirety of Tract D and used that scraped soil as fill in the Area of Impact. (Summary Report Vol. 1, at MOR00022, 31.) Synergy excavated this peripheral soil, approximately 3,150 tons, as a "cautionary step," even though the soil was "generally at or below the specified contaminant limits in the 2004 DEUR." (*Id.* at MOR00022.) Synergy imported clean soil to fill the Area of Impact and to cover all of Tract D with 6 inches of clean soil. (*Id.* at MOR00022–23, 32.)

---

[9] Synergy did not have a risk assessor working on the remediation of Tract D who could have aided in creating a risk assessment. (Shirley Tr. 128:16–129:13.)

Synergy issued a report titled "Removal Action to Address Residual Arsenic Contamination in Shallow Soils" ("Summary Report") on July 28, 2020, which documented Synergy's excavation of contaminated soil at Tract D.[10] (*See generally* Summary Report Vol. 1; Summary Report Vol. 2; Ex. 7.) In the Summary Report, Synergy calculated pre-excavation 95% UCL concentrations of 154 mg/kg for arsenic and 28 mg/kg for toxaphene.[11] (Summary Report Vol. 1 at MOR00020, 46–47.) Synergy chose to use only WTI's 21 grid samples collected at 3 to 6 inches below ground surface to calculate the 95% UCL because Synergy believed that this sample set was most representative of the arsenic contamination on Tract D. (*Id.* at MOR00019, 46–47.) Using the soil samples representative of the soil remaining at Tract D, Synergy calculated the post-excavation UCLs to be 9.9 mg/kg for arsenic and 4.9 mg/kg for toxaphene but estimated that excavating the top six inches of Tract D reduced the concentrations closer to 5.7 mg/kg and 1.7 mg/kg, respectively.[12] (*Id.* at MOR00023–24, 54–57.) Synergy did not conduct post-remediation soil sampling. (Shirley Tr. 99:9–16.)

Though Mr. Shirley testified that he was unaware of any viable remedial

[10] Synergy characterized its excavation in both the Work Plan and Summary Report as a "removal action." (Work Plan at MOR02192; Summary Report Vol. 1 at MOR00001.) ADEQ did not approve Synergy's excavation specifically as a removal action as defined under CERCLA, however. (LePage Tr. 20:3–21:4 (explaining that ADEQ does not distinguish between "removal" or "remedial" actions under Arizona law).)

[11] Synergy and WTI's cumulative sampling shows that H&A may have failed to adequately excavate portions of the Operations Area, leaving higher levels of residual arsenic across Tract D. However, because both Synergy and WTI only used sampling data from Tract D, a fraction of the Operations Area, the Court cannot conclude that Goodyear's 95% UCLs for the entire Operations Area in the 2004 DEUR were in fact underestimated. (Shirley Tr. 138:12–16, 179:17–180:3.) Though Moreland's expert, Dr. Speyer, disagreed with H&A's 95% UCL methodology and questioned the validity of its data, neither he nor any of Moreland's witnesses provided evidence that Goodyear's 95% UCL calculation for the entire Operations Area was inaccurate. (*See, e.g.,* Ex. 22, at SPEYER_000040–69; Shirley Tr. 140:25–142:7 (explaining that Synergy did not "interpolate" data to evaluate arsenic impact over the Operations Area).)

[12] When asked why Synergy did not use all of WTI's grid samples to calculate the pre-excavation 95% UCL, Mr. Shirley testified that the 21 samples represented "the most consistent data" of Tract D. (Shirley Tr. 296:1–298:10.) However, Synergy used all available grid samples to calculate the expected 95% UCL of soils remaining in place after its excavation, without explaining why it departed from its pre-excavation methodology. (*Id.* 298:13–299:19; Summary Report Vol. 1 at MOR00023, 23 n.16.) This, plus the fact that Synergy used different data sets for its calculations in each of the Settlement Agreement, Work Plan, and Summary Report (none of which included any samples from Goodyear's excavation sites) cast doubt on the reliability of Synergy's pre-excavation 95% UCLs.

alternatives for Tract D, Synergy did not prepare a feasibility study as part of its Work Plan or Summary Report that assessed any such alternatives. (*Id.* at 177:20–178:2, 305:11–306:15, 403:7–404:8 (stating that various remedial alternatives would not have been reasonable).) Synergy's reports also did not evaluate whether the arsenic on Tract D posed an imminent threat to human health or the environment. (*Id.* at 354:11–14; *see generally* Work Plan; Summary Report Vol. 1.) In October 2020, ADEQ confirmed that Moreland satisfied its obligations under the Settlement Agreement. (*See* Ex. 11.)

## II.    CONCLUSIONS OF LAW

### A.    CERCLA Claim[13]

CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed." *Carson Harbor Vill., Ltd. v. Unocal Corp.* (*Carson Harbor I*), 270 F.3d 863, 870 (9th Cir. 2001) (en banc) (quoting *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1357 (9th Cir. 1990)), cert. denied *sub nom. Carson Harbor Vill., Ltd. v. Braley*, 535 U.S. 971 (2002). To succeed on its CERCLA claim, Moreland must prove the following elements by a preponderance of the evidence:

> (1) the site on which the hazardous substances are contained is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" has occurred; (3) the "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary and "consistent with the national contingency plan"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a).

*Carson Harbor Vill. v. County of Los Angeles* (*Carson Harbor III*), 433 F.3d 1260, 1265 (9th Cir. 2006).

A facility includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). Courts construe the term "facility" in broad terms, such that a "plaintiff need

---

[13] The Court finds that Moreland abandoned its WQARF claim. Moreland makes only a passing reference to WQARF in a footnote in the parties' joint proposed pretrial order, in which Moreland stated that it "reserve[d] the right to pursue recovery under WQARF in the alternative to its [§] 107/113 claims under CERCLA." (Doc. 141 at 2 n.1.) Nor did Moreland include its WQARF claim in its proposed findings of fact and conclusions of law, or argue the WQARF claim during closing argument.

only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there." *Stevens Creek*, 915 F.2d at 1360 n.10 (quoting *United States v. Metate Asbestos Corp.*, 584 F. Supp. 1143, 1148 (D. Ariz. 1984)). Tract D is a facility, as Marsh's crop-dusting operations caused the release of hazardous substances there.[14] *See* 42 U.S.C. § 9601(22) (defining "release"); 40 C.F.R. § 302.4 (listing arsenic and toxaphene as hazardous substances).

Goodyear is also a potentially responsible party subject to liability as a former owner of Tract D, as there was a "disposal" of "hazardous waste" during its ownership. Specifically, Marsh's operations caused the "dumping, spilling, leaking, or placing" of "solid, liquid, [or] semisolid" materials onto Tract D. 42 U.S.C. § 9601(29) (adopting definitions of "disposal" and "hazardous waste" in section 1004 of the Solid Waste Disposal Act); *see Carson Harbor I*, 270 F.3d at 875 (a past owner is a potentially liable party under § 9607(a)(2) if there was a "'discharge, deposit, injection, dumping, spilling, leaking, or placing' of contaminants on the property during their ownership").

This leaves only the third element at issue: whether Moreland's response costs in excavating the contaminated soil at Tract D were necessary and consistent with the national contingency plan ("NCP"). *See Carson Harbor I*, 270 F.3d at 870–71; *AmeriPride Servs. Inc. v. Texas E. Overseas Inc.*, 782 F.3d 474, 490 (9th Cir. 2015) (holding that response costs must be necessary and consistent with the NCP for contribution claims). The Court finds that Moreland has not shown that its response costs were necessary or consistent with the NCP.

### 1.    Moreland's Response Was a Remedial Action

A threshold question is whether Moreland's response to the contamination at Tract D was a removal action or a remedial action, as the NCP prescribes heightened procedural requirements for remedial actions. *United States v. W.R. Grace & Co.*, 429

---

[14] Tract D is not a facility distinct from the Goodyear Property. That Moreland purchased a fraction of the Goodyear Property does not negate that Marsh released arsenic and toxaphene on what later became Tract D. Further, Moreland proved by a preponderance of the evidence that the arsenic and toxaphene at Tract D was residual contamination released by Marsh.

F.3d 1224, 1228 (9th Cir. 2005); *compare* 40 C.F.R. § 300.415 (removal actions), *with* 40 C.F.R. § 300.430 (remedial actions). Whether a response is a removal action or remedial action is a question of law. *Carson Harbor Vill., Ltd. v. Unocal Corp.* (*Carson Harbor II*), 287 F. Supp. 2d 1118, 1157 (C.D. Cal. 2003), *aff'd* 433 F.3d 1260.

CERCLA defines a "removal" as:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). By contrast, remedial actions are:

> [T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

*Id.* § 9601(24).

Recognizing the ambiguity of these terms, the Ninth Circuit distinguished between removal and remedial actions in *W.R. Grace*. There, the EPA conducted a cleanup of asbestos contamination after the EPA "extensively documented" the contamination's "imminent and substantial threat to human health and the environment." 429 F.3d at 1234. The Ninth Circuit noted that removal actions are "prompt action[s]" to mitigate "the immediacy of a threat" to human health or the environment. *Id.* at 1244. In other words, "removal actions encompass interim, partial time-sensitive responses taken to counter serious threats to public health," whereas remedial actions are "comprehensive" responses to contamination at a site. *Id.* at 1245. The Court explained that "[c]rucial to [its] determination [was] the documented evidence that, *absent immediate attention*, the airborne toxic particles would continue to pose a substantial threat to public health." *Id.* at 1247 (emphasis added); *see also Carson Harbor II*, 287 F. Supp. 2d at 1155 (landowner's cleanup of lead-contaminated tar and slag materials was a remedial action because the

landowner presented no evidence of an imminent threat to human health or the environment).

The Court concludes that Moreland's cleanup of Tract D was a remedial action and not a removal action. Moreland presented no evidence that the elevated arsenic or toxaphene concentrations in the soil required "immediate attention" to mitigate a substantial threat to public health or environment.[15] For example, groundwater contamination was not of concern. (Summary Report Vol. 1 at MOR00012.) Nor did Moreland show that "absent immediate attention," the arsenic or toxaphene, which had remained undisturbed in the soil for several years, threatened human health. (*See* Speyer Tr. 159:13–17 (explaining that human exposure to arsenic includes inhalation, contact with the skin, and ingestion).) Moreover, it took Moreland more than two years of planning before it began its excavation. (*See* Ex. 39 (setting agenda for meeting with ADEQ in February 2018); Summary Report Vol. 1 at MOR00030 (excavation began April 28, 2020).) This "slow pace of the cleanup underscores the lack of any imminent threat to health or safety that is typically viewed as a critical element of any 'removal action.'" *Long Beach Unified Sch. Dist. v. Santa Catalina Island Co.*, No. CV 19-1139-JFW(ASx), 2021 WL 4706552, at *11 (C.D. Cal. Aug. 17, 2021) (citing *W.R. Grace*, 429 F.3d at 1244).[16]

### 2.    Moreland Did Not Substantially Comply with the NCP

Moreland has the burden of proving that the remediation costs were "consistent with" the NCP. *Carson Harbor III*, 433 F.3d at 1265 (citing 42 U.S.C. § 9607(a)(4)(B)). "It is 'designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment.'" *Id.* (quoting *Wash. State Dep't of*

---

[15] Moreland argued that Tract D required a prompt response because potential buyers were interested in purchasing the property. Unlike imminent threats to health and the environment, a prospective business deal is not the type of "time-sensitive" matter for which the NCP was designed to afford "considerable leeway in structuring the cleanup." *W.R. Grace*, 429 F.3d at 1227–28. The Court is unaware of any caselaw or EPA guidance that suggests otherwise.

[16] Nor was Moreland's excavation a non-time critical removal action. *See Long Beach Unified Sch. Dist.*, 2021 WL 4706552, at *11 (requiring a "sufficiently serious" threat to health or the environment such "that the added time needed to comply with remedial requirements . . . would be unacceptable" (citation omitted) (alteration in original)).

*Transp. v. Wash. Nat. Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995)). A private remedial action is "'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with" the NCP's applicable requirements. 40 C.F.R. § 300.700(c)(3)(i). The EPA endorses holistic evaluations of remediations rather than requiring "a list of rigid requirements" that could otherwise "defeat cost recovery for meritorious cleanup actions based on a mere technical failure by the private party." *Carson Harbor II*, 287 F. Supp. 2d at 1160 (quoting National Oil and Hazardous Substance Pollution Contingency Plan, 55 Fed.Reg. 8666, 8793 (Mar. 8, 1990)); *see* 40 C.F.R. § 300.700(c)(4) (tolerating "immaterial or insubstantial deviations" from the NCP). Relevant to this lawsuit, the NCP requires a private party to (1) prepare a remedial investigation and feasibility study and (2) provide an opportunity for public participation. 40 C.F.R. § 300.700(c)(5)(viii), (6)(iii)–(iv).

### a.    No Feasibility Study

Moreland made no attempt to develop a feasibility study. A feasibility study "ensure[s] that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected." *Id.* § 300.430(e)(1). Using the data collected during the remedial investigation,[17] the party must conduct a feasibility study that develops and screens potential remedial alternatives, including a "no-action alternative, which may be no further action if some removal or remedial action has already occurred at the site." *Id.* § 300.430(e)(1)–(2), (6). When developing these alternatives, the party should consider each alternative's effectiveness, ease of

---

[17] A remedial investigation "collect[s] data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives" in the feasibility study. *Carson Harbor III*, 433 F.3d at 1267 (quoting 40 C.F.R. § 300.430(d)(1)). Moreland substantially complied with the NCP's remedial investigation requirements. *See* 40 C.F.R. § 300.430(d)(1)–(4). Synergy and WTI assessed the extent of arsenic and toxaphene contamination at Tract D and identified Marsh's aerial spraying activities as the source of the contamination. *See id.* § 300.430(d)(2). Synergy also identified that the arsenic and toxaphene were not risks to groundwater, though it did not characterize any "current and potential threats to human health." *Id.* § 300.430(d)(4) (requiring party to conduct a risk assessment of the contaminants to "help establish acceptable exposure levels").

1    implementation, and cost. *Id.* § 300.430(7). The feasibility study must then analyze a

2    "limited number" of these "alternatives that represent viable approaches to remedial

3    action." *Id.* § 300.430(9).

4    Synergy did not include a feasibility study in its Work Plan or Summary Report.[18]

5    Instead, The Work Plan offered only a single solution: to excavate the contaminated soil

6    at Tract D.[19] (Work Plan at MOR02196–97, 2206.) Moreland's decision to not consider

7    any remedial alternatives is evidenced by the fact that it "always" intended to remediate

8    Tract D to the arsenic level stated in the 2004 DEUR. (*See* Ex. 123.) This is no "mere

9    technicality" or "insubstantial deviation" from the NCP, but noncompliance. *See Carson*

10   *Harbor III*, 433 F.3d at 1268–69 (finding no substantial compliance with NCP where

11   party's remedial action plan did not discuss any alternatives to physical removal and did

12   not assess the effectiveness, cost, or ease of implementation of its chosen remediation).

13   ### b.    No Opportunity for Meaningful Public Participation

14   The NCP also requires "meaningful public participation" for a party to achieve a

15   CERCLA-quality cleanup. 55 Fed.Reg. 8793. The party conducting the cleanup must

16   make reasonable efforts to interview local officials, community residents, and other

17   interested parties "to solicit their concerns." 40 C.F.R. § 300.430(c)(2)(i). The party must

18   also maintain an "information repository" near the property and develop a "community

19   relations plan." *Id.* at § 300.430(c)(2)(ii)–(iii). Following the feasibility study, the party

20   "shall" make a "proposed plan" available to the public that describes the remedial

21   alternatives, proposes the party's preferred remedial alternative, and identifies the

22   ---

[18] Moreland also did not produce anything suggestive of a "focused" or "streamlined" feasibility study. *See* 55 Fed.Reg. 8793 (enumerating appropriate circumstances for a "streamlined analysis" and explaining that fewer remedial alternatives in a "focused" feasibility study may be consistent with the NCP in "appropriate cases"). Nor is the Court persuaded that Moreland could use previous investigations of the Goodyear Property as a substitute for conducting its own feasibility study. These investigations did not consider arsenic a contaminant of concern. (Work Plan at MOR02197–2200, 2206–08 *see generally* Ex. 58; Ex. 59 (proposing remedial alternatives for toxaphene and not arsenic).) Even after Ogden drafted its SAP, ADEQ required Ogden to amend the SAP to sample for arsenic. Moreland provided no other evidence of any remedial alternatives specific to address the arsenic contamination at Tract D, which was the focus of its own remediation.
[19] Similarly, the WTI Report informed Moreland that less expensive remedial alternatives to excavation might have been available but did not identify or discuss these possibilities. (WTI Report at GOODYEAR00006295.)

1   information used to select this preferred alternative. *Id.* at § 300.430(f)(2)–(3). "The
2   purpose of the proposed plan is to supplement the RI/FS" and provide the public an
3   opportunity "to participate in the selection of [the] remedial action." *Id.* at
4   § 300.430(f)(2).

5       Moreland did not substantially comply with the NCP's public participation
6   requirement. There is no evidence that Moreland prepared a community relations plan or
7   published any proposed plan[20] to ensure that the public had a "meaningful" opportunity
8   "to participate in the selection of [the] remedial action." 40 C.F.R. § 300.430(f)(2)–(3);
9   *see Carson Harbor III*, 433 F.3d at 1266 n.5 (finding no public participation where there
10  was no evidence of a "community relations plan, that the public was given notice of the
11  remedial action, that the remediation plan was published or otherwise made available to
12  the public, that any public meeting was held, or that any other opportunity for public
13  comment was given"). The Notice of Settlement indicated only that the Settlement
14  Agreement was available for review and comment, but the Settlement Agreement did not
15  propose any remedial action.[21] (*See* Notice of Settlement; Settlement Agreement at
16  GOODYEAR00002960–61 (requiring Moreland to "prepare and implement a remedial
17  action plan").) Moreover, Moreland's notice to nearby residents just two weeks before
18  Synergy began its excavation did not solicit feedback on the chosen remediation itself but
19  invited neighbors to submit "concerns or complaints *during* the course of work."
20  (Summary Report Vol. 2 at MOR00717 (emphasis added)); *c.f. Waste Mgmt. of Alameda*
21  *Cnty., Inc. v. East Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1102 (N.D. Cal. 2001)
22  (finding no "meaningful public participation" where the remediating party "was unlikely

---

[20] Even had the Work Plan included a feasibility study, it was never published to the public, despite being drafted before the Settlement Agreement.
[21] Moreland was required to publish notice of the Settlement Agreement pursuant to A.R.S. § 49-289.03(A)(4) and A.A.C. R18-16-301. The Court finds that these provisions are not "substantially equivalent" to the NCP's public participation requirement because they did not require Moreland to provide the public any opportunity to participate in the selection of a remedy. *See* 40 C.F.R. § 300.700(c)(6) (permitting public participation through "substantially equivalent state and local requirements"); *compare* A.R.S. § 49-289.03(A)(4) *and* A.A.C. R18-16-30140, *with* C.F.R. § 300.430(f)(3)(i)(A) (requiring published "notice of availability and brief analysis of the *proposed plan* in a major local newspaper") (emphasis added)).

to seriously reconsider its intended remedy" that it had proposed three years before publishing notice of the remedy).

Nor was ADEQ's involvement with Moreland's remediation an adequate substitute for public participation. In *Carson Harbor III*, the Ninth Circuit held that an agency's actions did not fulfill Carson Harbor's public participation requirement because the agency "was involved in a very limited fashion."[22] 433 F.3d at 1267. The agency "did not take a lead role" in the remediation or "oversee the cleanup," but "merely approved" the plaintiff's proposed remedial action plan "with very minor modifications," and inspected the property after the remediation. *Id.* at 1263–64, 1267. ADEQ's involvement with Moreland's excavation was similar. ADEQ reviewed and approved the Work Plan and Summary Report, but otherwise did not directly participate in the remediation because Moreland was not in the VRP. Ms. Malone and Ms. LePage both testified that they were unaware of the extent to which ADEQ verified the accuracy and adequacy of information that Moreland submitted throughout the remediation. (*See, e.g.,* Malone Tr. 78:24–83:12; LePage Tr. 19:8–12, 23:18–25:13, 27:11–25, 30:5–7, 32:19–33:8.)

The Court finds that Moreland's remediation did not substantially comply with the NCP because Moreland did not conduct any feasibility study or provide the public with a meaningful opportunity to participate in developing its remediation of Tract D.

### 3.    Moreland Did Not Show its Response Costs Were "Necessary"

Response costs are "necessary" if "there is a threat to human health or the environment and . . . the response action is addressed to that threat." *Carson Harbor I*, 270 F.3d at 872. "The issue is not why the landowner decided to undertake the cleanup, but whether it was necessary" to address "an actual and real threat human health or the environment." *Id.* at 871–72 (rejecting the "ulterior motive" analysis which focuses on a party's business or other motive in remediating its property).

Moreland has not shown that its response costs were necessary. Moreland has not

---

[22] The Ninth Circuit declined to decide whether "significant agency involvement" could satisfy the public participation requirement because the agency's involvement with Carson Harbor was nevertheless insufficient. 433 F.3d at 1266–67.

detailed how many truckloads of excavated soil might have been necessary to protect human health and the environment at Tract D. In fact, Moreland presented no analysis of the arsenic's threat to human health or the environment. Notably, ADEQ informed Moreland that it could explore site-specific SRLs for Tract D, but G&K represented that Moreland "always" intended to remediate Tract D to the contaminant concentrations in the 2004 DEUR[23] and declined to analyze this alternative. *See* A.R.S. § 49-152(B). Without a risk assessment or feasibility study, there no evidence that remediating Tract D to the contaminant levels in the 2004 DEUR was necessary to protect human health or the environment, particularly when Moreland disregarded ADEQ's suggestion to assess a site-specific SRL.[24] And while "an actual agency cleanup order is highly relevant and, in some cases, compelling on the necessity question," the evidence suggests that ADEQ considered Moreland's remediation to be voluntary, even though Moreland did not proceed through the VRP. (LePage Tr. 28:20–29:4; Malone Tr. 54:13–55:4 (explaining that Moreland contacted ADEQ voluntarily to remediate Tract D).)

The Court concludes that Moreland is not entitled to damages because it did not prove that its response costs were "necessary" and "consistent with" the NCP.[25] *Carson Harbor III*, 433 F.3d at 1269 (affirming summary judgment were plaintiff failed to

---

[23] Even then, Moreland incurred costs that it knew were disproportionate to achieve this goal. Specifically, Synergy "scraped" the top six inches of soil across the entirety of Tract D even though this peripheral soil was "at or below" the non-residential SRLs. (Summary Report Vol. 1 at MOR00022, 51–53 (listing toxaphene and arsenic concentrations of the excavated surficial soils).) Synergy estimated that this reduced Tract D's 95% UCL concentration of arsenic to 5.7 mg/kg and toxaphene to 1.7 mg/kg, both well below the *residential* SRLs. (*Id.* at MOR00024.) Moreland has not shown that such excavation was necessary to remediate to the levels stated in the 2004 DEUR, or to protect human health or the environment. (*Id.* at MOR00022, 31; *see* Shirley Tr. 180:10–184:3, 228:6–18.)

[24] Contrary to Mr. Shirley's testimony, the Settlement Agreement did not require Moreland to remediate Tract D to the contaminant levels stated in the 2004 DEUR, but instead specified only that Moreland had "to meet applicable non-residential standards that are protective of public health and the environment." (Shirley Tr. 61:19–24; Settlement Agreement at GOODYEAR00002960.) ADEQ suggested site-specific SRLs to Moreland after the Settlement Agreement as a method to satisfy this objective. *See* A.R.S. § 49-152(B) (site-specific SRLs are risk-based); AZ ADC R18-7-206.

[25] Because Moreland is not entitled to damages under CERCLA, the Court need not address whether Moreland's claim was a § 107 cost recovery action or a § 113 contribution claim. *AmeriPride Services Inc.*, 782 F.3d at 489–90 (explaining that response costs must be necessary and consistent with the NCP for both cost recovery and contribution actions).

1    substantially comply with the NCP); *Washington Nat. Gas Co.*, 59 F.3d at 805.

2          **B.**     **Implied Covenant of Good Faith and Fair Dealing**

3         Moreland also brings a claim for Goodyear's alleged breach of an implied

4    covenant of good faith and fair dealing. Arizona "law implies a covenant of good faith

5    and fair dealing in every contract." *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986)

6    (en banc). "The implied covenant of good faith and fair dealing prohibits a party from

7    doing anything to prevent other parties to the contract from receiving the benefits and

8    entitlements of the agreement." *Wells Fargo Bank v. Arizona Laborers, Local No. 395*

9    *Pension Trust Fund*, 38 P.3d 12, 28 (Ariz. 2002) (en banc). The duty "exists by virtue of

10   a contractual relationship." *Id.* The 2004 DEUR did create a contractual relationship

11   between Goodyear and ADEQ because it is a restrictive covenant and restrictive

12   covenants are contracts. *Powell v. Washburn*, 125 P.3d 373, 376 (Ariz. 2006) (en banc);

13   *see* A.A.C. R18-7-601 (defining "DEUR"); (*see generally* 2004 DEUR.) Moreland was

14   not a party to the 2004 DEUR between Goodyear and ADEQ, but instead argues that it

15   was an intended third-party beneficiary of the 2004 DEUR.

16        To recover as a third-party beneficiary of a contract, "the contracting parties must

17   intend to directly benefit that person and must indicate that intention in the contract

18   itself." *Sherman v. First Am. Title Ins. Co.*, 38 P.3d 1229, 1232 (Ariz. Ct. App. 2002)

19   (citing *Norton v. First Fed. Sav.*, 624 P.2d 854, 856 (Ariz. 1981)). "The contemplated

20   benefit must be both intentional and direct." *Norton*, 624 P.2d at 856. Turning to the 2004

21   DEUR, the Court must "give effect to the intention of the parties" based on the language

22   used in the covenant or the circumstances surrounding the covenant's creation. *Powell*,

23   125 P.3d at 377 (quoting Restatement (Third) of Property: Servitudes § 4.1(1) (2000)).

24        The 2004 DEUR is a "covenant that runs with and burdens the [Operations Area],

25   binds [the landowner] and its heirs, successors, tenants, and assigns, and inures to the

26   benefit of the Department and the State of Arizona." (2004 DEUR at

27   GOODYEAR00000005); *see* A.R.S. § 49-152(F). It requires the landowner to "assure

28   that the restricted area not be subject to residential use" and that the 2004 DEUR remain

in effect "because contaminant levels exceed residential standards." (2004 DEUR at Goodyear000000004.) As Ms. LePage explained, a DEUR notifies all future landowners that the restricted property cannot be used for residential purposes. (LePage Tr. 42:19–24.) And it is required whenever a landowner "elects to leave contamination on a property that exceeds the applicable residential standard for the property." A.D.C. R18-7-208. A DEUR benefits Arizona by providing funding to the DEUR program and limits the State of Arizona's liability by preventing the residential use of property that ADEQ knows exceeds acceptable contaminant levels. (LePage Tr. 41:16–42:4); *see* A.R.S. § 49-152(F) (explaining that a DEUR "inures to the benefit of [ADEQ] and the state"); § 49-158(B) (same). ADEQ is also authorized by statute to enter a DEUR-restricted property to ensure the landowner is abiding by the use restriction. A.R.S. § 49-158(I).

The 2004 DEUR is a restrictive covenant that imposes a burden on Moreland. And while the 2004 DEUR "limits the use of [Tract D] to non-residential use," even if this restriction could be considered a "benefit" to Moreland, it is not "intentional and direct," but merely incidental to its primary purpose of preventing Moreland from putting Tract D to residential use. (2004 DEUR at GOODYEAR00000004.) The Court is unaware of any caselaw that would support finding otherwise.[26] Because Moreland was not an intended beneficiary of the 2004 DEUR, its breach of implied covenant of good faith and fair dealing claim fails as a matter of law.

## III.    CONCLUSION

The evidence suggests that H&A did not comply with all of the provisions in the SAR/CAP both in connection with its sampling requirements and some of the depths of

---

[26] Moreland's reliance on *Zambrano v. M & RC II LLC*, 517 P.3d 1168 (Ariz. 2022), is misplaced. In *Zambrano*, the Arizona Supreme Court held that the implied warranty of workmanship and habitability "is enforceable by subsequent purchasers, despite a lack of contractual privity with the builder." 517 P.3d at 1174. The warranty guarantees that the builder-vendor "built the home in a workmanlike manner and that it is habitable," thereby protecting purchasers from latent defects in the home's construction. *Id.* Unlike the covenant of good faith and fair dealing, the warranty "is enforceable by subsequent purchasers" because it "arises from construction of the home itself." *Id.* (citation and internal quotations omitted). Further, the warranty is clearly intended to benefit of the home buyer, whereas the 2004 DEUR only "inures to the benefit" of ADEQ and the State of Arizona.

excavation. However, the evidence does not show that its calculation of the 95% UCL for the Operations Area was inaccurate. Nor has the evidence shown which of any of Synergy's 95% UCL calculations over Tract D reflect a correct 95% UCL prior to its remediation. Even if there were evidence that H&A's mistakes resulted in an erroneous 95% UCL and the representations of the 95% UCL in the 2004 DEUR were therefore inaccurate, Moreland would still be unable to obtain either CERCLA contribution or cost recovery because Moreland did not substantially comply with the NCP. And as explained above, Moreland does not have a claim for breach of contract based on the implied covenant of good faith and fair dealing.

**IT IS ORDERED** that judgment be entered in favor of Defendants Goodyear Tire & Rubber Company, and Goodyear Farms, Inc.

Dated this 27th day of July, 2023.

_____

Susan R. Bolton
United States District Judge